**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

GUY MITCHELL, )
)
    Plaintiff, )    CIVIL ACTION NO:
)
v. )    1:16-cv-00336-MLB
)
DIXIE TRANSPORT, INC., )
FELIX MILO DALEY, and GRANGE )
INDEMNITY INSURANCE COMPANY, )
)
    Defendants. )
_____)

**PLAINTIFF'S MOTIONS AND BRIEFS
ON ISSUES RAISED AT PRETRIAL HEARING**

Comes now, Plaintiff Guy Mitchell and hereby files this, his Motions and Briefs On Issues Raised At Pretrial Hearing, showing this Honorable Court as follows in these combined Motions and Briefs in Support:

On or about January 10, 2019, the parties met with the Court for a pretrial hearing, and the Court requested that Plaintiff brief several topics by January 17, 2019, which included (1) Why the Court should permit Dr. Chappuis' causation testimony over Defendants' objection, (2) What Plaintiff's intention is for use of the spoliation letter and other documents so the Court can better understand how to rule on admissibility, and (3) If Plaintiff anticipates a directed verdict on

employment issues, to brief the Court on these.  Included in section (1) herein is
Plaintiff's Motion to Exclude Defense Experts Dr. Martino and Dr. Jeffries.  There
were other issues raised at the pretrial hearing that are not addressed herein and
will be addressed separately.  Plaintiff has combine all issues raised into one
document for the Court's convenience. To the extent that any permissive page
limitation has been exceeded, the Plaintiff requests an exception to such limitation
herein.

## **Table of Contents:**

1.  Why the Court should permit Dr. Chappuis' causation testimony over
    Defendants' objection? And MOTION TO EXLUDE DEFENSE EXPERTS
    DRS. MARTINO AND JEFFRIES. .................................................... page 3

2.  What Plaintiff's intention is for use of the spoliation letter and other
    documents so the Court can better understand how to rule on admissibility
    ........................................................................................... page 20

3.  If Plaintiff anticipates a directed verdict on employment issues, to brief the
    Court on these. ................................................................. page 26

1.    **Why the Court should permit Dr. Chappuis' causation testimony over Defendants' objection? And MOTION TO EXLUDE DEFENSE EXPERTS DRS. MARTINO AND JEFFRIES.**

It is Plaintiff's position that a procedural analysis is appropriate first, which includes a Motion to Exclude Drs. Martino and Jeffries, followed by a substantive analysis.

A. **Procedural discussion**

On or about December 9, 2019, the Court entered an Order (by docket entry only) denying Defendants' 101 Motion to Exclude Testimony of James Chappius [sic], M.D. as untimely under Local Rule 26.2C and violative of the Court's order setting trial 97.  (*See* 12/09/19 Docket Entry.)  Defendants, in filing objections to deposition designations, Doc. 106, filed January 3, 2020, simply referenced Defendants' Motion to Exclude that was denied, and have back-doored that same motion into the Court's consideration.  It is Plaintiff's position that Defendants' objections to Dr. Chappuis' causation opinions be overruled due to them being untimely, and the matter having been ruled upon previously.

In the event that the Court is interested in entertaining motions to exclude testimony from experts at this stage, Plaintiff would request that the Court then entertain exclusion of both of Defendants' experts named, Dr. Martino and Dr. Jeffries, on the basis that Defendants have not provided adequate Fed. R. Civ.

Proc. 26(a)(2) reports, and have not provided meaningful availability to take the discovery depositions of either expert prior to the beginning of trial. Since December 19, 2019, only one date was given for the deposition of Dr. Martino, January 16, 2020, and that and January 21, 2020 for Dr. Jeffries. An unexpected onset of the flu caused Plaintiff's counsel to be able to proceed on January 16, 2020, and therefore Plaintiff has not had any meaningful ability to conduct such expert discovery. Dates for these depositions had been actively sought since November 19, 2019 (the date of the Order Denying Defendants' to Dismiss Grange and bifurcate).

What Plaintiff has received thus far regarding Defendants' experts include what is attached hereto as "Exhibit 1-A" and "Exhibit 1-B," what was provided for Dr. Martino and Dr. Jeffries, respectively. Fed. R. Civ. Proc. 26(a)(2)(B) provides:

> **(B)** Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

> > **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;
> > **(ii)** the facts or data considered by the witness in forming them;
> > **(iii)** any exhibits that will be used to summarize or support them;
> > **(iv)** the witness's qualifications, including a list of all

publications authored in the previous 10 years;
**(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
**(vi)** a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. Proc. 26(a)(2)(B)

"Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made … at least 90 days before the date set for trial or for the case to be ready for trial … ."  Fed. R. Civ. Proc. 26(a)(2)(D).

The difference regarding the type of witness that is required to offer a detailed report and one that is not was summarized succinctly by the Southern District of Florida:

Federal Rule of Civil Procedure 26(a)(2)(B) requires that a written report be prepared by a witness who is "retained or specially employed to provide testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. Proc. 26(a)(2)(B). By contrast, with respect to non-retained or "hybrid" witnesses, "who provide both fact testimony and opinion testimony based on their scientific, technical or other specialized knowledge," parties are required by Rule 26(a)(2)(C) to disclose "a summary of the facts and opinions to which the witness is expected to testify." *Ashkenazi v. S. Broward Hosp. Dist.*, No. 11-61403-CV, 2012 U.S. Dist. LEXIS 30692, 2012 WL 760824, at *1 (S.D. Fla. Mar. 8, 2012) (quoting Fed. R. Civ. Proc. 26(a)(2)(C)). The required Rule 26(a)(2)(C) "disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B).

Bach-Tuyet    Chau    v.    NCL    (Bah.)    Ltd.,    No.    16-21115-CIV

WILLIAMS/SIMONTON 2017 U.S. Dist. LEXIS 68330, at *8 (S.D. Fla. May 3, 2017). Regarding Dr. Chappuis, or any other of Mr. Mitchell's treating medical provider's requirement to provide a report under Rule 26(b)(2), there is none.

Dr. Martino's report failed to include any statement of compensation to be paid for the study and testimony in the case, as required under Rule 26(a)(2)(B)(vi), and the report reveals that Dr. Martino has reviewed the trial testimony of Dr. Chappuis in formulating his opinions, which are two grounds for the exclusion of Dr. Martino alone. While Dr. Martino's report, "Exhibit 1-A," was provided to Plaintiff's counsel in March of 2019, the documents provided on behalf of Dr. Jeffries attached as "Exhibit 1-B" was provided to Plaintiff on December 17, 2019. Both were submitted past the close of discovery, and following the parties' submission of the Consolidated Pre-trial Order.

Under the circumstances, if the Court is considering excluding any portions of testimony of Dr. Chappuis, then Dr. Martino and Dr. Jeffries should be excluded in their entirety based on late and inadequate disclosures under Rule 26(a)(1) alone. Plaintiff has not been able to provide a Daubert motion on these expert witnesses due to the inability to obtain their discovery depositions. If there is any chance that the Court will permit Drs. Martino or Jeffries to testify, Plaintiff would require a continuance from the current trial to ensure adequate time to depose them

in order to prepare Daubert challenges that have a high likelihood of success.  Dr.

Jeffries, for instance, is a known insurance defense witness that has been rejected

by courts for bias and invalid methodology, reliability or relevance:

> Jeffries testified that he has performed more than 2,000 film reviews
> in connection with personal injury legal cases during his career. [Cits.]
> Of those, he estimates that ninety-eight percent are for the defense.
> [Cits.] In all of those reviews, Jeffries has never found that a herniated
> disc was caused by an automobile collision. [Cits.] In fact, in all of the
> cases in which Jeffries has testified for the defense, he has only found
> an injury caused by an automobile collision one time. [Cits.] During
> his career, Jeffries has been paid more than $2 million by defendants
> in personal injury cases. [Cits.] In deciding the reliability of Jeffries'
> testimony in this case, the court should consider: (1) the amount of
> money being paid to Jeffries for his services; (2) the volume of cases
> in which he is retained by the defense; and (3) the fact that he has
> never found a herniated disc caused by an automobile collision and
> has testified to only one injury caused by an automobile collision.
> These facts strongly weigh against finding that Jeffries is independent
> in his analysis.

Ahler v. Cannon, 2011 Ga. State LEXIS 344, *13-14, attached hereto as "Exhibit

1-C." (citations omitted).

### B. Substantive discussion of Dr. Chappuis.

Dr. Chappuis' causation opinions should be permitted based upon Dr.

Chappuis' testimony being based upon reliable principles and methodology, and

him being qualified to render such opinions.

### (1) Statement of Facts

Dr. Chappuis is an orthopaedic surgeon.  (See Chappuis Depo, at p. 5, ll. 23-

25, attached hereto as "Exhibit 1-C.")  He graduated from the University of Toledo with a BS in Biology, and graduated from the Medical College of Ohio with a Medical Degree.  (Id., at p. 6, ll. 12-15.)  He completed a rotating surgical internship at Mercy Hospital in Toledo, a general surgery and orthopedic surgery residency at the University of Tennessee Capbell Clinic and an AO Spine fellowship in Germany with Professor Jorgans Harms. (Id., at p. 6, ll. 15-19.)  He's licensed to practice medicine in Georgia, Florida and Tennessee, and has been board certified by the American Board of Orthopedic Surgeons since 1989.  (Id., at p. 6, ll. 21-25.)

Dr. Chappuis has hospital privileges at Emory University Hospital Midtown and Atlanta Orthopedic Surgery Center.  (Id., at p. 7, ll. 1-3.) Dr. Chappuis is a clinical instructor at Georgia Regents University and a faculty member at the Parker H. Petit Institute for Bioengineering and Biosciences at Georgia Tech. (Id., at. P. 7, ll. 4-7.)

The medical problem for which Dr. Chappuis has rendered treatment to Mr. Mitchell is cervical disc herniation with associated neck pain. (Id., at p. 10, ll. 11-16.)  Dr. Chappuis testified regarding his understanding of mechanical-biological processes of injury:

> Q    Are you familiar with the mechanical processes as well as the biological processes at issue during any kind of motor vehicle

collision and how it can affect the spine?

A    Well, the study of biomechanics, I think, would cover that, what happens to the neck or the body in different types of settings, one being a motor vehicle accident.

But part of what we try to understand is a mechanism of injury when a patient sees us, whether it's a fall, a motor vehicle accident, an NFL player who's been hit from a certain side. So that's part of what biomechanics tries to understand, is mechanisms of injury.

(Id., at p. 11, ll. 2-15.)

Dr. Chappuis testified regarding the history he received from Mr. Mitchell

involved a rear-end collision which precipitated neck pain:

Q    Using your memory and the medical records, can you please go through your initial encounter with Mr. Mitchell and explain to the jury how he presented and what history was taken?

A    So his initial complaint was neck pain but also stated that he had some right -- pain on the back of the right shoulder.  As I mentioned earlier, he stated these symptoms began after a motor vehicle accident which occurred on 3/9/2014, where he stated he was a restrained driver of a minivan that was struck from behind by an 18-wheeler tractor trailer. He said he took hisself to the emergency room the next day, where he was treated and released, followed up with physical therapy. His complaints or symptoms at the time I saw him were, as I mentioned earlier, neck pain with some pain in the right -- back of the right shoulder, said  the pain was aggravated by moving or looking down, was alleviated with medications; also said he had headaches at least three days per week.

Q    Did you ask him if he had any previous neck injuries prior to the date of the collision?

A    Yes.

Q    And what was his response?

A    No.

Q    Is that something that you typically find relevant to your assessment of a patient?

A    Yes.

(Id., at p. 13, l. 10 – p. 14, l. 12.)

Dr. Chappuis testified regarding degenerative disc disease and how that impacted Mr. Mitchell regarding the cause of his injuries:

Q    Okay.  Is your understanding of what caused Mr. Mitchell to seek treatment from you a result of degenerative changes?

A    No.  Those sort of things were there for some -- a good period of time.  What I think resulted in him coming to see us was the disc herniations that occurred in conjunction with the degenerative changes.

Q    Okay.  Now, how does the degenerative changes work with the conjunction of a disc herniation?

A    Well, the first thing is when a spine gets degenerative, it's not as pliable or movable.  So when a given load X is presented to a degenerative spine, it's more likely to be injured than one that's not degenerative because it can't absorb the load quite as well. So in that case then if there is a given load, there's -- a disc herniation can result.  Of course, you can see it in nondegenerative segments also. But the degenerative segment is almost pre-exposed because it just doesn't move and absorb load as well as a nondegenerative segment.

(Id., at p. 21, l. 7 – p, 22, l. 3.)

Dr. Chappuis testified that his opinion was that the collision of March 9, 2014 caused the collision based upon the history that he had, and his understanding of the forces involved in the collision:

> Q    All right.  Now, as far as what caused Mr. Mitchell to have any kind of symp- -- symptomatic problems with his cervical spine, do you have an opinion of what that cause is?
>
> A    Well, unless there's a history that I don't know about, I would relate it to the motor vehicle accident that occurred on March 9th, 2014.
>
> Q    Okay.  And can you please explain why you would relate it to that motor vehicle collision?
>
> A    Well, I don't see where he's had any other symptoms or treatment for neck problems prior to this; and certainly the -- from what I understand of this accident, it was -- it was a force enough that  would -- that would create this type of a herniation.

(Id., at p. 22, ll. 4-17.)

Dr. Chappuis further explained that basis of his causation opinions, demonstrating a reliable methodology regarding the mechanic generally:

> Q    Okay.  Now, in general terms, can you explain how force can interact with the spine to cause damage –
>
> A    Well –
>
> Q    -- in something such as a motor vehicle collision?
>
> A    Right.  Well, when a force is involved with, you know, any part of the body, it's going to be absorbed somehow.  And then it absorbs in either -- creates a fracture, if it's a long bone; a contusion, which is

a muscular strain; herniation, if it's in the spine.  So the load somehow dissipates. And the question generally is how great is the load and where did the load focus, and what -- what consequences from that occurred.

(Id., at p. 22, l. 18 -  p. 23, l. 7.)

Further, Dr. Chappuis related his methodology reliably to Mr. Mitchell's case:

> Q    Okay.  So how would a motor vehicle collision have affected -- in terms of the physical forces involved, how would it have affected Mr. Mitchell's cervical spine?
>
> A    Well, from what I understand, it was a rear-end collision. So in that case there's a – a sort of a whiplash-type injury with, you know, forward flexion and then extension. Now, again, no one knows so many times on these what the position of the neck was at the time of impact. If it's turned to one side or the other, that can certainly affect the load.  But the whiplash, in and of itself-type injury, can cause herniations.

(Id., at p. 23, ll. 8-20.)

Dr. Chappuis' opinions regarding Mr. Mitchell's injuries are based on speculative science or guesswork, as the type of injury that Mr. Mitchell sustained in the 2014 collision is very common:

> Q    Is whiplash a common reason that neck injuries are sustained in patients?
>
> A    It is.  And it can result in everything as minimal as a muscular strain to a major herniation.
>
> Q    In other words, is this something – an unusual occurrence that has

-12-

happened with Mr. Mitchell, or is this a very common medically known type of a syndrome?

A    It's -- it's pretty common, especially in motor vehicle accidents where there's an impact from behind or the rear.

(Id., at p. 23, l. 21 – p. 24, l. 6.)

Dr. Chappuis has extensive experience working with thousands of patients that have suffered injuries like that of Mr. Mitchell over his career:

Q    All right.  How many patients do you think that you would have treated that have this kind of an injury over the course of your career, if you can estimate?

A    I guess I've been in practice 30 years now, so maybe 10 or 15 a month, so a hundred a year. Thousands at this point.

(Id., at p. 24, ll. 7-13.)

### (2) *Discussion and Citation of Authority*

The Defendants have argued (via a motion currently denied) that Dr. Chappuis' opinion that the March 9, 2014 collision caused Mr. Mitchell to suffer a cervical disc herniation with associated neck pain is not qualified to render expert causation testimony, such testimony lacks reliability, and no scientific principles or methodology were identified. (*See* Defendants' Brief 101-1.)

As a preliminary note, the subject matter to which Dr. Chappuis is testifying, that a rear-end collision has caused a cervical herniation where there was no history of prior neck pain and ongoing neck pain with objective findings thereafter,

is not a nuanced theory – it is such a well established principle of causation that it may even be within the keen of a layman to understand with or without expert testimony. There is no evidence that Mr. Mitchell had any prior or subsequent neck or cervical spine injury. Mr. Mitchell, like most adults, had some degree of degenerative disease in his spine, that made him more susceptible to injury of the spine, but there is nothing in Mr. Mitchell's history that challenges the March 9, 2014 collision as the cause other than the rote, unfounded speculation offered by Defendants.

Defendants cite to no authority where a treating physician's causation testimony was excluded in a case like this – a rear-end collision causing a disc herniation. (*See* Defendants' Doc 101-1.) Instead they cite to very different inquires, that are not analogous to the inquiry currently before the Court, such as McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1243, 18 Fla. L. Weekly Fed. C 281 (11th Cir. 2005) (A toxic torts products liability action where four plaintiff contended they suffered strokes due to the toxicity of an unreasonably dangerous diet drug, the court found problems with the causation methodology of a pharmacist expert and neurologist expert offered by the plaintiffs.).[1]

---

[1] McClain's analysis is highly distinguishable from the case at bar. While the issue before the Court involves Dr. Chappuis' opinion that a motor vehicle collision caused a neck injury, the McClain Court involved highly speculative

In stark comparison to Defendants' citations, courts that have taken up challenges to a treating physician's testimony regarding a motor vehicle collision being the cause of a plaintiff's injuries based on history and examination, those courts have found such testimony admissible.  *See, e.g.,* Majors v. Owens, 2015 UT App 306, ¶ 1, 365 P.3d 165, 166 (2015) (treating physician's opinions were sufficiently reliable; testified that at least some of plaintiffs' symptoms were caused by the motor vehicle collision; methodology involved personally examining plaintiffs, reviewing imaging studies, and was consistent with the methodology any treating physician would employ; sufficient data to support the physicians' opinions on causation; physicians were justified in relying on plaintiffs' statements, and the physicians did more than establish a chronological relationship between plaintiffs' injuries and the collision, and their testimony would not allow the jury to speculate as to causation.)

---

science in toxic tort cases subject to greater scrutiny on many levels: "When analyzing an expert's methodology in toxic tort cases, the court should pay careful attention to the expert's testimony about the dose-response relationship. The dose-response relationship is "[a] relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change -- either an increase or decrease -- in risk of disease." [Cits]. The expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology" McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1241-42, 18 Fla. L. Weekly Fed. C 281 (11th Cir. 2005)

Fed. R. Evid. 702 provides the flowing:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)**    the testimony is based on sufficient facts or data;

**(c)**    the testimony is the product of reliable principles and methods; and

**(d)**    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702

> **(a)**    **Dr. Chappuis satisfies Fed. R. Evid. 702(a), the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.**

Dr. Chappuis' testimony satisfies (a) because, as Plaintiff's treating physician, Dr. Chappuis has scientific, technical and specialized knowledge that will help the trier of fact to understand evidence about Plaintiff's injuries and their causation, which are facts at issue. He is a board certified orthopedic surgeon that currently teaches Bioengineering and Biosciences at Georgia Tech. (*See* Chappuis Depo, "Exhibit 1-D, at. P. 6, l. 12 – p. 7, l. 7.) He has specialized understanding of the mechanical processes and biological processes at issue during a motor vehicle collision and how it can effect the spine. (Id., at p. 11, ll. 2-15.) Dr. Chappuis has extensive experience working with thousands of patients that have suffered injuries

like that of Mr. Mitchell over his career. (<u>Id.</u>, at p. 24, ll. 7-13.)

**(b)    Dr. Chappuis satisfies Fed. R. Evid. 702(b), the testimony is based on sufficient facts or data.**

Dr. Chappuis satisfies (b), that his testimony is based on sufficient facts or data, because he has reviewed all of the relevant history that is involved in this case, and has treated Mr. Mitchell numerous times.  He testified regarding this history he received from Mr. Mitchell involving a rear-end collision which precipitated his neck pain.  (<u>Id.</u>, at p. 13, l. 10 – p. 14, l. 12.)

> [H]e stated these symptoms began after a motor vehicle accident which occurred on 3/9/2014, where he stated he was a restrained driver of a minivan that was struck from behind by an 18-wheeler tractor trailer. He said he took hisself to the emergency room the next day, where he was treated and released, followed up with physical therapy. His complaints or symptoms at the time I saw him were, as I mentioned earlier, neck pain with some pain in the right -- back of the right shoulder, said  the pain was aggravated by moving or looking down, was alleviated with medications; also said he had headaches at least three days per week.
>
> Q    Did you ask him if he had any previous neck injuries prior to the date of the collision?
>
> A    Yes.
>
> Q    And what was his response?
>
> A    No.
>
> Q    Is that something that you typically find relevant to your assessment of a patient?

A    Yes.

(Id., at p. 13, l. 10 – p. 14, l. 12.)

Dr. Chappuis testified about other conditions Mr. Mitchell had, and analyzed how those conditions effected Mr. Mitchell and the cause of his neck injuries, specifically degenerative disc disease.  (Id., at p. 21, l. 7 – p, 22, l. 3.)

It is important to note that Defendants have provided no information to the Court, and Plaintiff is aware of none, that would cause Dr. Chappuis' opinions to be based upon insufficient facts or data.  Stating that certain past medical records were not reviewed by Dr. Chappuis is irrelevant if those medical records do not contain information that would be relevant to Dr. Chappuis' opinions.

That Dr. Chappuis hasn't reviewed all of the medical records obtained in this case establishes nothing more than the fact that Dr. Chappuis hasn't been retained my the Plaintiff as an expert witness – he is Plaintiff's treating physician that has expert opinions. To give any credence to Defendants' arguments – that Dr. Chappuis doesn't have sufficient facts or data based on not having reviewed all of the medical records that are related to Mr. Mitchell – would prevent causation testimony from any treating physician from ever being admissible, which is an absurd result.  If there are facts or data that are relevant that Dr. Chappuis was missing, and which would have an impact on Dr. Chappuis' opinions, or the

Court's analysis, the burden was on Defendants to provide such relevant facts or data, and no such showing has been made. Dr. Chappuis' testimony is based upon what the record supports, and the Court should not entertain specious arguments based on conjecture and without substance, as the Defendants have provided.

### (c)    Dr. Chappuis satisfies Fed. R. Evid. 702(c), the testimony is the product of reliable principles and methods.

Dr. Chappuis' opinion that a motor vehicle rear end collision caused Mr. Mitchell to suffer a whip-lash injury which herniated a disc in his cervical spine was based on well-reasoned and reliable principles and methods. As stated *supra*, Dr. Chappuis first obtained Mr. Mitchell's history regarding the collision, pain onset, and treated Mr. Mitchell extensively for his injuries. Dr. Chappuis' opinions regarding Mr. Mitchell's injuries are based on speculative science or guesswork, as the type of injury that Mr. Mitchell sustained in the 2014 collision is very common. (Id., at p. 23, l. 21 – p. 24, l. 6.) Dr. Chappuis has extensive experience working with thousands of patients that have suffered injuries like that of Mr. Mitchell over his career. (Id., at p. 24, ll. 7-13.)   Further, no evidence has been produced to suggest that there is anything unreliable about Dr. Chappuis' opinions on causation – not one piece of evidence produced by Defendants that points to a different cause of injury.

### (d)    Dr. Chappuis satisfies Fed. R. Evid. 702(d), the expert has

**reliably applied the principles and methods to the facts of the case.**

Dr. Chappuis testified that his opinion was that the collision of March 9, 2014 caused the collision based upon the history that he had, and his understanding of the forces involved in the collision. (Id., at p. 22, ll. 4-17.) Dr. Chappuis further explained that basis of his causation opinions, demonstrating a reliable methodology regarding the mechanic generally. (Id., at p. 22, l. 18 -  p. 23, l. 7.) Further, Dr. Chappuis related his methodology reliably to Mr. Mitchell's case. (Id., at p. 23, ll. 8-20.)   Dr. Chappuis considered all other known factors, such as degenerative disc disease, and incorporated all relevant data into his opinions.

Dr. Chappuis' opinions on causation are admissible under Fed. R. Evid. 702 and the Court should therefore overrule any objection to the same by Defendants.

2.    **What Plaintiff's intention is for use of the spoliation letter and other documents so the Court can better understand how to rule on admissibility**

On or about May 30, 2014, Plaintiff, via law firm Montlick & Associates, send a Notice of Potential Litigation and Request for Preservation of Evidence Letter to Defendant Dixie Transport, Inc. ("Dixie"), requesting numerous things be maintained and preserved, such as daily logs, inspection reports, maintenance records for six months preceding the accident, on-board device data, etc., and providing the authority of O.C.G.A. § 24-4-22, Chapman v. Auto Owners

<u>Insurance Company</u>, 220 Ga. App. 539, 469 S.E. 2d 783 (1996) and/or <u>R.A. Siegal</u>

<u>Co. v. Bowen</u>, 246 Ga App. 177, 539 S.E. 2d 873 (2000). (*See* May 30, 2012

Litigation Hold Letter, a copy of which is attached hereto as "<u>Exhibit 2-A</u>.")

Defendant Dixie acknowledged receiving that letter.  (*See* 12/14/17 Jimmy

Brown Depo, attached hereto as "<u>Exhibit 2-B</u>," at p. 18, ll. 3-11.) Jimmy Brown

testified that he was the owner of Dixie.  (<u>Id.</u>, at p. 7, ll. 1-3.)  Mr. Brown testified

that, despite having received the Litigation Preservation Letter, they destroyed all

the log records that were being requested:

> Q.    Okay. And the reason why I'm asking you is this: There's a
> bunch of documents that I have asked for that are covered in that
> which you and I may have disagreement on it, but that letter says you
> should have kept aside. And what I've asked for here -- for example,
> I've asked for Mr. Daley's logs. And I never got any.
>
> A.    You ain't going to get them.
>
> Q.    Because they were destroyed?
>
> A.    We purged them. We purge the logs every six months. And you
> know why we do that? Because when the DOT ever comes in there,
> they can go back as long as you've got logs, and we don't need that.
> The requirement in the books says six months. And that's -- we get rid
> of them.
>
> Q.    But this letter here which you received asked you to keep them
> aside for longer. And I just want to know if they still exist.
>
> A.    They do not exist.

(<u>Id.</u>, at p. 19, ll. 2-20.)

As for maintenance records for the truck, which had not been produced at the time of the deposition, Mr. Brown said he would get those to Plaintiff's counsel. (<u>Id.</u>, at p. 19, l. 23 – p. 20, l. 19.)

Thereafter, Defendants produced through to Plaintiff the an "Annual Inspection Report" dated 1-2-14 that purported to show a perfect maintenance record for the vehicle at issue, along with five "Repair Order" documents showing a variety of equipment checks that all resulted in "ok." (*See* Vehicle Maintenance Records, attached hereto as "<u>Exhibit 2-C</u>.") However, the Annual Vehicle Inspection Report purported to be from 2014 was clearly not made in 2014, because it was completed on a form with a 2016 copyright. (<u>Id.</u>)

The accident at issue occurred on March 9, 2014, and it is Plaintiff's contention that Defendants' truck did not have appropriate braking ability, and was therefore unsafe, due to (1) Daly not being able to brake sufficiently to avoid the collision, and (2) skid marks at the scene of the collision showing a failure of proper anti-lock brakes.  Plaintiff believes that he would have more evidence of Defendants' unsafe vehicle and defective brakes if Defendants provided the real maintenance records rather than providing the falsified documents that they did.

Three months after the collision with Plaintiff, on June 11, 2014, during a Level-I full inspection, Officer Michael Smith of the Georgia Department of Public

Safety found that the truck at issue had, *inter alia*, violation of the following

FMCSA code sections regarding brakes:

1    396.3(a)(1) -  BRAKES OUT OF SERVICE: defective brakes is equal to or
greater than 20 percent- Front left brake has fluid on it and no brake
chamber on the right front drive;

2    393.48(a) - Inoperative/defective brakes- front left brake is saturated with
power steering fluid;

3    393.40 - Inadequate brake system on a CMV- there is no brake chamber on
the right front drive axle; lines have been capped;

4    393.45 - Brake Tubing and Hose Adequacy – Connections to Power Unit –
red air line from the CMV has rubber hose clamps instead of compressed
fittings;

5    393.45 - Brake Tubing and Hose Adequacy – Connections to Power unit- air
hoses under the rear of the trailer have rubber hose clamps instead of
compressed fitting;

6    393.48(a) - Inoperative/defective brakes – the right rear trailer brake
inoperative – no movement with the adjusters; and

7    392.2 & 40-8-7 - Operating unsafe vehicle – see above violations.

(*See* 6/11/14 Driver/Vehicle Examination Report, attached hereto as "Exhibit 2-

D.")

With evidence of fraudulent maintenance records prior to the collision at

issue showing a vehicle with no maintenance problems, and then a full inspection

three months after the collision showing such massive braking violations that the

violations included the operation of an unsafe vehicle, it is untenable to content

that the truck at issue did not have some braking issue at the time of the collision that caused or contributed to the collision.

Driver/Vehicle Examination Report was done on the date of the collision at issue, 3/9/14, but that was a "Level II –Walk Around" that did not inspect brakes or anything other than the outside of the truck.  (*See* 3/9/14 Driver/Vehicle Examination Report, attached hereto as "Exhibit 2-E.")

Therefore, it is Plaintiff's position that each of the documents referenced in this section is admissible and be used through the trial to establish both that the unsafe condition of the truck was a cause of the collision, that Defendants have acted in bad faith, and supports recklessness, conscious indifference to the consequences of their actions, attorney's fees and punitive damages.

Plaintiff also requests that a spoliation of evidence charge be read to the jury. "To remedy the prejudice resulting from the spoliation of evidence, a trial court may (1) charge the jury that spoliation of evidence creates the rebuttable presumption that the evidence would have been harmful to the spoliator; (2) dismiss the case; or (3) exclude testimony about the evidence." R.A. Siegel Co. v. Bowen, 246 Ga. App. 177, 180, 539 S.E.2d 873, 877 (2000).

There is enormous practical importance in clearly falsified maintenance records having been provided to Plaintiff because it deprived the Plaintiff the

ability to have direct evidence of the unsafe nature of the vehicle at issue, and

therefore was highly prejudicial to Plaintiff.  Defendants have acted in flagrant bad

faith, vexatiously, wantonly, and for oppressive reasons.

> Spoliation refers to the "destruction or significant alteration of evidence, or the failure to preserve property for another's use in pending or reasonably foreseeable litigation." Graff v. Baja Marine Corp., 310 Fed.Appx. 298, 301 (11th Cir. 2009). "A court's power to impose sanctions for spoliation flows from its inherent power to manage its affairs and achieve an orderly and expeditious disposition of cases." Woodard v. Wal-Mart Stores E., LP, 801 F. Supp. 2d 1363, 1371 (M.D. Ga. 2011) (citing Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005)). "Sanctions function to prevent unfair prejudice to litigants and to ensure the integrity of the discovery process." Id. The Court has broad discretion in determining whether to award spoliation sanctions. Flury, 427 F.3d at 945.

Carter v. Butts Cty., No. 5:12-CV-209 (LJA), 2016 U.S. Dist. LEXIS 43098, at

*18-19 (M.D. Ga. Mar. 31, 2016) (original unaltered).

> Although the Eleventh Circuit has not prescribed "specific guidelines" for imposing spoliation sanctions, the court in Flury set forth the following factors for courts to consider: (1) whether the [non-offending party] was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the [offending party] acted in good or bad faith; and (5) the potential for abuse if [evidence] is not excluded [or included]. Id. Appropriate sanctions for spoliation may include: "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." Id. However, an adverse inference should not be drawn unless the circumstances surrounding the evidence's absence indicate bad faith. See Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir.1997) (finding that "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of

that evidence is predicated on bad faith"). "While this circuit does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1310 (11th Cir. 2009).

Id., at *19-20.

Therefore, Plaintiff respectfully requests that the evidence discussed herein be deemed admissible, that a spoliation charge be given, and that the Court impose any other appropriate sanctions.

3.  **If Plaintiff anticipates a directed verdict on employment issues, to brief the Court on these.**

Plaintiff anticipates that the evidence at trial will track the evidence provided in discovery, which supports a directed verdict on vicarious liability under strict employment under the Federal Motor Carrier Safety Regulations ("FMCSR").

The evidence obtained in discovery is clear that Defendant Daley was driving his truck en route to pick up a trailer for a delivery, which is directly within the course and scope of his employment with Dixie Transport, and for the benefit of Dixie Transport, as the entire business involves trucking.

Q:    … So let's come forward to March 9, 2014. Walk me through your day that day as best you can recall.

A:    Well, it was a Sunday, I know that, because I had to take the truck to pick up the trailer. Had a Monday morning delivery. The trailer was sitting in the lot. The truck I had taken home that weekend because it was a short weekend. I didn't get home until Saturday so I had to wait my time off to get back Sunday. So it was late Sunday afternoon. Got

on the interstate traveling south to Dixie.

(*See* Depo of Daley, at p. 28, ll. 12-17.)

> … He [Plaintiff] was down to just barely moving. In which case I laid on my brakes as hard as I could and did some skidding and some sliding but, you know, kept her straight and steady. Tapped into the back end of him.

(Id., at p. 30, ll. 1-5.)

> Q:    So you are on your way to pick up a load for which – would you have taken it that night or the next day?
> A:    No, that night. That night I left. It had to be delivered Monday morning.

(Id., at p. 32, ll. 3-6.)

Contrary to Defendants' assertion that Daley was not "under dispatch," he very clearly was on the way to pick up the trailer, and so was "under dispatch" in so far as doing work in furtherance of Dixie's business interests at the time. Id. Prior to leaving his home, Daley testified he performed the federally required pre-trip inspection of his tractor truck. (Id., at p. 20, ll. 15-21.)  Following the collision Daley received a citation for not logging his time when he left the house. (Id., at p. 65, ll. 1-6.)

Under the FMCSR, the term "employee" includes "a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle)." 49 C.F.R. § 390.5 (parenthetical in original). "Driver," in turn, means "any person who operates any commercial

motor vehicle." Id.

Where a truck driver was "[n]ot yet under dispatch, he was en route to Ocala for the purpose of picking up another load. The undisputed facts show that [the driver] was within his 'work pattern' and 'operational routine.'" Hot Shot Express v. Assicurazioni Generali, S.P.A., 252 Ga. App. 372, 375, 556 S.E.2d 475, 478 (2001). "It cannot be said that the trip from Hialeah to the freight terminal in Ocala was not related to Hot Shot's business. We find as a matter of law that the accident occurred while Darr was "in the business" of Hot Shot." Id. (underline emphasis added). Just as in Hot Shot Express, the evidence is that Daley was en route to pick up another load, and that Daley was within his "work pattern" and "operational routine" so that the accident occurred "in the business of Dixie as a matter of law.

The Sixth Circuit has also provided a helpful framework for analyzing the scope of employment for motor carrier truck drivers that drive home with a bobtail truck, and has found that truck drivers are using trucks in the business of the company when going to and from homes:

> To be within the scope of employment, an employee's conduct must be "of the same general nature as that authorized or incidental to the conduct authorized." Osborne v. Payne, 31 S.W.3d 911, 915 (Ky. 2000)(citing Wood v. Se. Greyhound Lines, 302 Ky. 110, 194 S.W.2d 81, 83 (Ky. Ct. App. 1946)). At the time of the accident, [the truck driver] was returning to his home after dropping off a loaded semi-

trailer at [the trucking company]'s yard and he was not scheduled to haul any loads for [the trucking company] for the next few days. Under general agency principles, outside the trucking industry, an employee like [the truck driver] commuting home from work is considered to be acting outside the scope of his employment. <u>Bisel v. United States</u>, No. 96-1500, 1997 U.S. App. LEXIS 19187, 1997 WL 415316, at *2 (6th Cir. 1997). However, "it is the nature of the trucking business that drivers will make deliveries and return home with no further load or assignment. These drivers are still, however, using the trucks in the business of the company." <u>Greenwell v. Boatwright</u>, 184 F.3d 490, 491-92 (6th Cir. 1999) (adopting the reasoning of <u>St. Paul Fire Ins. Co. v. Frankart</u>, 69 Ill. 2d 209, 370 N.E.2d 1058, 1062, 13 Ill. Dec. 31 (Ill. 1977)); *see also* <u>Republic W. Ins. Co. v. Williams</u>, 212 Fed. App'x 235 (4th Cir. 2007) (holding a carrier-lessee liable for damages of an owner-operator driver who was in an accident while driving his vehicle from his home to the freight yard where he was intending to pick up a load).

[The tucking company] does not argue that [the truck driver] bobtailed home without permission or that he should have left his semi-tractor at [the trucking company]'s yard; it seems understood between the parties that [the truck driver] usually parked the semi-tractor at his home. Construing the evidence in the light most favorable to [the injured plaintiff], the non-moving party, [the truck driver]'s home was the termination point of the journey he made on [the trucking company]'s behalf and he was still furthering [the trucking company]'s trucking business until he reached there. *See* <u>Grimes v. Nationwide Mut. Ins. Co.</u>, 705 S.W.2d 926, 931 (Ky. Ct. App. 1985) (noting that if the driver had been making a trip for the carrier company, "it might be reasonable to conclude that [he] was using his truck in the business [of the carrier] on his return" trip, even if the driver was bobtailing).

<u>Bays v. Summitt Trucking, LLC</u>, 691 F. Supp. 2d 725, 732 (W.D. Ky. 2010).

Just like in <u>Bays</u>, Daley drove the bobtail truck home with the permission of

Dixie, as stated by Defendants: "He was using the truck with Dixie's permission to

return home for rest and to sleep before his next dispatch after having completed his prior dispatch." (Defendant's Brief, Doc. 84-1, at p. 29.)

It is noteworthy that the "statutory employment" doctrine applies for any leased truck, with automatic vicarious liability: "The language of 49 CFR § 376.12 (c) (1) and earlier regulations to the same effect have been interpreted to impose vicarious liability on the motor carrier, regardless of agency relationships, for the negligent operation of vehicles leased and operated under its certificate." PN Express, Inc. v. Zegel, 304 Ga. App. 672, 676 (2010) ("The case before us [] was brought by members of the general public 'for whose benefit motor carrier regulations are in place'[, and therefore t]he doctrine of statutory employment is applicable here, and the trial court did not err in giving the challenged instruction to the jury.")

As in Pn Express, Inc. v. Zegel, the present action is brought by a member of the public that was injured by a motor carrier "for whose benefit motor carrier regulations are in place," and therefore the statute of statutory employment should properly flow to trucks owned and operated by motor carriers. "Here, there is no question of coverage, because Dixie did not lease this truck from Daley or someone else. It was a truck that Dixie owned and listed under the subject policy." (Defendants' Brief, Doc. 84-1, p. 28.) The same public safety analysis applies here.

It is interesting to note that opposing counsel has been on the exact opposite side of this argument previously, having argued on behalf of Grange, that a driver was a "strict employee" of a company under FMCSR (19 CFR § 390.1 et seq.), despite the driver operating his personal Honda Civic at the time. Grange Indem. Ins. Co. v. BeavEx, Inc., 342 Ga. App. 601, 603-04, 804 S.E.2d 173, 175-76 (2017) (Court rejected that theory under such facts).

Therefore, Plaintiff anticipates moving for directed verdict on the issue of vicarious liability upon completion of evidence at trial.  It is worth noting, however, that liability coverage by Grange appears to cover the incident whether or not Daly is considered to be operating as an employee of Dixie at the time. *See* Hot Shot Express, 252 Ga. App. at 375, 556 S.E.2d 478-79 (finding that trucking policy covered accident because driver was en route to find another dispatch and thus engaged in trucking business).

## I.    CONCLUSION

For the reasons discussed herein, *supra*, Plaintiff Respectfully Requests that this Honorable Court rule that Dr. Chappuis' causation testimony is admissible, that Drs. Martino and Jeffries are to be excluded, that evidence of Defendants false maintenance records, as well as subsequent violation for brake disrepair are admissible and a spoliation charge is warranted, and that Dixie was acting within

the course and scope of his employment with Dixie at the time of the collision.

Respectfully Submitted, this 17th day of January, 2020.

The Law Firm of Leipow & Associates, P.C.

/s/ *Kevin A. Leipow*
Kevin A. Leipow, Esq.
235 Peachtree Street, N.E.    Georgia State Bar No.: 300163
North Tower, Suite 400    *Counsel for Plaintiff*
Atlanta, GA 30303
P: 404.581.3642; F: 404.506.9432
kal@leipowlaw.com

## II.    CERTIFICATION OF PAGE AND TYPE

In accordance with Civil Local Rules 5.1C and 7.1D, I hereby certify that this document has been prepared in 14 point, Times New Roman font.

/s/ *Kevin A. Leipow*
**Kevin A. Leipow, Esq.**
Georgia Bar No. 300163

## III.    CERTIFICATE OF SERVICE

This is to certify that a copy of this, **PLAINTIFF'S MOTIONS AND BRIEFS ON ISSUES RAISED AT PRETRIAL HEARING,** was served upon all appropriate parties by causing a copy to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

William Emery Gray II
Law Office of William E. (Bo) Gray II
3700 Crestwood Parkway, NW, Suite 185
Duluth, GA 30096
grayw@grangeinsurance.com

This 17th day of January, 2020.

**Leipow and Associates, P.C.**

/s/ *Kevin A. Leipow*
**Kevin A. Leipow, Esq.**
Georgia Bar No. 300163
*Counsel for Plaintiff*

235 Peachtree St., NE, Suite 400
Atlanta, GA 30303
P: 404.581.3642; F: 404.506.9432
kal@leipowlaw.com