# EXHIBIT 1-A

# Joseph A. Martino, MD, FAAOS
## Board Certified Orthopaedic Surgeon
## Medical Expert

## MOTOR VEHICLE INJURIES & ORTHOPAEDIC TRAUMA

In the matter of:

Guy Mitchell v. Dixie Transport, Inc.,et al.
Civil Action No 1:16-cv-00336-MLB
United States District Court for the Northern District of Georgia

Prepared for:

Mr. William Gray, Esq
Senior Defense Attorney
Law Office of Dan J Colley
3700 Crestwood Parkway, Ste 185
Duluth, GA 30096-7168

Prepared by:

Joseph A. Martino, MD, FAAOS, FACS
3535 Peachtree Rd NE
Ste 520-337
Atlanta, GA  30326

FEBRUARY 28, 2019

      

# <u>TABLE OF CONTENTS</u>

Introduction                                                                                      1

Medical Records & Documents Reviewed                                              3

Summary of Imaging Studies Reviewed                                              6

Findings of Fact
       Police Report & Photos                                                         7
       Dr. Nemisha Trivedi at Locust Grove Family Medicine             7
       MedOne Urgent Care                                                          9
       Dr. Alda Ali at Christ Medical Center                                10
       Gulf Coast Spine Institute                                                 15
       Pediatric & Internal Medicine Specialists                         19
       Dr. Brian Carter at Orthopaedic Center                             20
       Dr. Max Boone                                                                 21
       Dr. Jason Banks, Spine & Neuro Center                            21
       Johnson & Hayes Physical Therapy                                  23
       Dr. Anjaneyulu Alipati at Huntsville Hospital Neurological Associates     24
       Spine Center Atlanta                                                        25
       Dr. Mowery at American Family Care                                28
       Rehabilitation & Neurological Services                            29

Images Reviewed
       MRI Cervical Spine: January 30, 2015                             32
       MRI Brain: March 15, 2015                                            32
       Flexion Extension C Spine X-rays: March 16, 2016.          33
       MRI Cervical Spine, Upright: March 18, 2016                   33
       MRI Brian w/ and w/out contrast: May 16, 2016             33
       Esophagram: February 21, 2017                                     33
       Carotid Ultrasound: February 21, 2017                          33
       MRI Brain w/ and w/out contrast: February 26, 2018     33
       MRA Brain w/ contrast: July 9, 2018                             33
       X-rays Cervical Spine: August 17, 2016                        33
       MRI Cervical Spine: December 29, 2016                        33

Expert Opinions                                                    34

Summary                                                           49

References                                                        54

Appendix:

A.          AAOS Standards of Professionalism.
B.          AAOS Expert Witness Affirmation Statement.
C.          Curriculum Vitae.
D.          Photos: Examples of MVA's.
E.          Photos: Vehicles involved in this specific case.
F.          Photos: A portion of the Images reviewed in this case.
G.          Findings and Report: Barry Jeffries, MD.
H.          Example: Neck & Upper Extremity Spine Exam.
I.          Illustration: Suboccipital muscles.
J.          Photo: Basi-cervical model with key.
K.          Illustration: Cervico-occipital headache distribution.
L.          Illustration: Gradations of cervical disk degeneration.
M.          Illustration: Thickened, calcified degenerative Ligamentum Flavum.
N.          Illustration: Anatomy with surgical exposure of cervical disc herniation.
O.          Review Article: *Minor Traumatic Brain Injury: A Primer for Orthopaedic Surgeons*.
P.          Clinical Form: Acute Concussion Evaluation (ACE): Colloboration with CDC.
Q.          Clinical Form: SCAT3 concussion assessment tool.
R.          Clinical Form: NFL Concussion assessment instrument.
S.          Photo: X-ray example of accessory cervical ribs.
T.          Photo: X-ray example of fibrous dysplasia of the skull: clivus.
U.          Medical Expert Testimony Case List for the past four years.

Joseph A. Martino, MD FAAOS          Medical case review:          Civil Action No. 1:16
January 29, 2019                  Guy Mitchell v. Dixie Transport          CV-00336-MLB
                                         Inc.,et al.          United States District Court
                                                          The Northern District of GA

## **INTRODUCTION**

This report is a medical review, prepared by myself, regarding Mr. Guy Mitchell. I am a Board Certified Orthopaedic Surgeon Licensed in the States of Alabama, Florida, Georgia and New York. I graduated from Cornell University (Ithaca, NY) in 1984, where I received a Bachelor of Science Degree with Honors in Neurobiology and Behavior. I received my Medical Degree in 1988 from Albany Medical College (Albany, NY) and successfully completed my Internship and Residency training at Albany Medical Center Hospital (Albany, NY), in the medical specialty of Orthopaedic Surgery, in 1993. I completed my Fellowship training in Sports Medicine in 1994 at the Hughston Clinic (Columbus, GA) and was awarded my Fellowship Certification by the American Orthopaedic Society for Sports Medicine (AOSSM) in 1994.

In addition to being Board certified by the American Board of Orthopaedic Surgeons, I am also Board Certified by the National Board of Physicians and Surgeons. I am a Fellow of the American Academy of Orthopaedic Surgeons, as well as the American College of Surgeons. I am also a member of AO Trauma of North America, a division of The AO Foundation, an international association for the study of internal fixation and Orthopaedic injuries based in Davos, Switzerland.

In addition, I am a Certified Medical Examiner through the Federal Motor Carrier Safety Administration, a division of the Federal Department of Transportation, and a member of their National Registry of Certified Medical Examiners. I hold active memberships with the North American Spine Society, the Spine Intervention Society, the Interventional Orthopedics Foundation, the Georgia Chapter of the American College of Surgeons, AO Trauma of North America, the Biological Orthopaedic Society, the American Medical Association and The Hughston Society.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

I have over twenty five years of medical experience evaluating and treating a broad and diverse variety of Orthopaedic injuries and conditions, and participate annually in continuing medical education activities in order to maintain and expand my knowledge, skills and training within the fields of Orthopaedics, Sports Medicine and Traumatology.

I am currently active in the clinical specialty of Orthopaedic Surgery, specializing in treating Orthopaedic injuries sustained as a consequence of motor vehicle trauma. In addition, I have over twenty five years of experience as a medical expert in the specialty of Orthopaedic Surgery, and have extensive experience applying scientific knowledge and methods in regard to reviewing medical records of patients who have suffered Orthopaedic injuries associated with trauma. (See Appendix).

In summary, I am qualified as a medical expert in this matter based on my knowledge, skills, training, and education as a Board Certified Orthopaedic Surgeon with over twenty five years of experience diagnosing and treating patients with a broad variety of injuries caused by motor vehicle related trauma. (See Appendix).

This report is based on my personal review of the medical records and available imaging studies provided to me for the subject, Mr. Guy Mitchell, spanning from January 17, 2011 up to June 24th, 2018.  These records were provided to me through the offices of Mr. William Gray, Esq., which were reported as being a complete representation of all of the available medical records obtained through the Discovery process pertaining to the civil litigation between the two parties: Guy Mitchell v. Dixie Transport Inc.,et al.

In addition, I was presented with additional documents which pertain to this civil action for review. These additional documents include the following: two (2) certified Depositions (transcript of Plaintiff's Deposition and video of Dr. Chappuis's Deposition with transcript),  documents pertaining to the Plaintiff's responses to interrogatories and production of documents, as well as documents relating to prior litigation between the

Joseph A. Martino, MD FAAOS          Medical case review:                    Civil Action No. 1:16
January 29, 2019                <u>Guy Mitchell v. Dixie Transport</u>              CV-00336-MLB
                                        <u>Inc.,et al.</u>                    United States District Court
                                                                        The Northern District of GA

parties in Gordon County Magistrate Court.  In addition, I was provided a report created

by Dr. Barry Jeffries, another medical expert involved in this civil action. The following is

an itemized list of all of the twenty nine (29) records and eleven (11) imaging studies

presented to me and which I have personally reviewed.


## <u>MEDICAL RECORDS & DOCUMENTS REVIEWED</u>

1. State of Georgia Traffic Crash Report: Georgia State Patrol. US Interstate 75,
   Whitfield County GA.  Reporting Officer: Trooper C.D. Ratcliff, #344. March 9, 2014.

2. Photographs of vehicles taken by the Plaintiff following the accident (21): Kenworth
   truck and Chevy Astro Van. March 9, 2014.

3. Locust Grove Family Medicine records, Locust Grove, GA.  Nemisha Trivedi, MD:
   Primary Care.  January 17, 2011 through March 21, 2014.

4. MedOne Urgent Care records with cervical x-ray report, Ocala FL.  Brandy Wiley,
   PA-C: Urgent Care.  March 29, 2014.

5. Christ Medical Center records, Crystal River, FL.  Adla Adi, MD:  Primary Care.  April
   10, 2014 through January 30, 2014.

6. County Radiology report, Homosassa, FL.  Mike Herron, MD:  Radiologist.
   February 1, 2015.

7. Gulf Coast Spine Institute records, Hernando, FL.  Mitchell Taylor PA-C, supervised
   by James Ronzo, D.O. : Orthopaedic Surgeon. Includes cervical X-rays, cervical
   MRI and Physical Therapy reports. February 17, 2015 through April 17, 2015.

8. Pediatric & Internal Medicine Specialists records, Lecanto, FL.  Brenda Hayden-
   Brown, ARNP supervised by Dacelin St. Martin, MD:  Primary Care.  May 5, 2015.

Joseph A. Martino, MD FAAOS     Medical case review:     Civil Action No. 1:16
January 29, 2019     <u>Guy Mitchell v. Dixie Transport</u>     CV-00336-MLB
                                    <u>Inc.,et al.</u>     United States District Court
                                                               The Northern District of GA

## <u>MEDICAL RECORDS & DOCUMENTS REVIEWED</u> (continued)

9.   The Orthopaedic Center records, Huntsville, AL. Brian Carter, MD: Physical
     Medicine and Rehabilitation. January 14, 2016 through February 11, 2016.

10.  Max R. Boone, MD records, Athens, AL. Max Boone, MD: Primary Care.
     February 24, 2016 through March 22, 2016.

11.  BioImaging: 2 MRI's of the brain: w/ and w/out contrast; report and images,
     Huntsville, AL. Gregory Gum, MD /Tangayi Githu, MD: Radiologists.
     March 15, 2016 and May 16, 2016.

12.  Spine & Neuro Center records and images, Huntsville, AL. Jason Banks, MD:
     Neurosurgeon. March 16, 2016.

13.  Next Generation Imaging: MRI-Cervical with reports and images, Nashville, TN.
     Barry Allen, MD: Radiologist. March 18, 2016.

14.  Johnson & Hayes Physical Therapists records: 16 visits, Madison, AL.
     Megan Miller, DPT: Physical Therapist. March 23, 2016 through October 5, 2016.

15.  Huntsville Hospital Neurological Associates: records including neurology
     consultation, EEG and EMG/NCV studies, Huntsville, AL. Anjaneyulu Alipati, MD:
     Neurologist. July 20, 2016 through July 29, 2016.

16.  Huntsville Hospital EEG Department records, Huntsville, AL.
     Anjaneyulu Alipati, MD: Neurologist. July 27, 2016.

17.  Spine Center Atlanta records including MRI report, cervical x-rays, ESI and MBB;
     Atlanta GA. Gidget Black, NP and James Chappuis, MD: Orthopaedic Surgeon.
     August 17, 2016 through May 22, 2018.

18.  MRI report and images : Cervical spine. Spine Center of Atlanta. Calvin Barnes, MD:
     Radiologist. December 29, 2016.

Joseph A. Martino, MD FAAOS     Medical case review:     Civil Action No. 1:16
January 29, 2019     <u>Guy Mitchell v. Dixie Transport</u>     CV-00336-MLB
<u>Inc.,et al.</u>     United States District Court
The Northern District of GA

## <u>MEDICAL RECORDS & DOCUMENTS REVIEWED</u> (continued)

19. Athens Limestone Hospital: Radiology of Huntsville records: barium swallow and
carotid doppler studies, Athens, AL. Paul Fry, MD: Radiologist. February 21, 2017.

20. American Family Care records: Madison, AL.  David Mowery, MD, John Bowman,
MD, Nemil Shah, MD: Primary Care.  April 4, 2017 through June 4, 2018.

21. The Center of Imaging Excellence MRA brain report with images, Huntsville, AL.
James Mann, MD: Radiologist.  July 9, 2018.

22. Rehabilitation & Neurological Services records: Huntsville, AL.  Beliinda Savage-
Edwards MD: Neurologist and Laura Cambron, CRNP.

23. Plaintiff's Responses to Defendant Grange Indemnity Insurance Company's First
Request for Production of Documents: CV 1:16-cv-00336-AT. May 19, 2016.

24. Plaintiff's Responses to Defendant Grange Indemnity Insurance Company's First
Interrogatories: CV 1:16-cv-00336-AT. May 19, 2016.

25.  Medical Expert Opinion report; Barry Jeffries, MD: Radiologist. October, 18, 2018.

26.  Medical Timeline of Guy Mitchell.  Provided by Defense counsel.

27.  Case Report-Certified copy: Chief Magistrate Court, Gordon County, GA.
Case #14-1090CS Guy Mitchell v Dixie Transport et al. Leah Garmon, Civil Clerk.
Filed July 22, 2014.

28. Video Deposition and transcript, of James Chappuis, MD. October 19, 2018.

29. Transcript of video Deposition of Guy Mitchell.  December 13, 2017.

Joseph A. Martino, MD FAAOS      Medical case review:      Civil Action No. 1:16
January 29, 2019      <u>Guy Mitchell v. Dixie Transport</u>      CV-00336-MLB
     <u>Inc.,et al.</u>      United States District Court
     The Northern District of GA

## <u>Summary of Imaging Studies Reviewed</u>

1. MRI: Cervical spine. County Radiology, aka Sugar Mill Diagnostic Imaging; Homosassa, FL. Mike Herron, MD: Radiologist. January 30, 2015.

2. MRI: Brain w/out contrast. BioImaging, Huntsville, AL. Gregory Gum, MD. March 15, 2016.

3. Xrays: Flexion-Extension cervical spine. Spine & Neuro Center, Huntsville, AL. Jason Banks, MD. March 16, 2016.

4. MRI: Cervical spine; upright imaging. Next Generation Imaging, Nashville, TN. Barry Allen, MD. March 18, 2016.

5. MRI: Brain w/ and w/out contrast. BioImaging, Huntsville, AL. Tangayi Githu, MD. May 16, 2016.

6. Barium swallow esophageal . Radiology of Huntsville: Athens, AL. Paul Fry, MD. February 21, 2017.

7. Carotid ultrasound study: Radiology of Huntsville, Athens, AL. Paul Fry, MD. February 21, 2017.

8. MRI: Brain w/ and w/out contrast. Outpatient Diagnostic Center. February 26, 2018.

9. MRA: Brain with contrast. The Center of Imaging Excellence, Huntsville, AL. James Mann, MD: Radiologist. July 9, 2018.

10. X-ray: Cervical spine 2 view. Spine Center of Atlanta. August 17, 2016.

11. MRI: Cervical spine. Spine Center of Atlanta. Calvin Barnes, MD. December 29, 2016.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

# **FINDINGS OF FACT**

## **Police Report and Photos**

1. On **March 9, 2014** a motor vehicle accident **(MVA)** involving the two parties, Guy Mitchell (Plaintiff) and Felix Milo Daley (Defendant) occurred on Interstate 75 in Whitfield County, Georgia.

2. According to the police report filed by Officer C.D. Ratcliff (GSP Badge# 344), the injury severity level was described as, *"NO INJURY (0)"* for both parties involved in the accident.

3. Officer Ratcliff also reported that the extent of damage to both vehicles was, *"MINOR DAMAGE"*. Both parties were able to drive their respective vehicles from the scene.

4. 21 photographs reportedly taken by the Plaintiff at the scene of the accident revealed minor damage to the front bumper of the Defendant's vehicle, a Kenworth truck.

5. Photos of the Plaintiff's Astro Van revealed minor damage to the base of the rear doors, but no observable damage to the door glass or bumper below the doors.

## **Locust Grove Family Medicine: Nemisha Trivedi, MD**

1. On **March 10, 2014,** one day after the MVA, Mr. Mitchell presented for the first recorded medical evaluation to his Primary Care Physician, Dr. Trevedi.

2. A total of six (6) visits were included in the records obtained from Dr. Trevedi which included four (4) prior visits and two visits following the March 9th, 2014 MVA.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

**Locust Grove Family Medicine: Nemisha Trivedi, MD** (continued)

3. Past medical history was significant for hypothyroidism, elevated serum cholesterol chronic sinusitis and eye surgery in 2005.  His occupation was reported as "*self employed - renovating houses".*

4. On **March 10, 2014** Mr. Mitchell presented to Dr. Trivedi with complaints of neck pain and a head ache. **He denied any numbness, weakness, pain radiating down his arms or legs, or any other neurological symptoms**.

5. Mr. Mitchell reported that, "*Yesterday he got rear-ended by a semi truck - was driving his van — restrained - got jerk(ed) - **did not go to ER** - neck pain started after coming to the motel room.* "

6. Dr. Trivedi's physical examination reported that he was, "*Well appearing, well nourished and **in no distress**"*. In addition, Dr. Trevedi reported that Mr. Mitchell was alert and oriented to person place and time. No report of head trauma.

7. **Physical examination** on **March 10, 2014** revealed that  Mr. Mitchell's neck was, "*Normal except right sided **muscle spasm".***  No other findings were reported, and no evidence of neurological or musculoskeletal injury was identified.

8. X-rays were not taken at the **March 10, 2014** visit to Dr. Trevedi.

9. Dr. Trivedi's diagnoses for Mr. Mitchell on **March 10, 2014** was *"Sprain/Strain of Neck" and "Cervicalgia"* (a generic term which simply means generalized neck pain).

10. Dr. Trivedi's treatment recommendation was two non-narcotic medications and advice for using a heating pad.

11. On **March 21, 2014** Mr. Mitchell returned to Dr. Trivedi for a follow up evaluation.

12. At that visit, Mr. Mitchell complained of "*left ear ringing, headache and left hand tingling and numbness",* as well as "*post-occipital neck pain*".

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## Locust Grove Family Medicine: Nemisha Trivedi, MD (continued)

13. Physical Examination on **March 21, 2014** was reported as follows:

    1. Well appearing in **no distress.** Mental status was **normal and oriented**.

    2. Ears were normal except tympanic membranes landmarks were obscured in
       both ears.

    3. *"Neck was normal except for spinal tenderness - lower cervical/occipital area."*

    4. Lungs were clear.

    5. "**Musculoskeletal exam** was **normal**: *normal range of motion, strength, tone for
       Mr. Mitchell's head, neck, spine, ribs, pelvis and all extremities"*.

    6. **Neurological examination** *was* **normal** *except for subjective numbness/ tingling
       both hands in the morning. Deep tendon reflexes were normal.*

14. On **March 21, 2014,** twelve **(12) days following the MVA**, Dr. Trivedi's reported
    that the "**Major Problem**" *was listed as* "**allergic rhinitis**" (sinuses) along with
    "*Cervicalgia*", and **"Tension Headaches"**.

15. Treatment for the diagnosis of allergic rhinitis was an intramuscular injection of a
    corticosteroid (Kenalog), Fiorcet was prescribed for the tension headache, and *"if
    needed will refer to physical therapy"*. Follow up recommended in two (2) weeks.
    Mr. Mitchell did not follow up or attend physical therapy. There were a total of two (2)
    visits with Dr. Trivedi following the MVA.

## MedOne Urgent Care: Brandy Wiley, PA

1. On **March 29, 2014**, eight days after being evaluated by Dr. Trivedi, Mr. Mitchell
   presented to Brandy Wiley PA-C with MedOne Urgent Care, located in Ocala
   Florida.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## MedOne Urgent Care: Brandy Wiley, PA (continued)

2. Mr. Mitchell's chief complaint was neck pain and a request for x-rays ordered by Dr.
   Trivedi to be done. Mr. Mitchell also complained of nasal congestion.

3. Physical examination revealed full range of motion of Mr. Mitchell's neck. Extremities
   showed full range of active motion without joint pain.

4. **Neurological examination** was "unremarkable" **(normal)**. No sensory or motor
   (muscle) deficits. Lungs were clear.  X-rays of the cervical spine were reported as
   "NAD": Normal (no acute disease).

5. **Diagnosis** was **"Whiplash"** and treatment was over the counter medications for
   cold symptoms, pain medication (Tramadol), heat and ice for the neck symptoms
   and recommendation for getting physical therapy, which the patient declined.

6. An **x-ray report** from this date of service **(3/29/2014)** found anatomical alignment of
   the cervical spine, normal vertebral height, no acute fracture or subluxation and no
   widening of the prevertebral soft tissues. There was evidence of **slight
   degenerative disc disease at C6-C7.** Films reported by Rubjit Negpal MD,
   Diagnostic Radiologist. These films were not available, but had been requested.

## Christ Medical Center: Alda Adi, MD

1. The next available medical record was twelve days later with Dr. Adi **on April 10,
   2014.** At that time, Mr. Mitchell presented with left sided chest pain and an episode
   of coughing up blood.

2. The patient did not have a fever, but reported having been diagnosed with
   pneumonia the prior week, and was taking antibiotics for the treatment.  No records
   of this prior treatment were available, but have been requested.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

### Christ Medical Center: Alda Adi, MD (continued)

3. On **April 10, 2014** Mr. Mitchell had **not reported any complaints of neck pain, extremity pain, numbness or headaches**. He was diagnosed with Pneumonia and treated with antibiotics.

4. On **July 14, 2014** Mr. Mitchell had his next medical evaluation with Dr. Adi for follow up of the pneumonia as well as management of hypothyroidism.

5. At that visit, **Mr. Mitchell denied headaches**, ear pain, chest pain, dizziness or shortness of breath. He did complain of fatigue and difficulty swallowing. **There was no record of any complaints of neck pain, arm pain, numbness or headaches.**

6. On **July 14th, 2014 the** physical examination by Dr. Adi revealed that Mr. Mitchell was in no acute distress, lungs were clear and that the **neurologic exam, including muscle and sensory testing, was normal**. **There was no record of any neck pain or tenderness on the examination.**

7. At that time, Dr. Adi diagnosed the patient with Hypothyroidism, Esophageal Reflux, Vitamin D Deficiency and Malaise/Fatigue. **There was no diagnosis of any neck or nerve injuries reported.**

8. On **July 22, 2014**, approximately **three (3) months following the MVA**, Mr. Mitchell presented to Dr. Adi for a routine follow up visit to review lab results pertaining to hypothyroidism, cholesterol.

9. Per Dr. Adi's notes at that visit, "*Mr. Mitchell **denied** shortness of breath, chest pain, palpitations **or any other complications**"*.

10. On **July 22, 2014** Mr. Mitchell was documented to have **denied** the following symptoms:

    1. **(denied) Neck pain.**

    2. **(denied) Headaches.**

Joseph A. Martino, MD FAAOS          Medical case review:              Civil Action No. 1:16
January 29, 2019          Guy Mitchell v. Dixie Transport                CV-00336-MLB
                                   Inc.,et al.               United States District Court
                                                             The Northern District of GA

### Christ Medical Center: Alda Adi, MD (continued)

*3.* **(denied) Memory loss.**

*4.* **(denied) Lightheadedness.**

*5.* **(denied) Numbness or tingling.**

*6.* **(denied) Lumbar pain.**

*7.* **(denied) Muscle aches.**

*11.* On that same date, **July 22, 2014**, Dr. Adi's Physical Examination reported that Mr.
     Mitchell was in **no acute distress**, his lungs were clear and that the **neurological
     examination was normal,** including muscle strength and sensory examination of
     the upper and lower extremities.  The **sole diagnosis** was listed as
     "*Hypothyroidism*".

*12.* **On January 27, 2015, six months later,** Mr. Mitchell presented again to Dr. Adi.

*13.* This was approximately **ten (10) months following the March 9th MVA**. The
     reason reported for this appointment with Dr. Adi was *"for a referral"* and *"chronic
     headaches"*. Mr. Mitchell also complained of a dull aching pain in his neck which
     precedes his headaches. **The headaches radiated from the base of his skull and
     neck region to his temples.** He also described hearing a swishing and whirling
     sound in his left ear when he lays down. **Mr. Mitchell denied cough, chest pains,
     dizziness, memory loss, lumbar pain**.

*14.* On **January 27, 2015** Dr. Adi performed a Physical Examination of Mr. Mitchell and
     documented the following:

     *1.* General appearance was **uncomfortable due to pain.**

     *2.* Ears, eyes, throat, neck and thyroid reported as **normal**.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## Christ Medical Center: Alda Adi, MD (continued)

   3. **Normal neurological examination**: motor strength normal for upper and lower
      extremities, sensory exam intact.

15. Impression was:

   1. Hypothyroidism.

   2. **Cervicalgia (neck pain).**

   3. Disturbance of skin sensation.

   4. Esophageal reflux.

   5. **Chronic pain syndrome.**

16. At that time, an MRI of the cervical spine was ordered, in addition to a Nerve
    Conduction test of Mr. Mitchell's upper extremities.

17. On **January 27, 2018** a **Nerve Conduction Study** was performed on Mr. Mitchell by
    Eihab Tawfik, MD at Christ Medical Center, Crystal River Florida. The results
    revealed that Mr. Mitchell demonstrated electrodiagnostic evidence of the following:

   1. **"Bilateral Carpal Tunnel Syndrome";** entrapment of the median nerve at the
      wrist.

   2. **"Bilateral Ulnar sensory nerve peripheral neuropathy** consistent with
      Guyon's Tunnel Syndrome" (wrist).

   3. **All other nerves** were reported as being **normal.**

   4. There was **no evidence of cervical radiculopathy**.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

**Christ Medical Center: Alda Adi, MD** (continued)

*18.* On **January 30, 2015** Mr. Mitchell had the **first MRI** of his cervical spine,
approximately **ten months following the MVA.** The study was done at Christ
Medical Center in Homosassa, Florida and was reviewed by Mike Herron, MD, a
Board Certified Radiologist.

*19.* The results of this MRI revealed the following findings as reported by Dr. Herron:

   *1.* The cervical vertebrae feature normal height and marrow signal.

   *2.* The spinal cord is normal in bulk and signals.

   *3.* **Hypertrophy of the ligamentum flavum** at the level C6-C7 which is
   encroaching into the spinal canal.

   *4.* **Multilevel degenerative findings** involving disc dehydration and facet arthritis
   throughout the cervical spine.

   *5.* At C6-C7 there is also a **central disc herniation** of approximately 2 mm which is
   contacting the thecal sac.

   *6.* At C7-T1 there is a **broad based disc herniation** of approximately 2 mm
   contacting the thecal sac with **facet joint hypertrophy**.

   *7.* **No vertebral fractures, annular tears of the cervical discs, or Modic
   changes of the vertebrae reported**.

   *8.* **Final Impression:** *"Multiple levels of **osteoarthritis** involving the facet joints.
   Apparent **spinal stenosis** with compression of the spinal cord appreciated at
   C6-C7"* due to **"hypertrophy of the ligamentum flavum".**

   *9.* There were no further records for Mr. Mitchell with Dr. Adi.

Joseph A. Martino, MD FAAOS       Medical case review:             Civil Action No. 1:16
January 29, 2019            Guy Mitchell v. Dixie Transport              CV-00336-MLB
                                    Inc.,et al.              United States District Court
                                                            The Northern District of GA

## Gulf Coast Spine Institute: Mitchell Taylor, PA

1. On **February 17, 2015** Mr. Mitchell was evaluated by Mitchell Taylor PA-C at The
   GulfCoast Spine Institute located in Hernando, Florida. The visit details were
   reviewed and approved by supervising provider James Ronzo, DO.

2. On **February 17, 2015** Mr. Mitchell completed a patient questionnaire for Gulf
   Coast Spine Institute.  Four of nine pages were present for review, with the
   additional five pages missing and which have been requested.

3. Mr. Mitchell's occupation was listed as "*Home Renovations*".  He was self referred
   through the Yellow Pages.

4. On **February 17, 2015**, Mr. Mitchell's complaints were listed as, *"neck pain with
   headaches"*, *"right leg numbness, and hand numbness"*. The duration of the pain
   was described as, *"varies, sometimes all day, then other times very vague, pain off
   & on."* Mr. Mitchell stated that he, "*Never had any neck pain, headaches or
   numbness before the crash*".

5. On that same visit on **February 17, 2015** Mr. Mitchell reported that since the MVA,
   ***"it had improved after the first 6 months"*** (since the MVA), but ***"reoccurred in
   October or November (2014) when he returned to work (remodeling houses)".***
   He also reported that the pain ***"comes and goes"***.

6. Sitting, lying down, sneezing rolling in bed, leaning forward or tilting head backward
   all were reported as aggravating factors.

7. Walking, standing and Advil made the pain better.

8. Mr. Mitchell also reported prior history of "*cosmetic eye surgery*" on the left in 1999
   and again in 2005.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

### Gulf Coast Spine Institute: Mitchell Taylor, PA (continued)

9. On **February 17, 2015** Mr. Mitchell underwent a history and physical by Mitchell Taylor, PA-C.

10. The symptoms were described as being *"chronic non-traumatic"*.

11. The problems (neck pain, numbness and headaches) were described as fluctuating. The pain ranged from zero to ten using a visual analog scale, ten being the worst pain ever experienced. A prior (cortisone) injection did not help.

12. **No other medical records were reviewed** by Mr. Taylor or Dr. Ronzo; including the January 30th, 2015 Cervical MRI, January 17th 2015 Nerve Conduction Study, or prior medical records from Dr. Adi, Dr. Trivedi or MedOne Urgent Care.

13. Physical examination findings at that time revealed the following:

   A. Four **abnormal findings:**

      1. Cervical **paraspinal tenderness** to palpation.

      2. Spine tenderness w gait and station exam.

      3. Increased **cervical pain** with flexion, extension and rotation.

      4. **Decreased sensation on both hands** (C6 and C7) and the right thigh (L4).

   B. Eighteen **normal findings**, of which the following are noted:

      1. **General spine exam was reported as normal.**

      2. **All other sensation normal**.

      3. **Reflexes** were reported as **normal**.

      4. **No pathological reflexes.**

Joseph A. Martino, MD FAAOS     Medical case review:     Civil Action No. 1:16
January 29, 2019     Guy Mitchell v. Dixie Transport     CV-00336-MLB
Inc.,et al.     United States District Court
The Northern District of GA

**Gulf Coast Spine Institute: Mitchell Taylor, PA** (continued)

5. **Cervical spine exam** was **normal regarding provocative testing**.

6. **Provocative neurological testing** of the **lumbar spine was normal.**

7. **Muscle examination** was **normal** for upper and lower extremities.

14. A two view cervical x-ray and the second cervical MRI was obtained that same day. Neither of these imaging studies were available for review, but have been requested.

15. The x-ray was reported as demonstrating mild to moderate **spondylosis (arthritis)** at C5-C6 and C6-C7.

16. The **February 17, 2015** MRI was reported as showing the following:

   1. Mild to moderate **spondylosis (arthritis)** C5-C6 through C6-C7.

   2. **Spondylosis (arthritis)** with **central disc herniation** at C6-C7 with left lateral component **disc osteophyte complex (arthritis)**.

   3. Also moderate to severe **foraminal stenosis (arthritis)** at C5-C6 and C6-C7.

17. Final impression from this visit on **February 17, 2015** was as follows:

   Cervicalgia (non-specific neck pain).

   Cervical Spondylosis without myelopathy.

   Displacement of cervical disc without myelopathy.

   Spinal stenosis in cervical region.

18. Treatment recommendations on **February 17, 2015** were for a prescription for anti-inflammatory medication (Mobic) and Physical Therapy for cervical stabilization.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## Gulf Coast Spine Institute: Mitchell Taylor, PA (continued)

19. Two (2) visits of **Physical Therapy** were reported by Anthony Signoretti DPT, on **March 2,** and **March 16, 2015**. Mr. Signoretti reported that Mr. Mitchell had "*sustained a whiplash injury in March of 2014 and over the next few months the symptoms began to decrease; however once he (Mr. Mitchell) returned to work sometime around October or November he began noticing complaints of headaches, as well as, numbness and tingling in either or both hands*".

20. On **March 2, 2015** the Physical Therapist exam revealed normal shoulder and upper extremity strength bilaterally, decreased range of motion of the cervical spine and **normal cervical motor and "other tests"**.

21. On **March 16, 2015**, the second and final physical therapy visit, Mr. Mitchell was **reported as feeling better** since he started his home exercise program.

22. He also reported a decrease in upper extremity tingling. The plan was to progress with exercises at tolerated to improve posture and decrease pain and tingling.

23. On **April 7, 2015** Mr. Mitchell presented for his second and final evaluation at Gulf Coast Spine Institute. His current **pain level was reported as 1/10,** with his best level being 0/10 and worst level being 6/10. Mr.Mitchell also reported "*headaches when he is on long road trips or lying down*". He reported that his symptoms were **relieved with Advil.**

24. Physical examination on **April 7th, 2015** was **improved** compared with the initial evaluation on February 17, 2015, with the exception of sensory exam of both hands. Plan was continued physical therapy and possible a spinal cortisone injection if unimproved with therapy. There were **no recommendations for surgery** or further testing.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## Pediatric & Internal Medicine Specialists: Brenda Hayden-Brown, NP.

1. On **May 6th, 2015**, Mr. Mitchell was evaluated as a new patient by Brenda Hayden Brown, Nurse Practitioner for Pediatric and Internal Medicine Specialists located in Lecanto. Supervising physician was Dr. St Martin. **Prior records** from Dr. Adi and/or Dr. Ronzo, including cervical MRI's and Nerve Conduction study were **not reported as having been available or reviewed**.

2. Mr. Mitchell complained of neck pain and **headaches three times per week**, occasional joint pain in his right shoulder, as well as **numbness in both hands**. The patient **denied fatigue, memory loss, or back pain**.

3. **Physical Examination** revealed Mr. Mitchell to be **alert and oriented** to person, place and time.

4. **Musculoskeletal** examination was reported as **normal;** including head and **neck which was supple. No report of neck pain** on physical exam. **Neurological examination** was **normal** (**coordination, sensory and motor (muscle)**).

5. Assessment/Impression:

   1. Hypothyroidism: control uncertain. Obtain labs.

   2. Prostate cancer screening.

   3. **Cervical radiculopathy** (based solely on patient history). Patient reported seeing another physician named "Dr. Bueno" for a "*herniated cervical disc*". There were no records from a Dr. Bueno, but they have been requested.

   4. **Chronic headaches.**

   5. Recurrent upper respiratory infections. Recommend vaccination.

   6. **Chronic Sinusitis**. Prescribed antibiotics for ten days.

Page 19 of 57

Joseph A. Martino, MD FAAOS          Medical case review:          Civil Action No. 1:16
January 29, 2019              <u>Guy Mitchell v. Dixie Transport</u>          CV-00336-MLB
                                  <u>Inc.,et al.</u>          United States District Court
                                                      The Northern District of GA


## Orthopaedic Center: Brian Carter, MD

1. On **January 14, 2016** Mr. Mitchell presented to Dr. Carter for an evaluation following a referral from Dr. David Mayer, MD: Family Practice in Huntsville, AL. There were no medical records from Dr. Mayer, but they have been requested.

2. Chief complaint was "*longstanding neck and arm complaints*".

3. A **Pain Diagram** was completed by Mr. Mitchell (see **Jan 14, 2016** records).

4. **Physical examination** revealed **muscle spasms** with, *"mild generalized tenderness across the cervical, paraspinal and trapezius area with mild limitation of range of motion."*

5. **Neurological exam,** including memory and judgement, sensory, motor and reflexes, were all reported as being **normal.**

6. **Cervical spine MRI images from January 30, 2015** were reviewed by Dr. Carter who reported, **"*While I see a little bit of central protrusion there at 6,7, and a little bit of neural foraminal narrowing a little worse on the left, I really don't see any frank herniated or extruded disc fragment*". "*Really, his MRI doesn't look too bad to me*".**

7. **Impression: Cervical Spondylosis, Disc Bulge and Myofascial Pain.**

8. **Plan: "** *I think he is just trying to ensure any potential abnormal symptom he is feeling isn't related to his  motor vehicle accident.  I tried to assure him that I don't think it is.***"**

9. **Recommendations:** *"Cervical traction, Physical Therapy, possibly nerve conduction studies, trigger point injections and if unimproved cervical facet blocks."* **No recommendations for surgery.**

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## Max Boone, MD, Primary Care.

1. On **February 24, 2016** Mr. Mitchell was concerned regarding possible fungal meningitis with complaints of headaches, neck pain, left ear pain with auditory symptoms, neck crepitus, dizziness, uncontrolled night movements and skin rashes.

2. Dr. Boone ordered two (2) separate Brain MRI's: done on **March 15, 2016** and **May 16, 2016**. No acute process, injury or disease reported.

3. Dr. Boone referred the patient for an ENT evaluation by Juini Sunde, MD. No records from Dr. Sunde except for a single summary letter dated **January 31, 2017**. This correspondence reported that Mr. Mitchell had "*tinnitus of benign etiology*", "*orthostatic dizziness*", and "*dysphasia*". Dr.Sunde's full records have been requested. **No comments regarding concussion syndrome or headaches**.

4. Dr. Boone also referred the patient to Dr. Jason Banks, a Neurosurgeon with Spine & Neuro Center located in Decatur, Alabama.

## Spine & Neuro Center, Jason Banks, MD.

1. On **March 16, 2016** Mr. Mitchell was examined by Dr. Banks, **a Neurosurgeon**, with complaints of neck pain, numbness of arms, hands, neck noises and **headaches from back of head to temples**. History of "eyelid surgery" 2005.

2. Physical examination by Dr. Banks revealed mild tenderness at the base of the skull and down the posterior neck with mildly diminished range of motion secondary to pain.

3. A **Spurling's test** was reported as **negative bilaterally**.

4. **Neurological examination** was reported as **normal** for being alert and oriented, and with normal motor (muscle), sensory, and reflex testing.

Page 21 of 57

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

### Spine & Neuro Center, Jason Banks, MD. (continued)

5. Dr. Banks **reviewed the MRI images** of Mr. Mitchell's cervical spine from Florida and reported that, "*He has some mild bulging discs, worse at C6-7. He has some ligamentous hypertrophy there.*"

6. Dr. Banks obtained x-rays of Mr. Mitchell's cervical spine which he reported as, "*showing no significant motion on flexion and extension views.*"

7. **Impression; "*Mostly musculoskeletal neck pain and tension headaches*".**

8. **Dr. Banks did not feel that surgery was indicated and recommended physical therapy and exercises.**

9. Dr. Banks reviewed the **Brain MRI** done at BioImaging for Mr. Mitchell, and reported the images as showing "*No acute intracranial abnormalities*".

10. On **August 4th, 2016** a follow up evaluation with Dr. Banks revealed that a recent **nerve conduction study** was **negative for radiculopathy**. The patient reported that cervical traction increased his neck pain, and that Mobic caused dizziness.

11. At that visit, **Physical examination** revealed a **negative Spurling's test bilaterally**, and a **normal neurological examination** regarding sensory, motor (muscle) and reflexes.

12. **Dr. Banks** reviewed the **Upright Cervical MRI images** from **March 2016** and concluded that, " *Minor disc bulge with absolutely no compression of any neural structures.*" Furthermore, "*For his age I feel his MRI is completely normal*".

13. **Dr. Banks concluded that, *I do not think his cervical strain will allow him to have any more advanced degenerative changes then would normal aging*".**

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

### Spine & Neuro Center, Jason Banks, MD. (continued)

**14.** Dr. Banks also stated that Mr. Mitchell, **"Has had physical therapy and is making improvements".**

### Johnson & Hayes Physical Therapy, Megan Miller, DPT.

1. Twenty one (21) visits of **Physical Therapy** were recorded between **March 23rd, 2016** and **October 5th, 2016**.

2. Referred by Dr. Banks with a **diagnosis of "Cervical Degenerative Disc Disease".**

3. These records reveal that Mr. Mitchell was "**improved with Physical Therapy**".

4. **On April 22, 2016:** Mr. Mitchell was, **"Meeting goals with significant improvement".**

5. **On April 29th, 2016:** Mr. Mitchell reported that the, **" Neck felt better"** and **"home exercise program was still good."**

6. **On May 9th, 2016:** Ms. Miller reported that **"Patient tolerated treatment well with no pain or crepitus during passive range of motion (his) cervical spine".**

7. **On June 8th, 2016: "Patient reports that neck is getting stronger"** and **"has done better then I thought with working on (his) house."**

8. **On June 22, 2016:** Patient reported, **"I've noticed an increase in the grinding and clunking noises over the past week...once he started working on the floor boards and cleaning the floor".**

Joseph A. Martino, MD FAAOS     Medical case review:          Civil Action No. 1:16
January 29, 2019            Guy Mitchell v. Dixie Transport         CV-00336-MLB
                                  Inc.,et al.              United States District Court
                                                          The Northern District of GA

## Huntsville Hospital Neurological Associates: Anjaneyulu Alipati, MD

1. **July 7, 2016** Dr. Banks (Neurosurgeon) referred Mr. Mitchell to Dr. Alipati
   (Neurologist) for further evaluation of complaints of, **"Memory loss, hand tremors,
   body jerks". This was the first time memory loss was listed as a complaint.**

2. Past surgical history of **"eyelid surgery"** by Dr. Kenneth Cahill (Ophthalmologist,
   Ohio ) in the year **2005.** These records have been requested.

3. **July 20, 2016** Mr.Mitchell presented for the first time to Dr. Alipati with a chief
   complaint of **memory loss.** Also complaints of neck pain, headaches 2 to 3 times
   per week, upper extremity numbness and myoclonic jerks at night.

4. **Physical examination:**

   1. **Normal speech, comprehension, repetition and naming.**

   2. **Normal cranial nerve exam.**

   3. **Normal motor, reflexes, sensory, coordination and gait exam.**

   4. **Cervical spine movements restricted.**

5. **Cervical MRI reviewed:**

   1. **"*Degenerative disc disease*" (arthritis).**

   2. **"*No spinal cord compression*".**

6. **Impression:**

   1. **"*Cervical disc disease".*

   2. **"Myoclonic jerks related to sleep".**

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## Huntsville Hospital Neurological Associates: Anjaneyulu Alipati, MD (continued)

7. **Plan:**

   1. **EMG/NCV** bilateral upper extremities**.** Results were **NORMAL. "No definite electrophysiologic evidence of carpal tunnel, ulnar neuropathy or lower cervical radiculopathy on either side."**

   2. Neurontin.

   3. **EEG (Brain scan). Results were NORMAL.**

## Spine Center Atlanta: Gidget Black NP and James Chappuis, MD

1. **August 17, 2016** Mr. Mitchell presented for the first time to Spine Center Atlanta where he was evaluated by Gidget Black, Nurse Practitioner who was supervised by Dr. James Chappuis, MD: Orthopaedic Surgeon.

2. **Chief complaint** was neck pain.

3. **Physical examination** of Mr. Mitchell at that time revealed:

   A. Alert and oriented in **no acute distress**.

   B. **Negative hyperreflexia**: normal Babinski, Romberg, Hoffmans signs.

   C. **Deep tendon reflexes were normal** and symmetrical (biceps, triceps, bracheoradialis, knee, ankle). Negative clonus.

   D. **Sensation** was **normal** bilaterally upper and lower extremities.

   E. **Neck exam**: **"full range of motion in all planes of the cervical spine with no pain"** increasing at end of range of motion.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## Spine Center Atlanta: Gidget Black NP and James Chappuis, MD (continued)

16. **Physical exam on August 28, 2017:**

    1. **Full range of motion** of the cervical spine with moderate pain at end of range.

    2. **Normal motor, sensory and reflex exam.**

    3. **Positive Spurling's** test bilaterally.

    4. Mild **paraspinal hypertonia (muscle spasm).**

17. **Aug 28, 2017 Plan:** "*At this point, since he is doing well overall and will be moving out of State, he will return as needed.*"

18. On **May 22, 2018** Mr. Mitchell presented to Spine Center Atlanta for the final time, where he was evaluated by Gidget Black, NP. The Physical exam revealed moderate pain with range of motion, normal neurological exam, and a "*positive Spurling's test bilaterally*" with "*paraspinal hypertonia*" (**muscle spasm**). No trigger point injections, prescription medication, epidurals, further diagnostic procedures or surgical options were offered at this time.

19. **May 22, 2018 Plan:** "*The patient has previously been recommended for surgery*" (March 2017) and "***still wants to wait for now***". "*He will return as needed*". This is the last recorded visit at Spine Center Atlanta by Mr. Mitchell.

## American Family Care: David Mowery, MD.

1. On **April 4, 2017** Mr. Mitchell had presented to Dr. Mowery with "***Chief Complaint of joint pain and back pain***". **There are no complaints of neck pain, numbness or headaches reported.**

2. **Physical exam** was **negative for neck pain. Normal neurological exam.**

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## American Family Care: David Mowery, MD. (continued)

3. **Diagnosis: Pain in unspecified joint and Fatigue. No diagnosis of neck pain, radiculopathy or headaches.**

4. **August 11, 2017. Chief Complaint: Visual change, Joint pain, muscle spasms and Neck pain. Also complained of memory loss, headache and paresthesias.**

5. **Physical exam: Normal for all systems, including Neurological.**

6. Referred for a **Brain MRI with angiogram** (MRA). Results **normal (7/9/18).**

7. **November 7, 2017:** Presented for evaluation of positive HSV 2 lab test. Diagnosed with genital herpes. Denied myalgia, back pain, joint pain or rash. Physical exam reported that Mr. Mitchell was in no distress. **No report of neck symptoms, neurological symptoms or headaches**.

8. **June 5th, 2018. Chief Complaint**: Toenail fungus and prescription refill. **No complaints of headache, neck pain or numbness/tingling.**

9. **June 24, 2018**. **Chief Complaint**: **Headache. No complaint of neck pain, neurological symptoms, dizziness, memory loss numbness or weakness.**

10. **Physical Exam:** All systems reported as **normal. Diagnosis: Headache secondary to dehydration.**

11. This **June 24th, 2018** was the **most current medical record** for Mr. Mitchell which was presented to me for review.


## Rehab & Neurological Services: Belinda Savage-Edwards, MD.

1. **February 2, 2018** first evaluation with Dr. Savage-Edwards, Neurologist.

2. **Chief Complaint** was listed as **"Involuntary twitching".**

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

### Rehab & Neurological Services: Belinda Savage-Edwards, MD. (continued)

3. Referred by Dr. Mowery for neurological consultation of *"intractable post-traumatic headaches"*. Mr. Mitchell reported "*head pain and neck stiffness"* several hours after being in an MVA, which physical therapy was effective in relieving his symptoms.

4. There was no evidence in the files that any prior medical records were either requested or reviewed by Dr. Savage-Edwards.

5. Patient reported that symptoms resolved sufficient to allow returning to full time duty soon after the MVA, and that shortly thereafter his symptoms of intractable headaches, neck pain and muscle spasms returned. Frequency of headaches was about four to five per week, and were **associated with scintillating scotomas**. **N.B. Scotomas are usually associated with migraine and/or tension headaches**.

6. **Neurology General Exam**:  Formal **mental status** testing was **not performed**.

7. **Motor/muscle exam** was **normal**. **Reflexes** were **normal,** except for trace left biceps. **Sensory exam** was **normal**.  Proprioception was **normal**. Gait and Romberg testing was reported as **normal**.

8. **Assessment:** "*Post traumatic headache, post concussion syndrome, cervicalgia, muscle spasm, dizziness and giddiness, cervical disc disorder with radiculopathy: cervicothoracic region*". Stated that, **"*Patient was in a motor vehicle accident about 10 months ago.*" (n.b. MVA was on March 9, 2014, almost four years prior.)**

9. **Plan: "***Mr. Mitchell has evidence of bilateral C7 cervical radiculopathies clinically without evidence of cervical myelopathy.***" (n.b. This was not supported by the physical examination reported by Dr. Savage-Edwards).**

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

**Rehab & Neurological Services: Belinda Savage-Edwards, MD.** (continued)

10. **Mr. Mitchell declined prior recommendation for surgery.** "*He will return to the Neurology Clinic for follow-up after surgery*". **( n.b. The patient had declined surgery according to the notes that day).**

11. **May 14, 2018.** No new complaint. **Neuro exam essentially normal and unchanged**. Follow-up visit to review enhanced MRI of the brain and cervical spine (**February 26, 2018**). **Brain MRI was read as normal**. **C-Spine MRI showed "*no spinal cord compression*."**

12. Also noted on **May 14, 2018** was that previously prescribed medications (**Gralise and Lyrica**) were discontinued due to **"brain fog and drowsiness"**. **N.B. These medications may have caused the patient's symptoms which were previously attributed to a diagnosis of "*post concussion syndrome*"**

13. **April 18, 2018. EMG & NCV** performed by Dr. Savage-Edwards. These tests revealed **new** findings of **chronic left C7-T1 cervicothoracic radiculopathy** without denervation. The tests also showed **new** evidence of **bilateral carpal tunnel syndrome** and **bilateral ulnar nerve compression neuropathies** affecting both of the patient's wrists and hands.

14. No further records were available from Rehab and Neurological Services following the **April 18th, 2018** testing.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
<u>Guy Mitchell v. Dixie Transport</u>
<u>Inc.,et al.</u>

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## <u>IMAGES REVIEWED</u>

| <u>DATE</u> | <u>STUDY</u> | <u>SIGNIFICANT FINDINGS</u> |
|---|---|---|
| 1/30/2015 | MRI: CSpine | No acute findings. No fractures. No annular tears. No Modic changes. Hypertrophic (thickened and calcified) ligamentum flavum associated with degenerative spinal stenosis @ C6-C7. Multilevel facet arthropathy, with no effusions. Small 2mm degenerative central disc bulge with no spinal cord contact or compression. No syrinx. No hematoma. |
| 3/15/2016 | MRI: Brain | No acute abnormalities. Increased signal within pre-pontine region of indeterminate significance. May represent fibrous dysplasia (benign process). Recommend follow MRI or CT scan of Clivus for further investigation. |
| 3/16/2016 | X-ray: ⇂↾CSpine | Degenerative disc disease: multilevel. No acute findings. No evidence of cervical instability. |
| 3/18/2016 | MRI: ↑CSpine | No axials done above C2. Multilevel degenerative changes. No interval change compared with January 30, 2015 MRI. Degenerative disc disease at C6-C7 and C7-T1 with small 1-2 mm broad based disc bulging. No spinal cord involvement. No annular tears. No Modic changes. Consistent with age appropriate degenerative changes. |

Joseph A. Martino, MD FAAOS       Medical case review:              Civil Action No. 1:16
January 29, 2019                  <u>Guy Mitchell v. Dixie Transport</u>        CV-00336-MLB
                                        <u>Inc.,et al.</u>            United States District Court
                                                                  The Northern District of GA


# <u>IMAGES REVIEWED</u> (continued)


## <u>DATE</u>        <u>STUDY</u>              <u>SIGNIFICANT FINDINGS</u>

5/16/2016:    MRI: Brain +/-       Normal findings. No abnormal enhancement. Did not
                                   include specific scan of the Clivus however.

8/17/2016     X-ray:Cspine         Mild diffuse degenerative disc disease. Loss of
                                   cervical lordosis. Accessory cervical ribs at C7.
                                   Congenital finding which can be associated with
                                   Thoracic Outlet Syndrome.

12/29/2016    MRI:CSpine           Multilevel degenerative findings consistent with prior
                                   studies. Multilevel facet arthritis with no effusions. No
                                   annular tears. No Modic changes. Hypertrophic
                                   (thickened and calcified) ligamentum flavum
                                   associated with degenerative spinal stenosis @ C6-
                                   C7. Moderate increased facet arthritis at C2-C3 with
                                   left mild foraminal stenosis. No other interval changes
                                   compared with prior studies.

2/21/2017     Esophogram           Normal.

2/21/2017     U/S Carotids         Normal.

2/26/2018     MRI: Brain +/-       Normal. No imaging through Clivus.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
<u>Guy Mitchell v. Dixie Transport</u>
<u>Inc.,et al.</u>

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

# **EXPERT OPINIONS**

I, Joseph A. Martino, MD, have personally conducted a complete and meticulous review of all of the medical records and supplemental documents which were provided to me. Based on my knowledge, skill, education and experience as a Board Certified Orthopaedic Surgeon I have reached the following conclusions based upon a reasonable degree of Medical certainty.

• Mr. Mitchell suffered a mild muscle strain affecting his neck, possibly as a consequence of a motor vehicle accident which occurred on March 9, 2014.

• Appropriate medical management for these symptoms would typically have been 12 visits of supervised skilled Physical Therapy, non-narcotic medications and a brief period of activity modification.

• The patient's symptoms resolved by April 10, 2014 based on the medical records.

• The records do not support the contention that Mr. Mitchell suffered a disc herniation as a consequence of this accident in my expert opinion.

• I would not predict any long term sequelae to Mr. Mitchell's health due to the motor vehicle accident which he was involved.

• These opinions are supported by the following facts contained within the medical records and legal documents which I have reviewed:

    1.  The police report filed at the scene of the accident was negative for any report of injuries and documented only minor property damage.

    2.  Photos of the vehicles at the scene of the accident, taken by the Plaintiff, confirmed only minor property damage to the vehicles involved.

Joseph A. Martino, MD FAAOS     Medical case review:     Civil Action No. 1:16
January 29, 2019     Guy Mitchell v. Dixie Transport     CV-00336-MLB
Inc.,et al.     United States District Court
The Northern District of GA

## **EXPERT OPINIONS** (continued)

3.  Plaintiff did not seek medical attention until the day after the MVA, with his
    primary care physician Dr. Trivedi in Locust Grove, Georgia.  At no point did
    the Plaintiff require immediate medical attention, nor did he require
    emergency medical services.

4.  Examination by the Plaintiff's primary care physician on March 10, 2014 was
    normal, with the exception of "*right sided muscle spasm of his neck*". A
    normal neurological exam was documented.

5.  There were No signs or symptoms of radiculopathy associated with disc
    herniation, or symptoms of concussion noted on March 10, 2014. The initial
    diagnosis was "*Sprain/Strain of (the) neck*".

6.  The follow up evaluation of the Plaintiff by Dr. Trivdedi on March 21, 2014
    revealed that he was "*well appearing in no distress*". Neurological and
    musculoskeletal examination was documented as being normal. The major
    problem identified by Dr. Trivedi at that time was "*Allergic rhinitis*" and
    "*Tension headaches*". No evidence of disc herniation was reported.

7.  Twenty days following the MVA Mr. Mitchell was evaluated by a second
    health care worker, Brandy Wiley, PA at MedOne Urgent Care in Ocala,
    Florida. The physical exam was reported as normal regarding sensory and
    motor findings, and x-rays were performed which were reported as normal,
    with the exception of "*degenerative disc disease at C6-C7*".

8.  On April 10th the Plaintiff presented to a third clinician, Dr. Adi at Christ
    Medical Center in Crystal River, Florida. The patient presented with a single
    complaint of pneumonia. There was no complaints of neck pain, extremity
    pain or numbness, or headaches. Physical exam was normal with no
    objective evidence of a herniated disc at that time.

Joseph A. Martino, MD FAAOS          Medical case review:          Civil Action No. 1:16
January 29, 2019                <u>Guy Mitchell v. Dixie Transport</u>          CV-00336-MLB
                                   <u>Inc.,et al.</u>                United States District Court
                                                          The Northern District of GA

## <u>EXPERT OPINIONS</u> (continued)

9. On July 14, 2014 Mr. Mitchell denied having headaches. There were no complaints of head, neck, or extremity pain or numbness. Dr. Adi did not diagnose the patient with any head, neck or nerve injuries at that visit.

10. On July 22, 2014 Mr. Mitchell was again evaluated by Dr. Adi for routine follow up of resolving pneumonia. The records at that visit document that Mr. Mitchell specifically denied neck pain, headaches, memory loss, numbness or tingling, low back pain or muscle aches/spasms.

11. Physical examination by Dr. Adi at that visit confirmed that Mr. Mitchell was in no distress, and that his neurological examination was completely normal, with no evidence of a herniated disc or neck symptoms. The sole diagnosis at that visit on July 22, 2014 was "*Hypothyroidism*".

12. The next medical visit for Mr. Mitchell was six months later on January 27, 2015, with Dr. Adi.

13. The chief complaint at that time was "*chronic headaches*". The description of the headaches was consistent with the previous diagnosis of "*Tension Headaches*" made by Mr. Mitchell's previous Primary Care Physician Dr. Trivedi.

14. Physical exam at that time revealed cervico-occipital muscle spasm with normal neurological findings regarding motor and sensory examination. At the request of Mr. Mitchell Dr. Adi ordered an MRI of the cervical spine and a nerve conduction study (EMG/NCV).

15. The nerve studies revealed Carpal Tunnel Syndrome and Ulnar Neuropathy at the wrist (Guyon's Syndrome). Neither of these conditions were due the MVA, and more likely then not were attributable to the home renovation activities that Mr. Mitchell had resumed doing several months previously.

Joseph A. Martino, MD FAAOS          Medical case review:                Civil Action No. 1:16
January 29, 2019                     Guy Mitchell v. Dixie Transport                  CV-00336-MLB
                                           Inc.,et al.                       United States District Court
                                                                          The Northern District of GA

# EXPERT OPINIONS (continued)

16. The nerve studies were negative for any evidence of radiculopathy due to a herniated cervical disc.

17. I reviewed the MRI of the cervical spine done on January 30, 2014 which revealed chronic degenerative arthritis of Mr. Mitchell's neck with age appropriate disc bulges at C6-C7 and C7-T1. There were no acute findings, and there was no evidence of traumatic changes to the cervical spine such as compression fractures, Modic changes to the vertebral endplates, or annular tears.

18. On February 17, 2015 Mr. Mitchell presented to a fourth medical provider, Mitchell Taylor at Gulf Coast Spine Institute located in Hernando, Florida.

19. Mr. Mitchell reported that the symptoms of neck pain and headaches had improved within six months following the MVA, but returned when he was remodeling homes again.

20. The symptoms were recorded as *"Chronic non-traumatic"* at that time.

21. Physical examination was consistent with a diagnosis of degenerative arthritis of the neck and tension headaches. Neurological and provocative testing was all reported as normal.

22. On February 17, 2015 a second MRI of Mr. Mitchell's cervical spine was performed. The findings were reported as showing arthritis from C5 to C7 associated with a calcified disc osteophyte complex at C6-C7 and severe foraminal stenosis (degenerative arthritis) at C5-C6 and C6-C7.

23. Mr. Mitchell underwent two (2) session of supervised Physical Therapy along with home exercises, and *"reported feeling better."*

Joseph A. Martino, MD FAAOS | Medical case review: | Civil Action No. 1:16
January 29, 2019 | Guy Mitchell v. Dixie Transport | CV-00336-MLB
| Inc.,et al. | United States District Court
| | The Northern District of GA

## **EXPERT OPINIONS** (continued)

24. On April 7th, 2015 Mr. Mitchell presented  as being improved, had a normal physical examination with the exception of symptoms of carpal tunnel affecting both hands. There were no recommendations for any surgery, additional diagnostic testing or any further procedures and Mr. Mitchell was released from care by the clinicians at Gulf Coast Spine Institute.

25. On May 6th, 2015 Mr. Mitchell was examined by a fifth (5th) medical provider at Pediatric & Internal Medicine Specialists, located in Lecanto, Florida. Chief complaint at that visit was *"headaches three times per week"*.

26. Physical exam was normal, including absence of neck pain and a normal neurological exam. The headaches were attributed to chronic sinusitis and antibiotics were prescribed.

27. Eight months later, on January 14, 2016, Mr. Mitchell was evaluated by a sixth medical provider, Dr. Brian Carter, an Orthopaedic Surgeon in Huntsville, Alabama with a chief complaint of *"longstanding neck and shoulder/arm pain"*.

28. A Pain Diagram completed by Mr. Mitchell at that time was consistent with paraspinous muscle spasms affecting the neck region, and carpal tunnel symptoms. Physical examination confirmed the muscle spasms. The neurological exam was completely normal, with no evidence of cervical radiculopathy due to a herniated disc.

29. Dr. Carter reviewed the January 30, 2015 cervical MRI and opined that *"Really, his MRI doesn't look that bad to me"*.

Joseph A. Martino, MD FAAOS     Medical case review:     Civil Action No. 1:16
January 29, 2019     <u>Guy Mitchell v. Dixie Transport</u>     CV-00336-MLB
     <u>Inc.,et al.</u>     United States District Court
     The Northern District of GA

## <u>EXPERT OPINIONS</u> (continued)

30. Of possible significance, Dr. Carter also stated that, *"I think he (Mr. Mitchell) is just trying to ensure that any potential abnormal symptom(s) he is feeling isn't related to the motor vehicle accident"* and, "*I tried to assure him that I don't think that it is.*"

31. Dr. Carter did not recommend surgery, but instead advised Physical Therapy.

32. On February 24, 2016 Mr. Mitchell was evaluated by a seventh medical provider, Dr. Max Boone a Primary Care doctor in Athens, Alabama with a chief complaint of possible fungal meningitis. Although there was no evidence of this serious condition, Mr. Mitchell had a thorough evaluation, including 2 brain MRIs and referral to an Ear, Nose Throat specialist, Dr. Sunde.

33. Ultimately his symptoms were attributed to tinnitus of benign etiology, orthostatic hypotension secondary to dehydration, and dysphagia. There was no medical evidence of disc herniation, central nervous system pathology or concussion syndrome.

34. On March 16, 2016 Mr. Mitchell was evaluated by an ninth medical provider; Dr. Jason Banks, Neurosurgeon. Physical exam revealed cervico occipital muscle spasm and a completely normal neurological exam including negative provocative testing for cervical disc herniation (Spurling's test).

35. Dr. Banks reviewed Mr. Mitchell's prior MRI studies and opined that, *"He had some mild bulging discs, worse at C6-C7 with some ligamentous hypertrophy there"*. X-rays performed at this visit confirmed that there was no cervical instability or evidence of ligamentous laxity due to trauma.

Joseph A. Martino, MD FAAOS      Medical case review:      Civil Action No. 1:16
January 29, 2019      <u>Guy Mitchell v. Dixie Transport</u>      CV-00336-MLB
                                         <u>Inc.,et al.</u>      United States District Court
                                                                      The Northern District of GA

## <u>EXPERT OPINIONS</u> (continued)

36. Dr. Banks diagnosed Mr. Mitchell with *"Mostly musculoskeletal neck pain and tension headaches".* There was no diagnosis of cervical radiculopathy, post concussion syndrome or traumatic disc herniations.

37. On August 4th, 2016 Dr. Banks evaluated Mr. Mitchell again and found no evidence of cervical radiculopathy on physical examination. Again, neurological exam was completely normal, including provocative testing for symptomatic cervical disc herniations (Spurling's test).

38. On August 4th, Dr. Bank reviewed a recent EMG/NCV study which was negative for cervical radiculopathy, a normal brain MRI and an upright cervical MRI from March 2016 which revealed, *"Minor disc bulge with absolutely no compression of any neural structures".*

39. Dr. Banks also opined that, *"For his age I feel (that) his MRI is completely normal."*

40. Dr. Banks also concluded that, *"I do not think his cervical strain will allow him to have any more advanced degenerative changes then would normal aging."*

41. From March 23, 2016 through October 5th, 2016, at the direction of Dr. Banks, Mr. Mitchell was treated by a tenth medical provider and participated in 21 visits of skilled supervised Physical Therapy with a referring diagnosis of, *"Cervical Degenerative Disc Disease."*

42. During that period of time the medical records show that Mr. Mitchell showed significant improvement with reduced pain, improved range of motion and strength regarding his neck. Therapy was terminated by the patient.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## **EXPERT OPINIONS** (continued)

43. On July 7th, 2016 Mr. Mitchell was evaluated by an eleventh medical
    provider, Dr. Alipati, who was a neurologist, with a complaint of memory loss,
    hand tremors and body jerks.

44. Physical examination by Dr. Alipati was normal regarding speech, cognition,
    short term memory testing. The entire neurological examination was reported
    as being normal and a diagnosis of "*Cervical disc disease*" was made.

45. Dr. Alipati also ordered an EEG (electrical testing of the brain) and EMG/NCV
    (electrical testing of the upper extremities), both of which were reported as
    normal with no evidence of cervical radiculopathy, seizure disorder or other
    neurological abnormalities.

46. On August 17, 2016 Mr. Mitchell was evaluated by a twelfth medical provider,
    Gidget Black, RN under the supervision of Dr. James Chappuis, Orthopaedic
    Surgeon and Fellowship trained spine surgeon.

47. Physical exam at that visit was significant for normal findings regarding
    sensory, motor and reflex testing.  Spurling's test was normal.

48. In addition neck range of motion was reported as *"full range of motion in all
    planes of the cervical spine with no pain"*  and there was no evidence
    hyperreflexia.

49. The only positive finding on examination was, *"mild to moderate cervical
    paraspinal hypertonia (muscle spasm)."*

50. On September 26, 2016 a follow exam at Spine Center Atlanta was
    unchanged, with a normal neurological findings, negative provocative testing
    (Spurling's, FABER's and SLR testing).



Joseph A. Martino, MD FAAOS           Medical case review:           Civil Action No. 1:16
January 29, 2019              Guy Mitchell v. Dixie Transport              CV-00336-MLB
                                  Inc.,et al.              United States District Court
                                                          The Northern District of GA

## **EXPERT OPINIONS** (continued)

51. On October 17, 2016 Mr. Mitchell was treated by a thirteenth medical
    provider, and a cervical epidural was performed, with zero improvement
    reported by Mr. Mitchell.

52. On December 7, 2016 Mr. Mitchell underwent a second procedure on his
    cervical spine consisting of a medial branch block (MBB). Mr. Mitchell
    reported zero improvement following this second procedure.

53. On December 29, 2016 an updated cervical MRI was performed at Spine
    Center Atlanta which revealed new findings of facet arthritis at C2-C3, a small
    disc herniations at C2-C7 with no deformation of the spinal cord. Normal disc
    configuration was reported at C7T1. No annular tears or Modic changes were
    reported.

54. On March 1, 2017 Mr. Mitchell met his fourteenth medical provider, Dr. James
    Chappuis, who recommended surgery as a treatment option. Mr. Mitchell
    deferred.

55. Five months later on August 28, 2017 Mr. Mitchell returned and reported that,
    *"He is doing well overall"* and *"At this time his pain is mostly manageable."*
    The plan at that visit was, *"At this point, since he (Mr. Mitchell) is doing well
    overall and will be moving out of State, he will return as needed."*

56. On May 22, 2018 Mr. Mitchell returned to Spine Center Atlanta one last time.
    Physical exam revealed a positive Spurling's test and paraspinous muscle
    spasm of his neck muscles. The patient deferred surgical recommendations,
    stating that he, *"Still wants to wait for now."* This was the most recent visit to
    Spine Center Atlanta in the medical records.

Joseph A. Martino, MD FAAOS          Medical case review:                    Civil Action No. 1:16
January 29, 2019                     <u>Guy Mitchell v. Dixie Transport</u>              CV-00336-MLB
                                            <u>Inc.,et al.</u>                 United States District Court
                                                                        The Northern District of GA

## <u>EXPERT OPINIONS</u> (continued)

57. On April 4th, 2017 Mr. Mitchell presented to a fifteenth medical provider, Dr. David Mowery a Primary Care doctor. Physical exam was normal for neck pain, and the neurological exam was also reported as being normal.

58. Similar normal findings at subsequent evaluations by Dr. Mowery on August 11, 2017, November 7, 2017, June 5th, 2018 and June 24th, 2018. Headaches were attributed to dehydration. This was the most current record.

59. On February 2, 2018 Mr. Mitchell was seen by the sixteenth and seventeenth medical providers at Rehab & Neurological Services located in Huntsville, Alabama with a chief complaint of involuntary twitching. Physical examinations were consistently normal regarding motor, sensory, proprioception and reflexes. Memory and mental status changes had initially been attributed to post concussion syndrome, but later attributed to medications.

60. Review on May 14, 2018 of a recent Cervical MRI showed *"no cord compression"*. In addition, brain MRI was reported as being normal.

61. On April 18, 2018 nerve conduction studies revealed new findings of "Chronic left C7-T1 radiculopathy as well as new findings of bilateral Carpal Tunnel Syndrome and bilateral ulnar nerve compression neuropathies at both wrists. This was the last reported record from Rehab & Neurological Services.

62. All images were reviewed and were consistent with the diagnoses of degenerative arthritis of the cervical spine. No acute findings were observed. No evidence of annular tears or Modic changes were observed for the cervical spine.

Joseph A. Martino, MD FAAOS      Medical case review:      Civil Action No. 1:16
January 29, 2019      <u>Guy Mitchell v. Dixie Transport</u>      CV-00336-MLB
                 <u>Inc.,et al.</u>      United States District Court
                                    The Northern District of GA

## <u>EXPERT OPINIONS</u> (continued)

63. According to the Plaintiff's response to interrogatories, Mr. Mitchell reported a prior history of significant trauma in 1991 in which, *"he was assaulted and punched in the eye"*. As a result of this traumatic injury Mr. Mitchell subsequently required reconstructive facial surgery in 2005 of the orbital region *"where a 2mm silicone implant was placed under his left eye"*. (See Plaintiff's Response to Defendant's First Interrogatories, #13: Response, page 10, May 19, 2016).

64. This surgery was performed by Dr. Kenneth Cahill in Ohio. No records were provided regarding either the initial medical treatment following the assault in 1991 or the subsequent reconstructive facial surgery performed in 2005.

65. The traumatic injuries suffered due to the assault of Mr. Mitchell being punched in the face and head in 1991, with possible associated neck injuries, provide a reasonable explanation for the degenerative findings noted on Mr. Mitchell's 2015 cervical spine MRI.

66. There was insufficient objective evidence contained within the medical records to support the contention that the chronic degenerative findings noted on the January 2015 cervical MRI, or any of the subsequent MRIs, were attributable to the motor vehicle accident in March 2014.

67. There was sufficient evidence within the medical records to support that Mr. Mitchell's symptoms from his neck strain had resolved within four weeks of the motor vehicle accident. (See Dr. Ali's records from April 10, July 14 and July 22, 2014.

Joseph A. Martino, MD FAAOS          Medical case review:          Civil Action No. 1:16
January 29, 2019                 Guy Mitchell v. Dixie Transport              CV-00336-MLB
                                      Inc.,et al.              United States District Court
                                                            The Northern District of GA

## **EXPERT OPINIONS** (continued)

68. There was sufficient evidence within the medical records to support that Mr. Mitchell's symptoms from his neck strain had recovered by April of 2014 and was able to return to his prior occupation as a real estate investor.

69. Of particular significance within the medical records was the absence of any complaints related back to the motor vehicle accident over a span of nine (9) months, from April 10th 2014 to January 27, 2015. During this nine (9) month period of time shortly after the MVA,  Mr. Mitchell did not obtain, and presumably did not require, any medical care for mental confusion, post traumatic concussion symptoms, headaches, neck pain, extremity pain, numbness, extremity spasms, myoclonic jerking or any other symptoms related to the motor vehicle accident. (See Dr. Adi's records from Christ Medical Center, April 2014 - January 2015).

70. The time line for the complaints of head aches associated with neck pain, as well as the complaints of hand numbness which was diagnosed as bilateral Carpal Tunnel Syndrome (median nerve compression at the wrist) with bilateral Guyon's Tunnel Syndrome (ulnar nerve compression at the wrist) was consistent with aggravation of pre-existing arthritis of the neck, tension headaches and peripheral nerve symptoms attributable to the tasks associated with the Mr. Mitchell's occupation: remodeling residential real estate.

Joseph A. Martino, MD FAAOS          Medical case review:          Civil Action No. 1:16
January 29, 2019                  <u>Guy Mitchell v. Dixie Transport</u>            CV-00336-MLB
                                      <u>Inc.,et al.</u>              United States District Court
                                                            The Northern District of GA

# <u>EXPERT OPINIONS</u> (continued)

71. The records overwhelmingly supported the conclusions that Mr. Mitchell's constellation of symptoms were not due to an acute disc herniation of the cervical spine, or any physical injury to his central nervous system, but were instead attributed to 1) Myofascial pain and dysfunction of the cervical spine associated with an aggravation of pre-existing degenerative arthritis of the spine. 2) Chronic sinusitits with associated tension or migraine headaches. 3) Recurrent nerve entrapment affecting both wrists and hands most likely due to his occupation.

72. These conclusions are supported by the following specific medical records for Mr. Mitchell.

    1.  Christ Medical Center and Dr. Adi.

    2.  Gulf Coast Spine Institute.

    3.  Pediatric & Internal Medicine Specialists.

    4.  Dr. Carter with The Orthopaedic Center.

    5.  Dr. Boone and Dr. Sunde.

    6.  Dr. Banks with Spine & Neuro Center.

    7.  Megan Miller PT with Johnson & Hayes Physical Therapy.

    8.  and Dr. Alipati with Huntsville Hospital Neurological Associates.

Joseph A. Martino, MD FAAOS          Medical case review:          Civil Action No. 1:16
January 29, 2019                   <u>Guy Mitchell v. Dixie Transport</u>          CV-00336-MLB
                                           <u>Inc.,et al.</u>          United States District Court
                                                                    The Northern District of GA

## <u>EXPERT OPINIONS</u> (continued)

73. Regarding the findings reported by Gidget Black NP at Spine Center of Atlanta, it was reported that the first two visits for Mr. Mitchell revealed a completely normal physical examination regarding neurological findings, negative provocative testing for cervical disc herniation symptoms, *"full range of motion in all planes of the cervical spine with no pain"* ,and only mild to moderate muscle spasm.

74. The paucity of objective findings reported on August 17, 2016 and again on September 26, 2016 by Ms. Black also support the conclusion that Mr. Mitchell's symptoms were more likely then not related to the documented multilevel degenerative and arthritic conditions of his cervical spine and not specifically relateable to any prior injury or accident.

75. The absence of any substantive improvement for Mr. Mitchell following the cervical epidural cortisone injection which he received at Spine Cneter Altanta on October 17, 2016 and the subsequent diagnostic facet injections (Medial Branch Blocks) performed on December 7, 2016 of his cervical spine support the conclusion that the patient's symptoms were not due to either cervical disc herniations or caused by facet joint injuries. Instead, it is much more likely then not the symptoms were caused by myofascial pain and dysfunction of the cervical spine due to multilevel degenerative disc disease.

76. At that point in December of 2016, the most appropriate treatment for myofascial pain and dysfunction would still be conservative treatment with skilled supervised Physical Therapy for a period of no less then twelve weeks. There was no record of any enrollment for Mr. Mitchell into such a Physical Therapy program at that time.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

## **EXPERT OPINIONS** (continued)

77. In March of 2017, Mr. Mitchell subsequently deferred a recommendation by Dr. Chappuis for surgical management of his cervical degenerative disc disease.

78. Five months later on August 28, 2017 Mr. Mitchell returned to Spine Center Atlanta and reported that, *"He is doing well overall"* and, *"At this time his pain is mostly manageable."* The plan was reported that, *"At this point, since he (Mr. Mitchell) is doing well overall and will be moving out of State, he will return as needed."*

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
<u>Guy Mitchell v. Dixie Transport</u>
<u>Inc.,et al.</u>

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

# <u>SUMMARY</u>

## Documents Reviewed

At the request of Mr. William Gray, in house counsel for Grange Insurance Company, I personally reviewed the extensive medical file that had been presented to me. This file consisted of office notes from seventeen medical providers, twenty one photographs of the vehicles involved in the motor vehicle accident (MVA), a single police report regarding that MVA, numerous medical reports and test results including three nerve studies, eleven imaging studies including three (3) cervical MRI's, four brain MRI's and two (2) cervical x-rays. In addition legal documents were provided for review including responses to interrogatories, two Depositions, and a medical opinion prepared by Barry Jeffries, MD.

## History of Injury

On March 10, 2014 Mr. Guy Mitchell presented one day after a motor vehicle accident to his Primary Care physician with complaints of neck pain and headache. His neurological examination was reported as normal, and he was diagnosed with a cervical (neck) sprain/strain. The records show that these symptoms subsided by April 10, 2014 and that no further reports of neck pain or headache were noted until January 2015 after the patient resumed his occupation as residential home remodeler.

## Past Medical History

The records presented included only four (4) progress notes relating to Mr. Mitchell's medical history prior to the MVA. He had a history of sinus infections, elevated serum cholesterol, and hypothryoidism which was managed with annual lab testing and thyroid replacement medication.

Joseph A. Martino, MD FAAOS    Medical case review:    Civil Action No. 1:16
January 29, 2019    <u>Guy Mitchell v. Dixie Transport</u>    CV-00336-MLB
Inc.,et al.    United States District Court
The Northern District of GA

## <u>SUMMARY</u> (continued)

**Past Surgical History**

Surgical history for Mr. Mitchell was significant for reconstructive surgery in 2005 of facial bones which had been fractured (broken) as a consequence of having been assaulted and punched in the head in 1991.

**Initial Treatment**

Following his initial evaluation on March 10, 2014 Mr. Mitchell was treated with non narcotic medications and advise to use a heating pad. At the subsequent visit on March 21, 2014 examination revealed that Mr. Mitchell was "*well appearing in no distress*". Neurological and musculoskeletal examination was documented as being normal. The major problem identified by Dr. Trivedi at that time was "*Allergic rhinitis*" and "*Tension headaches*". No evidence of disc herniation was reported.

**Secondary Treatment**

Approximately one month later Mr. Mitchell had moved from Georgia to Florida and presented for evaluation and treatment at Christ Medical Center on April 10, 2014. At that point in time, approximately one month following the MVA, Mr. Mitchell had not reported any complaints of neck pain, extremity pain, numbness or headaches.  He was diagnosed with Pneumonia and treated with antibiotics. Two subsequent follow up visits by Mr. Mitchell to this same facility, on July 14th and July 22nd, were significant due to the absence of any complaints of neck pain, head aches or other symptoms related to the original MVA. Furthermore, these records showed that in fact Mr. Mitchell denied complaints of neck pain, headaches, memory loss, lightheadedness, numbness or tingling, low back pain, or muscle aches.

Joseph A. Martino, MD FAAOS      Medical case review:           Civil Action No. 1:16
January 29, 2019              Guy Mitchell v. Dixie Transport         CV-00336-MLB
                                    Inc.,et al.              United States District Court
                                                            The Northern District of GA

## **SUMMARY** (continued)

### Subsequent Presentation

Mr. Mitchell did not present with complaints of neck pain or headaches again until
January 27, 2015 after returning to work renovating older homes. A thorough and
complete evaluation at that time revealed evidence that the patient had an abnormal
nerve conduction study which showed bilateral Carpal Tunnel Syndrome, Ulnar nerve
compression at both wrists, and no evidence of cervical radiculopathy (neurological
symptoms due to a herniated cervical disc).  A cervical MRI was revealed age
appropriate degenerative findings, including a bulging disc without annular tear. A
subsequent opinion of Dr. Carter, an Orthopaedic Surgeon in Huntsville, Alabam was
that *"Really, his MRI doesn't look that bad to me"*.

A similar opinion was made by Dr. Banks, a Neurosurgeon who had evaluated Mr.
Mitchell as well and opined that, *"He had some mild bulging discs, worse at C6-C7 with
some ligamentous hypertrophy there"*, but no evidence of an acute process requiring
surgical action. According to Dr. Banks, Mr. Mitchell suffered from, *"Mostly
musculoskeletal neck pain (muscle spasm) and tension headaches"*

### Lack of Objective FIndings

Multiple medical evaluations within the records documented normal physical findings as
well as absence of pathological findings associated with cervical disc herniations or
head trauma. These include the notes from the following clinicians or medical groups:
Christ Medical Center and Dr. Adi, Gulf Coast Spine Institute, Pediatric & Internal
Medicine Specialists, Dr. Carter with The Orthopaedic Center, Dr. Boone, Dr. Sunde,
Dr. Banks with Spine & Neuro Center, Megan Miller PT with Johnson & Hayes Physical
Therapy, Dr. Alipati with Huntsville Hospital Neurological Associates and Gidget Black
NP at Spine Center of Atlanta.

Joseph A. Martino, MD FAAOS
January 29, 2019

Medical case review:
Guy Mitchell v. Dixie Transport
Inc.,et al.

Civil Action No. 1:16
CV-00336-MLB
United States District Court
The Northern District of GA

# SUMMARY (continued)

**Return to Work**

The records showed the Mr. Mitchell resumed work as a real estate investor who purchased distressed residential properties and then remodeled them for resale at a profit some time between July and October of 2014. There was no evidence of a permanent partial disability established at any time following the motor vehicle accident for Mr. Mitchell within the medical records.

**Conclusions**

In my expert opinion as a Board Certifed Orthopaedic Surgeon with over twenty five years of experience treating patients involved in motor vehicle accidents, and based on a reasonable degree of certainty, the motor vehicle accident that occurred on March 9, 2014 may have been a factor in regard to Mr. Mitchell's initial complaints of neck pain the following day after the accident due to muscle spasm, but there is no objective evidence that there was a herniated cervical disc.

This opinion is based on a lack of objective neurological findings on this first presentation. At that initial evaluation, Mr. Mitchell denied any numbness, weakness, pain radiating down his arms or legs, or any other neurological symptoms. His initial diagnosis the day following the incident was neck pain associated with a simple cervical strain.

Subsequent evaluations documented that these initial complaints of neck pain and headaches resolved by April 10, 2014, one month following the accident. Two additional follow up records confirmed this on July 14th and again on July 22nd, 2014.  In addition, it was documented in the records that soon after this period of time Mr. Mitchell had resumed traveling and renovating homes for profit.

Joseph A. Martino, MD FAAOS      Medical case review:     Civil Action No. 1:16
January 29, 2019     <u>Guy Mitchell v. Dixie Transport</u>     CV-00336-MLB
    <u>Inc.,et al.</u>     United States District Court
    The Northern District of GA

## **SUMMARY** (continued)

### **Conclusions**

It is also my expert medical opinion, based on a reasonable degree of certainty, that Mr. Mitchell's subsequent medical complaints documented on January 27, 2015, were not the result of having been in the motor vehicle accident on March 9, 2014, but instead were more likely due to an aggrevation of pre-existing degenerative arthritis affecting his neck. In addition, the peripheral neuropathies affecting the hand and wrist were also most likely associated with the strenuous manual labor involving demoltion, renovation and residential construction.

In my expert medical opinion, based on a reasonable degree of certainty, there is no objective evidence supporting any relationship between the March 2014 accident and the patient's other medical complaints of tension headaches, tinnitus (ringing ears), memory loss (later determined to be related to medications), or any need for surgery that Mr. Mitchell may possibly have presently.

In my expert opinion based on a reasonable degree of certainty, Mr. Mitchell's symptoms of neck pain that developed months after the accident were most likely due to his lifestyle of frequently moving, traveling long distances by car and his occupation as a home remodeler.  All of these activities may have more likely then not aggravated Mr. Mitchell's pre-existing arthritis acquired over a lifetime of hard work as a commercial truck driver, professional auto mechanic, and the demanding work associated with the physically strenuous tasks required for demolition and home renovation.

Furthermore, the physical assault that occurred in 1991, in which Mr. Mitchell suffered facial fractures caused by physical blows to the head, certainly may have played a role in the later development of head and neck symptoms which he presented with in 2015.

# References

Biondi DO, David. Cervicogenic Headache: *A Review of Diagnostic and Treatment Strategies.* The Journal of the American Osteopathic Association. 2005 Vol 105(4) S16.

Boden MD, Scott. Davis MD, David. Dina MD, Thomas. Patronas MD, Nicholas. Wiesel MD, Sam. Abnormal Magnietic Resonance Scans of the Lumbar Spine in Asymptomatic Subjects: A Prospective Investigation. JBJS. 1990 vol 72-A (3).

Bono MD, Christopher, et al. *Diagnosis and Treatment of Cervical Radiculopathy from Degenerative Disorders.* Christopher Bono, MD Committee Chair; North American Spine Society (NASS) Evidence-Based Guideline Development Committee. 2010. Burr Ridge, IL.

Borenstein MD, David. O'Mara MD, James. Boden MD, Scott. et al. *The Value of Magnetic Resonance Imaging of the Lumbar Spine to Predict Low-Back Pain in Asymptomatic Subjects: A Seven-Year Follow-Up Study.* JBJS 2001. Vol 83-A(9); 1306.

Browner MD, Bruce. Jupiter MD, Jesse. Levine MD, Alan. Trafton MD, Peter. **Skeletal Trauma: Fractures, Dislocations, Ligamentous Injuries, 1st edition.** Bruce Browner, MD editor. Spine Injuries. Vol 1, pp 585-728. W.B. Saunders. Chicago. 1992.

Brinjiki MD, W. et al. *Systematic Literature Review of Imaging Features of Spinal Degeneration in Symptomatic Populations.* American Journal of Neuroradiology. 2015 vol 36; 811-816.

Bucholz MD, Robert. Lippert III MD, Frederick. Wenger MD, Dennis, Ezaki MD, Marybeth. **Orthopadic Decision Making. 1st edition.** Ben Eiseman, MD consulting editor. pp 2-7. B.C. Decker and Mosby. New York. 1984.

Cailliet MD, Rene. **Whiplash Associated Diseases.** American Medical Association. Chicago. 2006.

Centers for Disease Control and Prevention. **Report to Congress on Traumatic Brain Injury in the United States: Epidemiology and Rehabilitation.** 2015. National Center for Injury Prevention and Control; Division of Unintentional Injury Prevention. Atlanta, GA.

Farrell SF, Smith A, Hancock M, Webb A, Sterling M. *Cervical spine findings on MRI in people with neck pain compared with pain-free controls: A systematic review and meta-analysis.* J Magn Reson Imaging. 2019 Jan 5. (Epub ahead of print).

Gauci MD, Charles. **Manual of RF Techniques: A Practical Manual of Radiofrequency Procedures in Chronic Pain Management, 3rd edition.** Comedical. Netherlands. 2011.

Genovese MD, Elizabeth. Galper PT, Jill. **AMA Guide to the Evaluation of Functional Ability.** American Medical Association. Chicago. 2009.

Guskiewicz KM, et al. *Evidence-based approach to revising the SCAT2: introducing the SCAT3* (Sport Concussion Assesment Tool). Br J Sports Med. 2013;47:289–293.

Haig MD, Andrew et al. *Electromyographic and Magnetic Resonance Imaging to Predict Lumbar Stenosis, Low-Back Pain, and No Back Symptoms.* JBJS. 2007 vol 89-A (2); 358.

Hall MSc, Toby. Briffa PhD, Kathy. Hopper PhD, Diana. *Clinical Evaluation of Cervicogenic Headache: A Clinical Perspective.* The Journal of Manual and Manipulative Therapy. 2008 vol 16(2) 73.

Heman-Ackah MD, Selena. Boyer MD, Holly. Odland MD PhD, Rick. *Clival fibrous dysplasia: Case series and review of the literature.* ENT-Ear, Nose & Throat Journal. 2014 Vol 93(12); E4.

Ho MD, Kwo Wei. Przkora MD, Rene. Kumar MD, Sanjeev. *Sphenopalantine ganglion: block, radiofrequency ablation and neurostimulation- a systematic review.* The Journal of Headache and Pain. 2017 18:118.

Hoppenfeld MD, Stanley. Boer MA, Peter. Buckley MD, Richard. **Surgical Exposures in Orthopaedics: The Anatomic Approach,  5th edition.** Applied Surgical Anatomy of the Posterior Approach to the Subaxial Cervical Spine. pp 306-307. Wolters Kluwer. 2017.

Jarraya MD, Mohamed et al. *A longitudinal study of disc height narrowing and facet osteoarthritis at the thoracic and lumbar spine, evaluated by computed tomography; the Framingham Study.* The Spine Journal. 2018 vol 18; 2065-2073.

Jensen MD, Maureen. Brant-Zawadzki MD, Michael. Obuchowski PhD, Nancy. Modic MD, Michael. Malkasian MD PhD, Dennis. Ross MD, Jeffrey. *Magnetic Resonance Imaging of the Lumbar Spine in People Without Back Pain.* New England Journal of Medicine. 1994 Vol 331(2); 69-73.

Konin PhD ATC PT, Jeff. et al. **Special Tests for Orthopedic Examination. Fourth edition.** Section 2: Cervical Spine. pp 7-18. SLACK incorporated. 2016.

McGill PhD, Stuart. **Low Back Disorders: Evidence-Based Prevention and Rehabilitation, Third edition.** Human Kinetics. Montreal. 2016.

Melhorn MD, J. Mark et al. **AMA Guides to the Evaluation of Disease and Injury Causation. 2nd edition.** American Medical Association. Chicago. 2014.

Mojica, Jeffrey. Mo, Bi, Ng, Andrew. *Sphenopalatine Ganglion Block in the Management of Chronic Headaches.* Anesthetic Techniques in Pain Management. D Wang Section editor. 2017, 21:27.

Netter MD, Frank. **Atlas of Human Anatomy, Professional Edition: 7th Edition.** Elsevier; New York 2018.

Page PhD PT, Phil. *Cervicogenic Headaches: An Evidence-Led Approach to Clinical Management.* The International Journal of Sports Physical Therapy. 2011 Vol 6(3) 254.

Park S, Yang, DJ, Kim JH, Heo JW, Uhm YH, Yoon JH. *Analysis of mechanical properties of cervical muscles in patients with cervicogenic headache.* Journal of physical therapy science. 2017 vol 29(2):332-5.

Riew MD, K Daniel. Ecker MD, Erica, Dettori MD, Joseph. *Anterior cervical discectomy and fusion for the management of axial neck pain in the absence of radiculopathy or myelopathy.* Evidence-Based Spine-Care Journal. 2010 vol 1(3), 45-50.

**Rothman-Simeone. The Spine, sixth edition.** Harry Herkowitz MD, Steven Garfin MD, Frank Eismont MD, Gordon Bell MD, and Richard Balderston MD: Editorial Board. Vol 1& 2. Section I Basic Science, Section II Diagnosis, Section III Surgical Anatomy, Section VI Cervical Degenerative Disorders, Section XII Spine Trauma, Section XIV Spinal Cord, and Section XVII Chronic Pain/Rehabilitation. Philidelphia. 2011.

Steilen PA, Danielle. Hauser MD, Ross. Woldin, Barbara, Sawyer MD, Sarah. *Chronic Neck Pain: Making the Connection Between Capsular Ligament Laxity and Cervical Instability.* Open Orthopaedic Journal. 2014 Vol 8. 326-345.

Talmage MD, James. Melhorn MD, J. Mark. Hyman MD, Mark. **AMA Guides the Evaluation of Work Ability and Return to Work. 2nd edition.** American Medical Association. Chicago. 2011.

Travell MD, Janet. Simons MD, David. Simons, Lois. **Myofascial Pain and Dysfunction: The Trigger Point Manual, 3rd edition.** Joseph Donnelly, PT, DHS Editor in Chief. Sections 1, 2 and 3, pp 2-328. Wolters Kluwer. Philadelphia. 2019.

Wnuk MD, Nathan. Alkasab MD, Tarik. Rosenthal MD, Daniel. *Magnetic resonance imaging of the lumbar spine: determining clinical impact and potential harm from overuse.* The Spine Journal. 2018 vol 18; 1653-1658.

Wood MD, KB et al. *Magnetic resonance imaging of the thoracic spine. Evaluation of asymptomatic individuals.* JBJS. 1995 vol 77(11); 1631-8.

Wood MD, KB et al. *The natural history of asymptomatic thoracic disc herniations.* Spine. 1997 vol 1(22); 525-9.

Yang DJ, Kang DH. *Comparison of muscular fatigue and tone of neck according to craniocervical flexion exercises and suboccipital relaxation in cervicogenic headache patients*. Jorunal of Physical Therapy Science. 2017 Vol 29(5); 869-73.

Zuckerbraun MD, Noel. Atabaki MD, Shireen. Collins PhD, Michael, Thomas MD, Danny, Gioia PhD, Gerard. *Use of Modified Acute Concussion Evaluation (ACE) Tools in the Emergency Department.* PEDIATRICS. 2014 Vol 133(4).

Appendix:

A.    AAOS Standards of Professionalism.

B.    AAOS Expert Witness Affirmation Statement.

C.    Curriculum Vitae.

D.    Photos: Examples of MVA's.

E.    Photos: Vehicles involved in this specific case.

F.    Photos: A portion of the Images reviewed in this case.

G.    Findings and Report: Barry Jeffries, MD.

H.    Example: Neck & Upper Extremity Spine Exam.

I.    Illustration: Suboccipital muscles.

J.    Photo: Basi-cervical model with key.

K.    Illustration: Cervico-occipital headache distribution.

L.    Illustration: Gradations of cervical disk degeneration.

M.    Illustration: Thickened, calcified degenerative Ligamentum Flavum.

N.    Illustration: Anatomy with surgical exposure of cervical disc herniation.

O.    Review Article: *Minor Traumatic Brain Injury: A Primer for Orthopaedic Surgeons*.

P.    Clinical Form: Acute Concussion Evaluation (ACE): Colloboration with CDC.

Q.    Clinical Form: SCAT3 concussion assessment tool.

R.    Clinical Form: NFL Concussion assessment instrument.

S.    Photo: X-ray example of accessory cervical ribs.

T.    Photo: X-ray example of fibrous dysplasia of the skull: clivus.

U.    Medical Expert Testimony Case List for the past four years.





AA**O**S  AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS
AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS

## *Standards of Professionalism*

# Orthopaedic Expert Opinion and Testimony

Adopted April 18, 2005; Amended May 12, 2010 (effective for expert opinions offered on or after May 12, 2010; expert witness opinions rendered prior to May 12, 2010 are governed by the original Standards of Professionalism for Orthopaedic Expert Witness Testimony, adopted April 18, 2005)

*AAOS Standards of Professionalism (SOPs) establish the minimum standards of acceptable conduct for orthopaedic surgeons. Violations of any SOP may result in professional compliance actions against an AAOS Fellow or Member found in violation. Not prepared using a systematic review, SOPs are developed through a consensus process and are ultimately adopted as official AAOS statements by the two-thirds vote of the AAOS Fellowship casting ballots.*

Orthopaedic surgeons are frequently called upon to provide oral or written medical testimony or expert medical opinions in legal or administrative proceedings. It is in the public interest for orthopaedic testimony and medical opinions to be readily available, knowledgeable and objective. As a member of the orthopaedic profession, an orthopaedic surgeon must recognize a responsibility to provide testimony and expert medical opinions that are truthful, scientifically correct and appropriate for the context of the issues being considered. All Fellows and Members of the American Academy of Orthopaedic Surgeons and the American Association of Orthopaedic Surgeons ("AAOS") are required to accept this responsibility. For purposes of these SOPs, all Fellows and Members of the AAOS are considered to be "orthopaedic surgeons," regardless of whether they perform surgery. In recognition to this responsibility, the AAOS has adopted these Standards of Professionalism.

These Standards of Professionalism draw from the aspirational Code of Medical Ethics and Professionalism that appears in bold Italics. The statements that follow the aspirational Code establish the minimum standard of acceptable conduct for AAOS Fellows and Members. Violations of these minimum standards may serve as grounds for formal complaint to and action by the AAOS as outlined in the AAOS Bylaws Article VIII.

These Standards of Professionalism apply to all AAOS Fellows and Members who provide oral or written expert opinions, testimony and other services to attorneys, litigants, administrative agencies or the judiciary in the context of administrative, civil or criminal matters and include but are not limited to writing expert opinions, signing certificates or affidavits of merit, reviewing medical records, and providing sworn testimony. Only an AAOS Fellow or Member may file a grievance about alleged violation of these Standards of Professionalism against another AAOS Fellow or Member.

## A. IMPARTIAL TESTIMONY

**Aspirational: <u>AAOS Code of Medical Ethics and Professionalism for Orthopaedic Surgeons, V. C.</u>:**
*Orthopaedic surgeons are frequently called upon to provide expert medical opinions or testimony. In providing opinions, the orthopaedic surgeon should ensure that the opinion provided is non-partisan, scientifically correct, and clinically accurate.*

<u>Mandatory Standards</u>:

1. An orthopaedic surgeon shall not knowingly provide oral or written medical testimony or expert medical opinions that are false.

2. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall provide these statements in a fair and impartial manner.

3. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall have knowledge and experience regarding the standard of care and shall evaluate the medical condition and care in light of generally accepted practice standards at the time, place and in the context of care delivered.

4. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall neither condemn performance that falls within generally accepted practice standards nor endorse or condone performance that falls outside these standards.

5. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall be prepared to explain the basis of his or her statements. If these statements vary from generally accepted practice standards, he or she shall indicate how and why they vary and whether they are supported by personal experience, specific clinical and/or scientific evidence.

6. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall seek and review all pertinent medical records and applicable legal documents, including relevant prior depositions, before rendering any statement or opinion on the medical or surgical management of the patient.

## B. SUBJECT MATTER KNOWLEDGE

**Aspirational: <u>AAOS Code of Medical Ethics and Professionalism for Orthopaedic Surgeons, V. C.</u>:**
*Orthopaedic surgeons are frequently called upon to provide expert medical opinions or testimony. In providing opinions, the orthopaedic surgeon should ensure that the opinion provided is non-partisan, scientifically correct, and clinically accurate.*

<u>Mandatory Standard</u>:

7. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall provide statements only about subject matters in which he or she has relevant clinical experience and specific orthopaedic knowledge in the areas of medicine that are the subject of the proceeding.

## C. QUALIFICATIONS

**Aspirational: <u>AAOS Code of Medical Ethics and Professionalism for Orthopaedic Surgeons, V. C.</u>:**
*The orthopaedic surgeon should not offer opinions concerning matters about which the orthopaedic surgeon is not knowledgeable.*

<u>Mandatory Standards</u>:

8.  An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall have a current, valid, and unrestricted license to practice medicine in one or more U.S. states or territories.

9.  An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall maintain a current certificate from the American Board of Orthopaedic Surgery (ABOS), the American Osteopathic Board of Orthopaedic Surgery (AOBOS), or the certifying body, if any, in the country in which the orthopaedic surgeon took his or her training.

10. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall be engaged in the active practice of orthopaedic surgery or demonstrate enough familiarity with present practices to warrant designation as an expert on the subject matter of the inquiry.

11. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall accurately represent his or her credentials, qualifications, experience or background.

## D. COMPENSATION

**Aspirational: <u>AAOS Code of Medical Ethics and Professionalism for Orthopaedic Surgeons, V. C.</u>:**
*It is unethical for an orthopaedic surgeon to accept compensation that is contingent upon the outcome of litigation.*

<u>Mandatory Standards</u>:

12. An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall not agree to or accept a fee that is contingent upon the outcome of the matter.

13. Compensation for an orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall be reasonable and commensurate with expertise and the time and effort necessary to address the issues raised.



# Expert Witness Affirmation Statement

As a member of the medical profession and a Fellow or Member of the American Academy of Orthopaedic Surgeons/American Association of Orthopaedic Surgeons (AAOS), I affirm my duty, when giving evidence or testifying as an expert witness, to do so solely in accordance with the merits of the case. Furthermore, I declare that I will uphold the following professional principles in providing expert evidence or expert witness testimony:

1. I will always be truthful.
2. I will conduct a thorough, fair and impartial review of the facts and the medical care provided, not excluding any relevant information.
3. I will provide evidence or testify only in matters in which I have relevant clinical experience and knowledge in the areas of medicine that are the subject of the proceeding.
4. I will evaluate the medical care provided in light of generally accepted standards, neither condemning performance that falls within generally accepted practice standards nor endorsing or condoning performance that falls below these standards.
5. I will evaluate the medical care provided in light of generally accepted standards that prevailed at the time of the occurrence.
6. I will state where my opinion honestly varies from generally accepted standards.
7. I will provide evidence or testimony that is complete, objective, scientifically based, and helpful to a just resolution of the proceeding.
8. I will make a clear distinction between a departure from accepted practice standards and an untoward outcome, making every effort to determine whether there is a causal relationship between the alleged substandard practice and the medical outcome.
9. I will submit my testimony to scrutiny, if requested, by professional organizations, hospitals, peer review bodies and state medical and/or licensing boards, as appropriate.
10. I will not accept compensation that is contingent upon the outcome of the litigation.

Printed Name: _Joseph A. Martino, MD_

Signature: _____

AAOS Member Number: _49570_

Date: _Feb 8, 2018_

**Please Note: AAOS will not accept an Affirmation Statement that has been altered. This Affirmation Statement will expire only upon receipt of your written request to rescind it.**

**Email to aaosexpertwitness@aaos.org**

# JOSEPH A. MARTINO, M.D., F.A.A.O.S.

3535 Peachtree Road, NE
Suite 520-337
Atlanta, Georgia 30326

Email: jamartinomd@gmail.com

Cell phone: (770) 568-9187

**EDUCATION**

Fellowship in Sports Medicine.
The Hughston Clinic. Columbus, GA, 1993-1994.

Residency: Orthopaedic Surgery.
Department of Orthopaedic Surgery. Albany Medical Center Hospital, Albany, NY. 1989-93.

Internship: General Surgery.
Department of General Surgery, Albany Medical Center Hospital, Albany, NY. 1988-1989.

Medical Degree.
Albany Medical College, Union University, Albany, NY. 1984-1988.

Externship in Orthopaedic Trauma.  L.A. County Hospital.
Department of Orthopaedics. University of Southern California. Los Angeles, CA. 1987

Externship in Pediatric Orthopaedics, A.I DuPont Hospital for Children.
Department of Pediatric Orthopaedics. A.I. DuPont Institute, Wilmington, DE. 1987.

Bachelor of Science with Honors, Cornell University.
Degree in Neurobiology and Behavior.  Cornell University, Ithaca, NY.  1980-1984.

**EXPERIENCE**

Orthopaedic Consultant: OrthoCare, LLC. Orthopaedic and Trauma Care.
Atlanta, GA. January 2013 to Present.

Surgical Preceptorship in Orthopaedics, Jack Hughston Memorial Hospital.
The Hughston Clinic. Columbus, GA. January 2014 to January 2015.

Medical Director: Top Docs.
Atlanta, GA. March 2012 to December 2012.

Medical Director: iMED, LLC. Director of Sports Medicine Research.
Luzern, Switzerland. August 2010 to February 2012.

Private Practice: Orthopaedic Consultant.
Atlanta, GA. February 2003- July 2010.

Assistant Team Physician. Southeastern Conference Championship.
NCAA Division I Football.  Georgia Dome, Atlanta, GA. December 2002.

Physician Consultant. Amedisys Health Care.
Baton Rouge, LA. January 2001 through October 2003.

**EXPERIENCE**
(Continued)

Private Practice: Resurgens Orthopaedics.
Atlanta, GA. March 1998 - January 2003.

Private Practice: American Sports Medicine. Solo Practice.
Atlanta, GA. August 1994 - March 1998.

Clinical Instructor: Advanced Trauma & Life Support.
Gwinnett Medical Center. Lawrenceville, GA. January 2001.

Medical Director: HealthSouth Physical Therapy & Rehabilitation.
Atlanta, GA.  March 1997- December 2002.

Clinical Certification: Carticel™ Cartilage Transplantation.
Genzyme Corp. Boston, MA. May 1997.

Preceptorship: Shoulder Arthroscopy, Dr. Stephen Snyder.
Southern California Orthopaedic Institute (SCOI). Los Angeles CA. April 1994.

Examination Committee Member: Fellowship Certification.
American Orthopaedic Society for Sports Medicine. AOSSM, Chicago, IL. 1994.

Clinical Instructor:  CME Lecture Series, Sports Medicine.
American Academy of Family Practice. Atlanta, GA. March 1994.

Clinical Instructor: Sports Medicine.
Tulane University, Department of Orthopaedics. New Orleans, LA. 1993-1994.

Chief Resident: Orthopaedic Research Lab.
Senior Thesis, *Biomechanical Analysis: A New Formulation of PMMA Bone Cement*.
Department of Orthopaedics, Albany Medical Center, Albany, NY. 1993.

Laboratory Technician:  Pulmonary Function & Blood Gas Lab.
Albany Medical Center Hospital, Albany,, NY 1985-1987.

Clinical Preceptorship: Family Practice with Dr. Richard Ross.
American Academy of Family Practitioners, Culver City, CA. 1985 & 1986.

Chairman: Albany Medical College Honor Committee.
Albany Medical College. Albany, NY. July 1986-June 1988.

Member: Albany Medical College Honor Committee.
Albany Medical College, Albany, NY. July 1984-June 1986.

Research Assistant: Fetal growth and regulation of preterm labor.
Dept. of Reproductive Medicine, Cornell Univ. Veterinary College. Ithaca, NY 1982-1984

**HONORS**                  Meritorious Service Award. Forsyth County Sheriff's Office.
                            Forsyth County, GA. December 15, 2000.

                            Clark Award for Distinguished Research: Chief Resident Thesis.
                            *A Biomechanical Analysis of a New Formulation of PMMA.*
                            Department of Orthopaedics. Albany Medical Center Hospital. Albany, NY and
                            Department of Biomedical Engineering, Rensselaer Polytechnic Institute, Troy, NY. 1993.

                            Finalist: Smith-Nephew Richards International Residents Research Award.
                            *An Analysis of Blood Salvage Techniques in Spinal Surgery.*
                            Smith-Nephew Richards, Inc. Memphis, TN. 1992.

                            Distinguished Service Award: Chairman of the Honor Committee.
                            Albany Medical College. Albany, NY. May 1988.

                            Dean's List Award, six consecutive semesters.
                            Cornell University. Ithaca, NY. 1981-1984.


**TEACHING**

     PostGraduate Level

- Critical Care Issues in Orthopaedics.
- Advanced Trauma & Life Support (ATLS).
- Arthroscopy Skills Training: Ankle, Hip, Knee & Shoulder Surgery.
- Endoscopic Carpal Tunnel Release (ECTR).
- Orthopaedic Management of Polytrauma Patients.
- Orthopaedic Management of High Velocity Gun Shot Injuries.
- AO Clinical Instructor: Methods of fracture fixation: elbow.
- AO Clinical Instructor: Methods of fracture fixation: supracondylar femur.

     Graduate Level

- Anatomy:  Musculoskeletal system.
- Physiology:  Musculoskeletal system.
- Physiology:  Peripheral & central nervous system.
- Molecular biology: Techniques in cellular perfusion systems.
- High Performance Liquid Chromatography. Techniques for analysis of
  fetal plasma catecholamines.

**CERTIFICATIONS**  Board Certification, American Board of Orthopaedic Surgeons.
ABOS, Chapel Hill, NC. July 1997.  Recertification April 29, 2017.

Board Certification, National Board of Physicians and Surgeons.
NBPS, San Diego, CA. February, 2016. Scheduled for Recertification Feb ~~2018~~. 2020.

Certified Medical Examiner, Federal Motor Carrier Safety Administration.
U.S. Department of Transportation. April 2014 - April 2024.

Fellowship Certification, American Orthopaedic Society for Sports
Medicine. AOSSM, Chicago, IL. 1994.

Fellow, American Academy of Orthopaedic Surgeons.
AAOS, Chicago, IL. February 1999.

Fellow, American College of Surgeons.
Chicago, IL. February 2019.

Diplomat, National Board of Medical Examiners.
NBME, Philadelphia, PA. 1989.

**LICENSURE**

| | |
|---|---|
| Georgia | Active. |
| New York | Active. |
| Alabama | Active. |
| Florida | Active. |
| Federal  DEA | Active. |
| FMCSA | U.S. Dept of Transportation Certified Medical Examiner. |

**MEMBERSHIPS**   American Academy of Orthopaedic Surgeons.

AOTrauma of North America.

North American Spine Society.

Spine Intervention Society.

The Hughston Society.

Southern Orthopaedic Association.

Biologic Orthopedic Society.

Alliance of Advanced Biomedical Engineering.

## PUBLICATIONS and PRESENTATIONS

"Natural History of PCL Injuries: Analysis of 123 cases".  Joseph Martino, MD, Fred Flandry MD, and Jack Hughston, MD. Paper Presentation.  AAOS Annual Meeting, Atlanta. 1995.

"Arthroscopic Assisted Fixation of Fractures Involving the Hip":  Fred Flandry MD, Joseph Martino MD, David Hurd, PhD. Video Presentation. AAOS Annual Meeting, Atlanta 1995.

"Biomechanical Analysis of Distal Biceps Tendon Repair: Description of a New Technique". Joseph Martino MD, Fred Flandry, MD, David Hurd, PhD. Poster Presentation. AAOS Annual Meeting, Atlanta 1995.

"Sternocostoclavicular Hyperostosis Associated with Malaria: Two Case Reports". Joseph Martino, MD, Fred Flandry, MD, George McCluskey, MD. Poster Presentation. AAOS Annual Meeting, Atlanta 1995.

"Total Shoulder Arthroplasty: Surgical Technique and Postoperative Protocol". George McCluskey MD, Joseph Martino, MD. Video Production. The Hughston Clinic, Columbus, GA. 1994.

The Hughston Clinic Sports Medicine Book. Chapter: *Knee Arthroscopy* by Joseph Martino, MD and Champ Baker, MD. Editors Champ Baker MD, Fred Flandry MD and John Henderson, DO. Publisher Williams and Wilkins. 1995.

The Hughston Clinic Sports Medicine Book. Chapter: *Physical Examination of the Shoulder* by Joseph Martino, MD and George McCluskey, MD. Editors Champ Baker MD, Fred Flandry MD and John Henderson, DO. Publisher Williams and Wilkins. 1995.

"Clinical Application of the Forearm Tourniquet". Suheil Khuri MD, Richard Uhl MD, Joseph Martino MD, Richard Whipple MD. The Journal of Hand Surgery, Volume 19, Issue 5, Sept. 1994. pp 861-863.

"Septic Arthritis Associated with Intraarticular Corticosteroid Injection Following Arthroscopy": Joseph Martino MD, et al. Paper presented at Linvatec Residents and Fellows Arthroscopy Meeting. Phoenix, AZ. 1994.

"Biomechanical Analysis of Distal Biceps Tendon Repair: Description of a New Technique". Joseph Martino MD, Fred Flandry, MD, David Hurd, PhD. Paper presented at the The Hughson Society Annual Meeting, Columbus GA. June 1994.

"A Biomechanical Analysis of a New Formulation of PMMA". Joseph Martino MD. Paper presented at Albany Medical College Annual Chief Residents Research Awards Meeting. Awarded the Clark Award for Independent Research by The Department of Orthopaedics: Albany Medical Center Hospital. Albany, NY. June 1993.

"Posterior Tibial Tendonitis Masquerading as a Complete Tendon Rupture: Clinical and MRI Findings". Joseph Martino MD, Richard Jacobs MD. Iowa Orthopaedic Journal. Volume 12. December 1992.

"Anatomical Analysis of Intramedullary Alignment Rods in Total Knee Arthroplasty" James Bono MD, Joseph Martino MD. Poster Presentation. AAOS Annual Meeting. San Franciso CA. 1992.

## PUBLICATIONS and PRESENTATIONS
(continued)

"Septic Arthritis Associated with Intraarticular Corticosteroid Injection Following Arthroscopy". Joseph Martino MD, Richard Alfred MD, James Striker MD, Jeffrey Lozman MD. Paper Presentation at AAOS Annual Meeting, San Francisco, CA. 1992.

"Clinical Application of the Forearm Tourniquet". Suheil Khuri MD, Richard Uhl MD, Joseph Martino MD, Richard Whipple MD. Paper Presentation at ASSH Annual Meeting. Phoenix AZ. 1992.

"An Analysis of Blood Salvage Techniques in Spinal Surgery". Joseph Martino MD, Alan Carl MD. Paper Presentation at Smith-Nephews Annual International Residents Research Awards.  Memphis, TN. 1992.



date September 4, 2014 at
3:45:20 PM

date September 4, 2014 at
3:45:21 PM

date September 4, 2014 at
3:45:29 PM





date September 4, 2014 at
3:45:30 PM











date September 10, 2018 at
9:12:38 AM

date September 10, 2018 at
9:12:50 AM

date September 10, 2018 at
9:13:44 AM

date October 24, 2018 at 9:51:10 AM









date October 24, 2018 at 9:51:17 AM

date October 24, 2018 at 9:51:24 AM

date October 24, 2018 at 9:51:31 AM

date October 24, 2018 at 9:51:42 AM









date October 29, 2018 at
10:32:00 AM

date October 29, 2018 at
10:32:10 AM

date October 29, 2018 at
10:32:21 AM

date October 29, 2018 at
10:32:31 AM









date October 31, 2018 at
10:39:19 AM

date October 31, 2018 at
10:39:27 AM

date October 31, 2018 at
10:39:39 AM

date November 5, 2018 at
10:08:49 AM



date November 5, 2018 at 10:35:58 AM



date November 5, 2018 at 10:36:07 AM



date November 8, 2018 at 9:14:28 AM



date November 8, 2018 at 9:14:35 AM



date November 9, 2018 at 9:08:47 AM



date November 9, 2018 at 9:09:13 AM



date November 14, 2018 at 9:16:58 AM



date November 14, 2018 at 9:17:05 AM



date November 26, 2018 at 9:38:35 AM



date December 12, 2018 at 11:05:12 AM



date December 12, 2018 at 11:05:27 AM



date December 12, 2018 at 11:07:02 AM



date December 17, 2018 at 9:57:43 AM



date December 18, 2018 at 9:54:18 AM



date December 18, 2018 at 9:54:33 AM



date January 7, 2019 at 10:01:33 AM



date January 8, 2019 at 10:44:25 AM



date January 14, 2019 at 12:48:02 PM



date January 14, 2019 at 12:49:11 PM

date January 14, 2019 at 12:51:10 PM



date January 15, 2019 at 10:02:53 AM



date January 15, 2019 at 10:03:00 AM



date January 22, 2019 at 11:16:18 AM



date January 22, 2019 at 11:16:24 AM



date January 22, 2019 at 11:16:34 AM



date January 22, 2019 at 11:16:39 AM



date January 22, 2019 at 11:16:46 AM



date January 22, 2019 at 11:17:01 AM



date January 22, 2019 at 11:17:37 AM



date January 22, 2019 at 12:08:43 PM



date January 22, 2019 at 12:08:52 PM



date January 23, 2019 at 12:54:12 PM



date January 23, 2019 at 12:54:14 PM



date January 23, 2019 at 1:00:42 PM



date January 23, 2019 at 1:00:50 PM



date January 23, 2019 at 1:00:58 PM



date January 23, 2019 at 1:01:02 PM



date January 23, 2019 at 1:06:00 PM



date January 23, 2019 at 1:06:03 PM



date January 30, 2019 at 11:33:13 AM



date January 30, 2019 at 11:33:26 AM



date January 30, 2019 at 11:33:34 AM



date January 30, 2019 at 12:23:16 PM



date January 30, 2019 at 12:23:24 PM



date February 5, 2019 at 9:19:48 AM



date February 5, 2019 at 9:19:55 AM



date February 5, 2019 at 9:20:09 AM



date February 5, 2019 at 9:20:31 AM



date February 11, 2019 at 9:03:50 AM



date February 11, 2019 at 9:04:05 AM



date February 11, 2019 at 12:26:17 PM



date February 12, 2019 at 9:30:35 AM



date February 12, 2019 at 9:31:12 AM



date February 12, 2019 at 11:31:48 AM



date February 12, 2019 at 11:31:59 AM



date February 13, 2019 at 11:03:33 AM



date February 27, 2019 at 11:07:07 AM



date February 27, 2019 at 11:07:25 AM



date February 27, 2019 at 11:07:34 AM



date February 27, 2019 at 11:07:54 AM




date February 27, 2019 at
11:07:59 AM

date February 27, 2019 at
11:08:19 AM

date February 27, 2019 at
11:08:38 AM

date February 27, 2019 at
11:08:56 AM






date February 27, 2019 at
11:10:48 AM

date February 27, 2019 at
11:11:04 AM

date February 27, 2019 at
12:03:27 PM

date February 27, 2019 at
12:03:42 PM






date February 27, 2019 at
12:03:53 PM

date February 27, 2019 at
12:04:04 PM

date February 27, 2019 at
12:04:12 PM

date February 27, 2019 at
12:04:18 PM






date February 27, 2019 at
12:04:27 PM

date February 27, 2019 at
12:05:26 PM

date February 27, 2019 at
12:05:35 PM

date February 27, 2019 at
12:05:40 PM






date February 27, 2019 at
12:05:46 PM

date February 27, 2019 at
12:05:50 PM

date February 27, 2019 at
12:06:04 PM

date February 27, 2019 at
12:06:09 PM




date February 27, 2019 at
12:06:14 PM

date February 27, 2019 at
12:06:21 PM



MITCHELL 000005



MITCHELL 000006







MITCHELL 006009



MITCHELL 000910



MITCHELL 000011





AL 000013





MITCHELL 000015



MITCHELL 000016



MITCHELL 000017



MITCHELL 000018



MITCHELL 000019



MITCHELL 000020



MITCHELL 000021



MITCHELL-000022

















date October 17, 2018 at 9:11:12 AM  date October 17, 2018 at 9:11:37 AM  date October 17, 2018 at 9:14:04 AM  date October 17, 2018 at 9:14:11 AM  date October 17, 2018 at 9:14:17 AM









date October 17, 2018 at 9:14:22 AM  date October 17, 2018 at 9:18:00 AM  date October 17, 2018 at 9:18:11 AM  date October 17, 2018 at 9:21:35 AM  date October 17, 2018 at 9:23:10 AM











date October 17, 2018 at 9:23:21 AM  date October 17, 2018 at 9:23:48 AM  date October 17, 2018 at 9:24:06 AM  date October 17, 2018 at 9:24:18 AM  date October 17, 2018 at 9:25:09 AM











date October 17, 2018 at 9:26:07 AM  date October 17, 2018 at 9:26:16 AM  date October 17, 2018 at 9:26:29 AM  date October 17, 2018 at 9:26:36 AM  date October 17, 2018 at 9:27:26 AM











date October 17, 2018 at 9:27:37 AM  date October 17, 2018 at 9:30:30 AM  date October 17, 2018 at 9:30:38 AM  date October 17, 2018 at 9:30:46 AM  date October 17, 2018 at 9:31:10 AM











date October 17, 2018 at 9:31:17 AM  date October 17, 2018 at 9:31:21 AM  date October 17, 2018 at 9:35:06 AM  date October 17, 2018 at 9:35:18 AM  date October 17, 2018 at 9:35:50 AM



date  January 7, 2019 at 12:21:10 PM  date  January 7, 2019 at 12:21:50 PM  date  January 7, 2019 at 12:23:25 PM  date  January 7, 2019 at 12:23:30 PM  date  January 7, 2019 at 12:24:37 P

    

date  January 7, 2019 at 12:24:41 PM  date  January 7, 2019 at 12:25:06 PM  date  January 7, 2019 at 12:25:09 PM  date  January 7, 2019 at 12:27:36 PM  date  January 7, 2019 at 12:28:25 PM

    

date  January 7, 2019 at 12:28:27 PM  date  January 7, 2019 at 12:30:15 PM  date  January 7, 2019 at 12:30:20 PM  date  January 7, 2019 at 12:30:31 PM  date  January 7, 2019 at 12:30:34 PM

    

date  January 7, 2019 at 12:31:34 PM  date  January 7, 2019 at 12:31:40 PM  date  January 7, 2019 at 12:31:44 PM  date  January 7, 2019 at 12:32:17 PM  date  January 7, 2019 at 12:34:22 P

    

date  January 7, 2019 at 12:34:27 PM  date  January 7, 2019 at 12:35:10 PM  date  January 7, 2019 at 12:35:28 PM  date  January 7, 2019 at 12:35:45 PM  date  January 7, 2019 at 12:36:40

date  January 7, 2019 at 12:36:45 PM  date  January 7, 2019 at 12:36:51 PM  date  January 7, 2019 at 12:39:32 PM  date  January 7, 2019 at 12:39:37 PM  date  January 7, 2019 at 12:40:08 P


date  January 7, 2019 at 12:40:11 PM


date  January 9, 2019 at 10:30:38 AM


date  January 9, 2019 at 10:30:50 AM


date  January 9, 2019 at 10:31:46 AM


date  January 9, 2019 at 10:34:29 AM




date  January 9, 2019 at 10:37:21 AM


date  January 9, 2019 at 10:37:35 AM


date  January 9, 2019 at 10:41:12 AM


date  January 9, 2019 at 10:41:21 AM


date  January 9, 2019 at 10:43:04 AM


date  January 9, 2019 at 10:43:14 AM


date  January 9, 2019 at 10:43:21 AM


date  January 9, 2019 at 10:58:08 AM


date  January 9, 2019 at 10:58:22 AM


date  January 9, 2019 at 11:04:37 AM


date  January 9, 2019 at 11:04:44 AM


date  January 9, 2019 at 11:07:11 AM


date  January 9, 2019 at 11:08:38 AM


date  January 9, 2019 at 11:10:08 AM


date  January 9, 2019 at 11:15:38 AM


date  January 9, 2019 at 11:15:44 AM


date  January 9, 2019 at 11:17:04 AM


date  January 9, 2019 at 11:17:11 AM


date  January 9, 2019 at 11:26:27 AM


date  January 9, 2019 at 11:26:34 AM



date   January 9, 2019 at 11:30:47 AM



date   January 9, 2019 at 1:04:38 PM



date   January 9, 2019 at 1:05:01 PM



date   January 9, 2019 at 1:05:12 PM

date   January 21, 2019 at 12:50:47 PM



date   January 21, 2019 at 1:19:26 PM

5785 DeClaire Ct.
Atlanta, GA 30328

October 18, 2018

Mr. William E. Gray, II
The Law Office of Dan J. Colley
3700 Crestwood Pkwy, Suite 185
Duluth, GA 30096-7168

Re:   Guy Mitchell vs. Dixie Transport, Inc., Felix Milo Daley,
      & Grange Indemnity Insurance Company
      Civil Action File No.: 1:16-CV-00336-AT
      United States District Court for the Northern District of Georgia, Atlanta Division

Dear Mr. Gray:

At your request, I have reviewed the studies and records that you sent me of Mr. Mitchell. First I will describe my findings and then discuss their significance.

The first examination was an MR scan of the cervical spine performed at Sugar Mill Diagnostic Imaging dated January 30, 2015.

At C2-3:  There was degenerative desiccation and left facet arthropathy.

At C3-4:  There was degenerative desiccation, mild diffuse bulging and minimal bilateral uncovertebral joint hypertrophy, greater on the right. This caused mild foraminal stenosis.

At C4-5:  There was degenerative desiccation with minimal anterior bulging and osteophyte formation. There was left degenerative facet arthropathy.

At C5-6:  There was degenerative desiccation, mild disc bulging and mild bilateral degenerative facet arthropathy.

At C6-7:  There was degenerative desiccation, mild diffuse bulging and a small paramedian protruding disc herniation. This did not cause direct cord compression.

At C7-T1:  There was degenerative desiccation and minimal bulging associated with left facet arthropathy. The patient had a paramedian protruding disc herniation causing subtle anterior cord compression. This was only partially seen on the axial images.

There was no evidence of bleeding, edema, healing fracture or traumatic malalignment.

The next examination was an x-ray of the cervical spine dated March 16, 2016 performed at Decatur Orthopedic Clinic. This included flexion and extension views. There was slight reversal of cervical lordosis which appeared to be positional. There was mild anterolisthesis of C2 on C3 with a posterior osteophyte. There was mild anterolisthesis at C3-4. At C4-5, there may be mild uncovertebral joint hypertrophy, but this was not definite. At C5-6, there was minimal anterior osteophyte formation. At C6-7, there was anterior bony remodeling which would represent early osteophyte formation.

The next study was an MR scan of the cervical spine dated March 18, 2016 performed at Upright MRI. This included flexion and extension views. The study showed no evidence of instability. When compared to the prior study, there was no change allowing for the flexion and extension views. The study was primarily to evaluate alignment during lateral bending and flexion and extension.

The next examination was an MR scan of the cervical spine performed at Outpatient Diagnostic Center dated February 26, 2018.

At C4-5: There was paramedian bulging.

At C5-6: The patient had developed mild anterolisthesis, moderate narrowing and a small paramedian and a small superior extruded paramedian disc herniation. There was bilateral degenerative facet arthropathy with subluxation, left greater than right. The disc herniation and the anterolisthesis represented new findings.

At C6-7: The patient had a paramedian protruding disc herniation causing subtle anterior cord compression. The disc herniation was slightly larger.

The remainder of the study was stable when compared to the prior study. These changes represented expected progression.

The last examination was an MR scan of the brain dated March 15, 2016 performed at the Outpatient Diagnostic Center.

There was a focal area of gliosis in the gray-white matter interface of the right frontal lobe. There was no evidence of atrophy to suggest prior trauma nor was there evidence of acute or chronic hemorrhage. The remainder of the study was normal. The inner ear structures were normal. There was no evidence of a closed head injury or an abnormality involving the inner ear structures to suggest an etiology for the patient's ringing in his ears's.

Regarding records, the motor vehicle collision report was dated March 9, 2014. This was a rear-end impact. No injuries were claimed.

Records from Spine Center Atlanta indicated the patient was complaining of neck pain. He went to the emergency room the day after the motor vehicle collision and then followed up with physical therapy. He had numbness in both hands. His neural exam was negative. On musculoskeletal examination, he had full range of motion with no pain: however, he did have increasing pain at the end of his range of motion. He had mild to moderate cervical paraspinal hypertonia.

X-rays demonstrated mild spondylosis. An MR scan dated February 18, 2016 showed a disc herniation at C6-7 with facet arthropathy and a disc herniation at C7-T1. He was recommending a cervical epidural steroid injection followed by a medial branch block and radiofrequency ablation and, if they were not successful, he would recommend an anterior cervical discectomy and fusion at C6-7 and C7-T1.

Pictures were included. There was damage to the front bumper of a truck which showed the inferior aspect of the bumper bent backwards. There was damage to the rear cargo doors of the van. It appeared as if the truck bumper predominantly rode over the top of the rear bumper of the van. There may be a bend involving the left quarter panel.

Under the plaintiff's response to first interrogatories, he was complaining of a concussion injury, a whiplash injury, a disc protrusion at C6-7 and C7-T1 with neck pain, headache, numbness in the fingers and hands and ringing in the ears. He stated that the motor vehicle collision occurred because the defendant slowed or stopped for debris in the highway and was struck by the truck.

To summarize, the patient was involved in a rear-end motor vehicle collision on March 9, 2014. At the time of the motor vehicle collision, no injuries were claimed. In that report, there was no mention of loss of consciousness which would be a component of a concussion. The patient was claiming a whiplash injury to the neck which normally represents a sprain/strain injury to the longus colli muscle and/or the ligaments of the anterior part of the spine, disc protrusions at C6-7 and C7-T1 associated with neck pain, headache, numbness in his fingers and hands and ringing in the ear. In my review of the imaging studies, the first study was dated January 30, 2015 and was an MR scan of the cervical spine. It demonstrated degenerative disc desiccation at all disc levels including the C7-T1 disc. Degenerative desiccation represents a chemical alteration in the structure of the disc and requires at least one year to develop. The MR study was performed approximately ten months after the date of the motor vehicle collision and these changes could not have developed in such a short period of time. To support that opinion was the presence of facet arthropathy and uncovertebral joint hypertrophy at several levels. Uncovertebral joint hypertrophy and facet arthropathy usually represents a reactive change which develops after discs begin to degenerate. Facet arthropathy can be a primary condition, but it would be extremely unlikely to develop so much facet arthropathy at so many levels in such a short period of time. The MR scan showed no finding which would represent an acute injury such as edema, bleeding, healing fracture or traumatic malalignment. Disc herniations were present at the C6-7 level and at the C7-T1 level, however, disc herniations do not indicate that trauma has occurred or that they were caused by trauma at any time. They are part of the degenerative disc continuum. The process involving the cervical spine represents an arthritis known as intervertebral osteochondrosis which does not require trauma to begin or to progress. The patient had subsequent x-rays of the cervical spine dated 3/16/16 which again showed multilevel arthritic changes as well as the presence of osteophytes. The patient had an MR scan of the cervical spine on 3/18/16 which was essentially unchanged from the prior study and showed no significant progression. The patient had a final MR scan of the cervical spine on February 26, 2018. It showed the development of paramedian bulging at C4-5, the development of a small disc herniation and anterolisthesis at C5-6 as well as facet arthropathy and subluxation and a paramedian protruding disc herniation at C6-7 which had increased slightly in size. The remainder of the study was stable. The fact that there was progression in the patient's arthritic changes over a period of four years is not surprising and does not indicate evidence of a traumatic injury. Should these changes have been the result of the motor vehicle collision, they should have been present on the initial study. The patient also had an MR scan of the brain. The study showed gliosis in the right frontal lobe, but there was no evidence of atrophy or hemorrhage adjacent to the gliosis to suggest that it had a traumatic origin. This most likely is the result of small vessel ischemic disease. The remainder of that study was entirely normal. The patient was complaining of headaches. There was nothing on the MR scan to support a traumatic etiology for the headaches. The patient was complaining of a whiplash injury. The MR scan failed to show any evidence of edema or swelling of the longus colli muscles or any other structure in the neck to support a sprain or strain injury to support a diagnosis of a whiplash injury. The patient was complaining of disc protrusions as a result of the motor vehicle collision. The presence of a disc herniation does not indicate that trauma has occurred or that it was caused by trauma at any time. The disc herniations progressed over a four year period of time indicating that they were an ongoing process rather than the result of a single traumatic event. Isolated disc herniations in the absence of any other evidence of

trauma has not been reported in the literature. In general, it requires a great deal of force to disrupt a disc and it would be extremely unlikely that the patient would have no claim of injuries at the time of a traumatic disc disruption. In addition, the patient had a rear-end impact. This would cause a hyperextension distraction mechanism of force upon the cervical spine. This would primarily involve the front of the disc, the front of the cervical vertebral bodies and/or the anterior longitudinal spinal ligament. There was no evidence of an injury involving these structures. The patient had complaints of neck pain. The patient certainly could have neck pain, but this would be due to the underlying arthritic changes which predated the date of the motor vehicle collision. There was no evidence of a traumatic injury superimposed upon the pre-existing arthritic changes. The patient claimed numbness in the fingers and hands. There was no evidence of significant cord or root compression by either the herniations or stenosis of the neural foramina to explain symptoms of numbness in the fingers and hands as a result of the motor vehicle collision. Finally, the patient was complaining of ringing in his ears. The MR scan of the brain showed a normal appearing posterior fossa which included visualization of the inner ear structures. There was no evidence of a traumatic injury which would explain the patient's complaint of ringing in the ears.

In conclusion, the patient has multilevel degenerative changes involving the cervical spine and, with the exception of a minimal area of gliosis in the right front lobe, a normal MR scan of the brain. It is my opinion based upon a reasonable degree of medical certainty that the imaging studies show no evidence of an acute injury which can be specifically related to a motor vehicle collision which occurred on March 9, 2014 nor do they show evidence of an injury which would cause the significant change in symptoms claimed by the patient. In addition, there was no evidence of an injury which would accelerate the development of his pre-existing arthritic changes. Please let me know if you have any questions.

Sincerely,

Barry F. Jeffries, M.D.
BFJ/vlo

**Spine**

# Neck & Upper Extremity Spine Exam

[ ] 👤 2 📖 0 🎥 1 💬 9 ❓ 0 0 0%

Q SEARCH

✏️ ✅ ✉️ ➡️ Joseph Martino ▼
PEAK

Thoracic Spine Anatomy

🏠 Topics Techniques QBank Evidence Cases Videos Posts Groups Products Hel ◀ <  >

O Intervertebral Disc

**EVALUATION** ∧

Neck & Upper extremity spine
Exam

Lower Extremity Spine &
Neuro Exam

Spinal Cord Monitoring



**Overview**

| Root | Primary Motion | Tested Muscles | Sensory | Reflex |
|------|----------------|----------------|---------|--------|
| **C5** | Shoulder abduction | Deltoid | Lateral arm below | Biceps |
| | Elbow flexion (palm up) | Biceps | deltoid | |
| C6 | Elbow flexion (thumb up) | Brachioradialis | Thumb and radial | Brachioradialis |
| | Wrist extension | ECRL | hand | |
| **C7** | Elbow extension | Triceps | Fingers 2, 3, 4 | Triceps |
| | Wrist flexion | FCR | | |
| C8 | Finger flexion | FDS | Finger 5 | - |
| T1 | Finger abduction | Interossei (ulnar n.) | Medial elbow | - |

SPINE TRAUMA

SPINAL CORD INJURY ∧

Cervical Spine Trauma
Evaluation

Spinal Cord Injuries

Incomplete Spinal Cord
Injuries

ATLANTOAXIAL
TRAUMA ∧

Occipital Condyle FX

Occipitocervical Instability &
Dislocation

Atlantoaxial Instability

Atlas Fracture & Transverse
Ligament Injuries

Odontoid Fracture (Adult and
Pediatric)

Traumatic Spondylolisthesis of
Axis (Hangman's Fracture)

SUBAXIAL CERVICAL
TRAUMA ∧

Cervical Facet Dislocations &
FX

Cervical Lateral Mass Fracture
Separation

Subaxial Cervical Vertebral
Body FX

Clay-shoveler Fracture
(Cervical Spinous Process F

CERVICAL TRAUMA
PROCEDURES ∧

Closed Cervical Traction

Halo Orthosis Immobilization

THORACOLUMBAR

- Brachial Plexus Illustrations
- Nerve root anatomy
  - key difference between cervical and lumbar spine is
    - pedicle/nerve root mismatch
      - cervical spine C6 nerve root travels under C5 pedicle (mismatch)
      - lumbar spine L5 nerve root travels under L5 pedicle (match)
      - extra C8 nerve root (no C8 pedicle) allows transition
    - horizontal (cervical) vs. vertical (lumbar) anatomy of nerve root
      - because of vertical anatomy of lumbar nerve root a paracentral and foraminal disc will affect different nerve roots
      - because of horizontal anatomy of cervical nerve root a central and foraminal disc will affect the same nerve root

**Inspection, Palpation, ROM**

- Inspection
  - alignment in sagittal and coronal plane (e.g., kyphotic cervical spine)
  - prior surgical scars (e.g., prior ulnar nerve transposition or carpal tunnel surgery)
  - skin defects (e.g., cafe au lait spots associated with neurofibromatosis)
  - muscle atrophy (e.g., palsy will see decrease deltoid and biceps mass)
- Palpation
  - palpate local tenderness on the spinal axis, asymmetric



FIGURE 127-1  A and B, Examination of the upper extremity for strength, sensation, and reflexes. *(From Miller MD, Thompson SR, Hart JA: Review of orthopaedics, Philadelphia, 2012, Elsevier.)*





Suboccipital muscles.

Rectus capitis posterior major muscle

Rectus capitis posterior minor muscle

Obliquus capitis superior muscle

Obliquus capitis inferior muscle

Rudiger-Anatomie
Gesellschaft mbH

Leipziger Str 60
14612 Falkensee

Telefon:  03322 / 27 561-0
Telefax:  03322 / 27 561-20

mail@ruediger-anatomie.de
http://www.ruediger-anatomie.de



## Beschreibung der Muskeln für die A213.7 – Halswirbelsäule mit Halsmuskeln (Latein)

### Halsmuskeln

1. M. rectus capitis anterior
2. M. rectus capitis lateralis
3. M. rectus capitis posterior minor
4. M. obliquus capitis inferior
5. M. rectus capitis posterior major
6. M. obliquus capitis superior
7. Mm. intertransversarii cervicis
8. Mm. interspinales
9. Mm. rotatores
10. Mm. multifidi
11. M. longus colli - oberer Teil
12. M. longus colli – medialer Teil
13. M. longus capitis
14. M. spinalis

Literatur:

1. Sobotta J: Atlas der Anatomie, Band 1 und 2, 18. Auflage, Urban & Schwarzenberg, München, 1982
2. Netter F.H.: Human Anatomy, Ciba Geigy Corporation, Summit, New Jersey, 1989
3. Fau-Verlag GmbH, 7. Auflage 2007

Rüdiger Anatomie Gesellschaft mbH
Leipziger Str. 60
D-14612 Falkensee

Telefon: 03322 / 27 561-0
Telefax: 03322 / 27 561-20
mail@ruediger-anatomie.de
http://www.ruediger-anatomie.de

Geschäftsführer
Heinz-Harro Rüdiger
Olaf Rüdiger

Amtsgericht
Potsdam
HRB 20001P










Spinous Process

Inferior Articular Process

Dorsal Ramus

Transverse Process

Spinal Ganglion

Spinal Nerve
(Ventral Ramus)

Spinal Cord

Gray Ramus
Communicans

Sympathetic Ganglion

Ligamentum Flavum
(Thickened And Calcified)

Central Canal Stenosis

Superior Articular Process
(Facet Hypertrophy)

Vertebral Foramen
(Narrowed)

Lateral Recess Stenosis

Foraminal Stenosis

Posterolateral
Disc Herniation

Posterior Longitudinal
Ligament
(Thickened And Calcified)

Marginal Ridge
(Spondylophytes,
Osteoarthritic Spine)

Nucleus Pulposus

Anulus Fibrosus



**Figure 6-58** Identify the disc space and a possible herniated disc.

Review Article

# Minor Traumatic Brain Injury: A Primer for the Orthopaedic Surgeon

Richard L. Uhl, MD

Andrew James Rosenbaum, MD

Cory Czajka, MD

Michael Mulligan, MD

Christopher King, MD

From the Division of Orthopaedic Surgery (Dr. Uhl, Dr. Rosenbaum, Dr. Czajka, and Dr. Mulligan) and the Department of Emergency Medicine (Dr. King), Albany Medical Center, Albany, NY.

Dr. Uhl or an immediate family member is a member of a speakers' bureau or has made paid presentations on behalf of Auxilium and has received nonincome support (such as equipment or services), commercially derived honoraria, or other non–research-related funding (such as paid travel) from ConMed Linvatec, Stryker, and Synthes. None of the following authors or any immediate family member has received anything of value from or has stock or stock options held in a commercial company or institution related directly or indirectly to the subject of this article: Dr. Rosenbaum, Dr. Czajka, Dr. Mulligan, and Dr. King.

J Am Acad Orthop Surg 2013;21: 624-631

http://dx.doi.org/10.5435/ JAAOS-21-10-624

Copyright 2013 by the American Academy of Orthopaedic Surgeons.

## Abstract

Minor traumatic brain injury (mTBI) is a major public health problem. The Centers for Disease Control and Prevention and the National Center for Injury Prevention and Control label it a "silent epidemic." Subtle signs and symptoms of mTBI, including headache, fatigue, and memory loss, are often seen in conjunction with musculoskeletal trauma. Although sometimes evident immediately, mTBI may not manifest until patients return to work and their personal lives. In the patient with acute concurrent mTBI, skeletal management must be based on either a period of observation to rule out evolving neurologic symptoms or, when warranted, the recommendations of a neurosurgeon. Such input is particularly important when mTBI is associated with a prolonged loss of consciousness or posttraumatic amnesia. In the outpatient setting, when concern for mTBI exists weeks after an injury, familiarity with and referral to locally available mTBI specialists and programs can facilitate proper care. Armed with this knowledge, the orthopaedic surgeon has an opportunity to positively influence outcomes and help provide crucial care that extends beyond the management of musculoskeletal injuries.

## Background

In the United States, approximately 1.4 million people suffer a traumatic brain injury (TBI) annually.[1] Of these, 75% sustain a minor TBI (mTBI). Multiple definitions of mTBI exist, but it is probably best described as a head injury that results in a transient change in mental status.[1,2]

Despite the connotation of the term minor, significant postinjury cognitive, emotional, behavioral, physical, and psychosocial problems are a relatively common cause of disability and stress for patients with mTBI and their families.[3-7] Fifteen percent to 25% of those who sustain

mTBI have residual symptoms that sometimes lead to compromised function and can last a year or more after the original injury.[1,8,9] The extent of this problem has led the Centers for Disease Control and Prevention and the National Center for Injury Prevention and Control to declare mTBI a major public health issue and a silent epidemic; these organizations recommend that research efforts to reduce disability after mTBI become a national priority.[10]

Falls and motor vehicle accidents are responsible for most cases of mTBI and are a common cause of orthopaedic injuries, as well.[11] As such, a large number of patients with musculoskeletal trauma may also have

Richard L. Uhl, MD, et al

## Table 1

**Signs and Symptoms of Minor Traumatic Brain Injury**

**Observed signs**
Appears dazed
Confused about events
Repeats questions
Answers questions slowly
Amnesia for events before and/or after the injury
Loss of consciousness
Behavioral or personality changes
Forgetfulness
Sleeping more or less than usual
Difficulty falling asleep

**Physical symptoms**
Headaches
Nausea or vomiting
Dizziness
Balance problems
Feeling tired
Blurry vision
Sensitivity to light and noise
Numbness or tingling

**Cognitive symptoms**
Difficulty concentrating
Difficulty thinking clearly
Difficulty remembering
Feeling sluggish and slow

**Emotional symptoms**
Irritability
Sadness
More emotional than usual
Nervous

sustained TBIs.[12,13] Orthopaedic surgeons are in a position to evaluate for and recognize mTBI, which is not necessarily the result of high-energy trauma. Often, mTBI goes undiagnosed initially because symptoms do not appear until the patient resumes everyday life. These patients may present for routine orthopaedic care following an accident, and they or their family members may express concern regarding the unexpected cognitive sequelae associated with mTBI. Therefore, the orthopaedic surgeon must be equipped to identify mTBI and also facilitate proper care that could have greater long-term effects on patient outcomes than musculoskeletal care.

## Case Study

A 54-year-old man was seen 3 weeks after undergoing open reduction and internal fixation for a bimalleolar ankle fracture-dislocation. The injury occurred when he fell 10 ft from a ladder at his home. The fracture was healing well, but the patient reported significant ongoing symptoms, including headaches, dizziness, difficulty concentrating, and depressed mood. He experienced a traumatic loss of consciousness for several minutes after the fall but a CT scan of the head, which was obtained as part of the trauma evaluation, was negative. He was concerned about being able to return to work after his extremity injury healed.

This case depicts an all too common scenario in which the orthopaedic surgeon is the first, and possibly only, healthcare provider to learn of a patient's cognitive symptoms following a presumed isolated orthopaedic injury.

## Definitions

The terms head injury and TBI are frequently, but incorrectly, used interchangeably. Head injury is defined as clinically evident trauma above the clavicles, including lacerations, ecchymosis, and abrasions. TBI implies impairment of the brain's function, which can occur even in the absence of visible head injury.[1] Specific signs of TBI include confusion, an altered level of consciousness, focal neurologic deficits, and more subtle findings identifiable only on neuropsychological examinations (Table 1).

The orthopaedic surgeon must be familiar with these signs and symptoms and appreciate that these findings are not always evident immediately. Often, symptoms develop insidiously and go unrecognized until outpatient follow-up.

In a clinical context, the terms concussion and mTBI are often used synonymously. Although they are conceptually similar, mTBI more accurately pertains to the pathologic state of the brain after a concussive event.[14] The American Academy of Neurology has classified concussions into three grades.[15] In grades 1 and 2, no loss of consciousness occurs; however, altered mental status is present for <15 minutes (grade 1) or >15 minutes (grade 2). Grade 3 concussions involve any loss of consciousness.

In the literature pertaining to mTBI, a consensus definition does not exist, and the precise criteria for diagnosis is a topic of debate.[5,16-18] Historically, the criteria have included a loss of consciousness for <30 minutes, amnesia for <24 hours, or peri-injury confusion/disorientation in a patient with a Glasgow Coma Scale (GCS) score of 13 to 15[16-19] (Table 2). However, patients with a persistent GCS score of 13 are currently excluded from the category of mTBI because this score is more commonly associated with intracranial lesions found on CT, the need for neurosurgical intervention, and adverse long-term sequelae.[1] Generally, these patients are now classified as having moderate TBI. Patients with severe TBI are those who have structural brain abnormalities that result in permanent neurologic dysfunction or death.

## Pathophysiology

In all types of TBI, the brain is subject to linear forces (acceleration/deceleration), rotational forces, or

Minor Traumatic Brain Injury: A Primer for the Orthopaedic Surgeon

both. Because the type and severity of these forces vary with each patient, a wide variety of resulting injuries are seen. Animal models and human studies that used novel imaging techniques (eg, magnetic resonance spectroscopy, single photon emission CT) suggest that mTBI results in a complex cascade of neurometabolic changes.[20-22] Abnormalities in the brain, including unchecked ionic shifts, indiscriminant release of neurotransmitters, impaired axonal metabolism, and alteration in cellular glucose metabolism, likely result in a metabolic energy crisis that may persist for long periods. In addition, ultrastructural axonal shearing injuries may also influence the pathophysiology of mTBI.[23]

## Implications of Minor Traumatic Brain Injury

Symptoms such as headache, fatigue, dizziness, anxiety, impaired cognition, and memory deficits may affect more than 58% of patients 1 month after injury and 25% of patients at 1 year.[24] When symptoms last for >3 months, a patient is said to have postconcussion syndrome (PCS), a disorder that can be associated with substantial financial, social, and emotional challenges. Approximately 20% of patients with PCS are unemployed at 1 year postinjury, and medical costs for treating a patient with mTBI and PCS may surpass $85,000 annually.[18,25]

The literature suggests that approximately 80% of patients who have sustained an mTBI can be safely discharged from the emergency department (ED) and will fully recover, particularly in the setting of a negative head CT and a return to the patient's baseline mental status.[24,26] However, these patients must be counseled at discharge regarding postconcussive symptoms and leave with written instructions and refer-

rals for follow-up in the event that any of the previously described symptoms develop. The distribution of patient education materials following mTBI has been validated as an effective means of counseling; these materials describe mTBI-associated symptoms and coping strategies and have resulted in a decrease in patient-reported anxiety and fewer reports of ongoing problems at 3 months following injury.[27]

Recovery following mTBI is adversely affected by the presence of concurrent extra-cranial injuries.[28,29] In a study by Jackson et al,[28] patients with multisystem trauma and mTBI were almost twice as likely than those with multisystem trauma alone to have persistent cognitive impairment and to report symptoms of depression, anxiety, and posttraumatic stress disorder. Extremity trauma impedes short- and long-term recovery more than do nonmusculoskeletal injuries.[29] Additionally, patients who present with mTBI and lower extremity injuries are three times more likely to experience cognitive and behavioral difficulties at 1 year postinjury than are those who sustain isolated lower extremity trauma.[30] This is a significant issue for the orthopaedic surgeon because up to 50% of patients with musculoskeletal injuries have been found to have concurrent mTBI.[30]

Orthopaedic surgeons must recognize that many patients with musculoskeletal injuries will also have mTBI, which may result in greater morbidity than that associated with isolated musculoskeletal injuries. Orthopaedic surgeons can have a dramatic effect on the overall health and well-being of patients who present with these injuries if a high index of suspicion for mTBI is maintained and appropriate referral is provided. It is of paramount importance to look beyond the skeletal injuries, recognize minor head trauma, facilitate

### Table 2

**Glasgow Coma Scale[a]**

| Category | Points |
| --- | --- |
| **Eye opening** | |
| Eyes open spontaneously | 4 |
| Eyes open to verbal command | 3 |
| Eyes open only with painful stimuli | 2 |
| No eye opening | 1 |
| **Verbal response** | |
| Oriented and converses | 5 |
| Disoriented and converses | 4 |
| Inappropriate words | 3 |
| Incomprehensible sounds | 2 |
| No verbal response | 1 |
| **Motor response** | |
| Obeys verbal commands | 6 |
| Localizes pain | 5 |
| Withdraws from pain | 4 |
| Flexor posturing | 3 |
| Extensor posturing | 2 |
| No motor response | 1 |

[a] The total score is the sum of each of the three categories. Brain injury severity is classified based on total scores: <9, severe; 9 to 12, moderate; and ≥13, minor.

proper specialist evaluation and treatment, and provide patients and their families with the resources needed to combat the adverse cognitive sequelae that are often associated with mTBI.

## Evaluation and Management of Minor Traumatic Brain Injury

Minor traumatic brain injury is predominantly a clinical diagnosis.[31] However, when mTBI is suspected, additional testing and evaluation methods may help to determine the presence and severity of mTBI (Figure 1). Examples of these methods include the Graded Symptom Scale Checklist, Acute Concussion Evaluation, Immediate Postconcussion Assessment and Cognitive Testing, King-Devick test, and Military

**Figure 1**

## ACUTE CONCUSSION EVALUATION (ACE)
### PHYSICIAN/CLINICIAN OFFICE VERSION
Gerard Gioia, PhD[1] & Micky Collins, PhD[2]
[1]Children's National Medical Center
[2]University of Pittsburgh Medical Center

Patient Name:
DOB:          Age:____
Date:          ID/MR#

---

**A. Injury Characteristics**   Date/Time of Injury ____          Reporter:   Patient   Parent   Spouse   Other

**1. Injury Description**

1a. Is there evidence of a forcible blow to the head (direct or indirect)?   Yes   No   Unknown
1b. Is there evidence of intracranial injury or skull fracture?   Yes   No   Unknown
1c. Location of Impact:  _Frontal   _Lft Temporal   _Rt Temporal   _Lft Parietal   _Rt Parietal   _Occipital   _Neck   _Indirect Force
**2. Cause:**  _MVC   _Pedestrian-MVC   _Fall   _Assault   _Sports (specify)____          _Other____
**3. Amnesia Before (Retrograde)** Are there any events just BEFORE the injury that you/ person has no memory of (even brief)?   Yes   No   Duration
**4. Amnesia After (Anterograde)** Are there any events just AFTER the injury that you/ person has no memory of (even brief)?   Yes   No   Duration
**5. Loss of Consciousness:** Did you/ person lose consciousness?   Yes   No   Duration
**6. EARLY SIGNS:** _Appears dazed or stunned   _Is confused about events   _Answers questions slowly   _Repeats Questions   _Forgetful (recent info)
**7. Seizures:** Were seizures observed? No_   Yes_   Detail_

---

**B. Symptom Check List** Since the injury, has the person experienced any of these symptoms any more than usual today or in the past day?   *Lovell & Collins, 1998 JHTR
Indicate presence of each symptom (0=No, 1=Yes).

| PHYSICAL (10) | | | COGNITIVE (4) | | | SLEEP (4) | | |
|---|---|---|---|---|---|---|---|---|
| Headache | 0 | 1 | Feeling mentally foggy | 0 | 1 | Drowsiness | 0 | 1 |
| Nausea | 0 | 1 | Feeling slowed down | 0 | 1 | Sleeping less than usual | 0 | 1   N/A |
| Vomiting | 0 | 1 | Difficulty concentrating | 0 | 1 | Sleeping more than usual | 0 | 1   N/A |
| Balance problems | 0 | 1 | Difficulty remembering | 0 | 1 | Trouble falling asleep | 0 | 1   N/A |
| Dizziness | 0 | 1 | **COGNITIVE Total (0-4)** | | | **SLEEP Total (0-4)** | | |
| Visual problems | 0 | 1 | **EMOTIONAL (4)** | | | | | |
| Fatigue | 0 | 1 | Irritability | 0 | 1 | **Exertion:** Do these symptoms worsen with | | |
| Sensitivity to light | 0 | 1 | Sadness | 0 | 1 | Physical Activity   Yes   No   N/A | | |
| Sensitivity to noise | 0 | 1 | More emotional | 0 | 1 | Cognitive Activity   Yes   No   N/A | | |
| Numbness/Tingling | 0 | 1 | Nervousness | 0 | 1 | **Overall Rating:** How different is the person acting | | |
| **PHYSICAL Total (0-10)** | | | **EMOTIONAL Total (0-4)** | | | compared to his/her usual self? (circle) | | |
| (Add Physical, Cognitive, Emotion, Sleep totals) Total Symptom Score (0-22) | | | | | | Normal  0  1  2  3  4  5  6  Very Different | | |

---

**C. Risk Factors for Protracted Recovery** (check all that apply)

| Concussion History? Y   N | √ | Headache History? Y   N | √ | Developmental History | √ | Psychiatric History |
|---|---|---|---|---|---|---|
| Previous # 1 2 3 4 5 6+ | | Prior treatment for headache | | Learning disabilities | | Anxiety |
| Longest symptom duration Days_ Weeks_ Months_ Years_ | | History of migraine headache    Personal    Family_ | | Attention-Deficit/ Hyperactivity Disorder | | Depression |
| | | | | | | Sleep disorder |
| If multiple concussions, less force caused reinjury? Yes_ No_ | | | | Other developmental disorder_ | | Other psychiatric disorder |
| List other comorbid medical disorders or medication usage (e.g., hypothyroid, seizures)_ | | | | | | |

---

**D. RED FLAGS for acute emergency management:** Refer to the emergency department with sudden onset of any of the following.
* Headaches that worsen      * Looks very drowsy/ can't be awakened   * Can't recognize people or places      * Neck pain
* Seizures                   * Repeated vomiting                       * Increasing confusion or irritability * Unusual behavioral change
* Focal neurologic signs     * Slurred speech                          * Weakness or numbness in arms/legs    * Change in state of consciousness

**E. Diagnosis (ICD):** _Concussion w/o LOC 850.0   _Concussion w/ LOC 850.1   _Concussion (Unspecified) 850.9   _Other (854) ____
____No diagnosis

**F. Follow-Up Action Plan**   Complete *ACE Care Plan* and provide copy to patient/family.
_No Follow-Up Needed
_Physician/Clinician Office Monitoring: Date of next follow-up____
_Referral:
   _Neuropsychological Testing
   _Physician: Neurosurgery_   Neurology_   Sports Medicine_   Physiatrist_   Psychiatrist_   Other____
   _Emergency Department

**ACE Completed by:**_____ MD RN NP PhD ATC          © Copyright G. Gioia & M. Collins, 2006

This form is a part of the "Heads Up: Brain Injury in Your Practice" tool kit developed by the Centers for Disease Control and Prevention (CDC).

---

The Acute Concussion Evaluation is an assessment tool for minor traumatic brain injury (mTBI) that provides the clinician with an evidence-based approach for evaluation and diagnosis of mTBI. This tool aids the practitioner in developing a follow-up action plan.[24] (Reproduced with permission from the Centers for Disease Control and Prevention: *Acute Concussion Evaluation [ACE]*. Available at: http://www.cdc.gov/concussion/headsup/pdf/ACE-a.pdf. Accessed July 12, 2013.)

Acute Concussion Evaluation.[31-34] The Centers for Disease Control and Prevention's concussion website (www.cdc.gov/concussion) is a valuable resource for clinicians and patients who wish to know more about mTBI; it provides various fact sheets, screening tools, and online seminars free of charge.[31]

Noncontrast CT of the head is considered the standard of care with regard to imaging for diagnosis of mTBI. However, neuroimaging is often of minimal utility because 85% of patients with mTBI show no pathology on initial CT.[1] Additionally, imaging rarely changes neurologic management, with only 1% of patients with suspected mTBI requiring neurosurgical intervention.[1,35] However, the absence of pathology on CT does not imply a clinically insignificant injury; the risk of persistent cognitive and emotional impairment following mTBI remains even with normal findings on imaging.[10,11]

Cognitive rehabilitation therapy (CRT) is becomingly an increasingly important component of treatment in patients with persistent symptoms following mTBI and is one focus of current research.[36] In a 2011 Institute of Medicine report, the Committee on Cognitive Rehabilitation Therapy for Traumatic Brain Injury supported the use of CRT for patients with behavioral and cognitive deficits due to TBI.[37] However, the committee also acknowledged that, based on current evidence, no definitive conclusion could be made regarding the efficacy of CRT in managing the sequelae of mTBI.

CRT uses a goal-oriented approach to management of mTBI and attempts to restore a person's ability to process information and perform cognitive tasks. This is accomplished by retraining previously learned skills, teaching compensatory strategies, and making environmental modifications to the person's domestic and work settings.[38] CRT may involve a wide variety of providers across multiple disciplines, including nursing, rehabilitation medicine, sports medicine, neurology, physical therapy, speech pathology, occupational therapy, and psychiatry. CRT can be administered in various settings, including hospitals, patients' homes and workplaces, and community care centers.

Referral of a patient to a cognitive rehabilitation specialist can be made by any healthcare provider and is indicated when a patient is symptomatic following mTBI, as in the patient described in the case study. A person who is trained to assess mTBI (eg, physician, nurse, nurse practitioner, physician assistant) performs the initial evaluation, which should be done within 30 days of referral. If a significant impairment is identified, further treatment by providers with expertise in managing mTBI is generally indicated. The website for the Society for Cognitive Rehabilitation is an excellent resource for patients with mTBI, their families, and physicians because it provides information on CRT and mTBI support groups.[39] Patients and healthcare providers can contact the society through its website for assistance with finding a cognitive rehabilitation specialist.

## Orthopaedic Approach to Minor Traumatic Brain Injury

Patients with musculoskeletal injuries and concomitant mTBI are susceptible to second-impact syndrome, which can have devastating consequences, including rapid-onset cerebral edema, worsening neurologic deficit, and physiologic instability. It is also associated with a rate of mortality approaching 50%.[18] Second-impact syndrome is traditionally thought of in the context of a person who sustains a second concussion before symptoms of an earlier concussion have resolved, thus compounding the initial injury. However, this condition is also caused by the systemic inflammatory response that occurs after trauma or a major operation. Orthopaedic procedures are notoriously implicated, with intramedullary instrumentation specifically linked to a systemic inflammatory response that can cause a second-impact event.[40]

Damage-control orthopaedics is an effective means of preventing second-impact syndrome in critically injured and physiologically unstable patients.[41] However, the use of damage-control orthopaedics should also be considered for treatment of stable patients with mTBI because they too are vulnerable to second-impact syndrome. Richards et al[42] found that reamed nailing was associated with a moderate risk factor for development of cognitive impairment at 1 year following initial injury in patients with negative findings on intracranial imaging and Injury Severity Scores >15.

At our institution, an urban academic trauma center, patients who present with a GCS score of ≤13 following blunt trauma are first evaluated by ED and trauma service physicians, with strict adherence to Advanced Trauma Life Support guidelines. These teams also determine the need for intracranial imaging and neurosurgical consultation. Members of the orthopaedic surgery team are taught to assess each patient for the presence of mTBI because patients initially thought to have an isolated musculoskeletal injury may have an associated mTBI.

We have developed an algorithm to assist orthopaedic residents and attending physicians with clinical decision making in the setting of concern for mTBI (Figure 2). This algorithm can be used to determine whether a

Richard L. Uhl, MD, et al



**Figure 2**

The Albany Medical Center Division of Orthopaedic Surgery algorithm for the management of minor traumatic brain injury (mTBI) in the setting of presumed isolated musculoskeletal trauma.

patient can be safely discharged home after a minor injury and intervention (eg, cast application for a distal radius fracture) or if a more formal workup is required either preoperatively or before discharge. This workup also addresses the need for neurosurgical consultation; we do not order intracranial imaging without first seeking a neurosurgery con-

sult (Table 3). The indications for neurosurgical consultation are part of a modified version of the guidelines for management of mTBI in adults developed by the Centers for Disease Control and Prevention and the American College of Emergency Physicians.[26] In the setting of mTBI, we defer to the neurosurgeon for preoperative clearance; we specifi-

cally ask for guidance on whether damage-control orthopaedics should be initiated to minimize the risk of a second-impact syndrome. In patients with an orthopaedic injury that is neither limb- nor life-threatening and a possible mTBI that does not require a neurosurgical evaluation, we routinely observe the patient for up to 4 hours before proceeding to the

Minor Traumatic Brain Injury: A Primer for the Orthopaedic Surgeon

Table 3

**Indications for Neurosurgical Consultation in the Setting of Presumed Isolated Musculoskeletal Trauma**

Loss of consciousness for >5 min or posttraumatic amnesia and one or more of the following:

Headache

Vomiting

Age >60 y

Drug or alcohol intoxication

Short-term memory deficit

Posttraumatic seizure

Physical evidence of trauma above the clavicle

Glasgow Coma Scale score <15

Focal neurologic deficit

Coagulopathy

operating room or discharging the patient, whichever is indicated. This protocol is also based on the practice guideline developed by the Centers for Disease Control and Prevention and the American College of Emergency Surgeons. It is intended to avoid any potential worsening of neurologic status. Prior to discharge, we routinely discuss with the patient the signs and symptoms of mTBI, refer the patient to www.cdc.gov/concussion, and recommend a follow-up visit with a primary care physician for evaluation and monitoring of symptoms.

The manifestations of mTBI may develop insidiously or initially go unrecognized until orthopaedic outpatient follow-up, as depicted in the case study. In such instances, the orthopaedic surgeon must be familiar with physicians and other specialists in the community who can evaluate for and manage mTBI, to facilitate appropriate referral and follow-up for patients with mTBI. If concern for intracranial hemorrhage or a more severe TBI exists at any time during orthopaedic outpatient follow-up, emergent transfer to an ED is crit-

ical because such symptoms (eg, severe, persistent, worsening headache; altered level of consciousness; focal neurologic symptoms) require neuroimaging and further evaluation.

## Summary

mTBI is now recognized as an important public health problem. It is associated with potentially severe cognitive, behavioral, social, and physical dysfunction, leading to unemployment and significant disability. Often, mTBI is a clinical diagnosis, and neuroimaging is typically of limited utility.

Orthopaedic surgeons can play a crucial role in the diagnosis of this condition because they are commonly the only physicians who provide long-term care for patients after trauma. Consequently, it is important for orthopaedic surgeons to be adept at detecting the signs and symptoms of mTBI. In addition to caring for musculoskeletal injuries, these healthcare providers can identify potentially subtle indications of mTBI and ensure that patients are appropriately referred to those with expertise in managing this condition.

## References

*Evidence-based Medicine*: Levels of evidence are described in the table of contents. In this article, reference 40 is a level I study. References 3, 6, 7, 16, 18, 19, 25, 27, 30, and 37 are level II studies. References 2, 24, 28, 29, 35, and 42 are level III studies. References 5, 10, 15, 17, and 26 are level V expert opinion.

References printed in **bold type** are those published within the past 5 years.

1. Bruns JJ Jr, Jagoda AS: Mild traumatic brain injury. *Mt Sinai J Med* 2009;76(2):129-137.

2. Blostein P, Jones SJ: Identification and evaluation of patients with minor

traumatic brain injury: Results of a national survey of level I trauma centers. *J Trauma* 2003;55(3):450-453.

3. Kashluba S, Hanks RA, Casey JE, Millis SR: Neuropsychologic and functional outcome after complicated mild traumatic brain injury. *Arch Phys Med Rehabil* 2008;89(5):904-911.

4. Upadhyay D: Cognitive functioning in TBI patients: A review of the literature. *Middle East Journal of Scientific Research* 2008;3(3):120-125.

5. Silver JM, McAllister TW, Arciniegas DB: Depression and cognitive complaints following mild traumatic brain injury. *Am J Psychiatry* 2009;166(6):653-661.

6. Bazarian JJ, Atabaki S: Predicting postconcussion syndrome after minor traumatic brain injury. *Acad Emerg Med* 2001;8(8):788-795.

7. Jorge RE, Robinson RG, Starkstein SE, Arndt SV: Influence of major depression on 1-year outcome in patients with traumatic brain injury. *J Neurosurg* 1994;81(5):726-733.

8. Flierl MA, Stoneback JW, Beauchamp KM, et al: Femur shaft fracture fixation in head-injured patients: When is the right time? *J Orthop Trauma* 2010;24(2):107-114.

9. Bazarian JJ, McClung J, Shah MN, Cheng YT, Flesher W, Kraus J: Mild traumatic brain injury in the United States, 1998-2000. *Brain Inj* 2005;19(2):85-91.

10. National Center for Injury Prevention and Control: *Report to Congress on Minor Traumatic Brain Injury in the United States: Steps to Prevent a Serious Public Health Problem*. Atlanta, GA, Centers for Disease Control and Prevention, 2003.

11. Rutland-Brown W, Langlois JA, Thomas KE, Xi YL: Incidence of traumatic brain injury in the United States, 2003. *J Head Trauma Rehabil* 2006;21(6):544-548.

12. Glenn JN, Miner ME, Peltier LF: The treatment of fractures of the femur in patients with head injuries: 1973. *Clin Orthop Relat Res* 2004;(422):142-144.

13. Grotz MR, Giannoudis PV, Pape HC, Allami MK, Dinopoulos H, Krettek C: Traumatic brain injury and stabilisation of long bone fractures: An update. *Injury* 2004;35(11):1077-1086.

14. Ling GS, Marshall SA, Moore DF: Diagnosis and management of traumatic brain injury. *Continuum (Minneap Minn)* 2010;16(6 Traumatic Brain Injury):27-40.

15. Practice parameter: The management of concussion in sports (summary statement). Report of the Quality Standards Subcommittee. *Neurology*

1997;48(3):581-585.

16. Cassidy JD, Carroll LJ, Peloso PM, et al: Incidence, risk factors and prevention of mild traumatic brain injury: Results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury. *J Rehabil Med* 2004;(43 suppl):28-60.

17. von Holst H, Cassidy JD: Mandate of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury. *J Rehabil Med* 2004;(43 suppl):8-10.

18. Bazarian JJ, Donnelly K, Peterson DR, Warner GC, Zhu T, Zhong J: The relation between posttraumatic stress disorder and mild traumatic brain injury acquired during operations enduring freedom and Iraqi freedom. *J Head Trauma Rehabil* 2013;28(1):1-12.

19. Teasdale G, Jennett B: Assessment of coma and impaired consciousness: A practical scale. *Lancet* 1974;2(7872):81-84.

20. Toth A, Kovacs N, Perlaki G, et al: Multi-modal magnetic resonance imaging in the acute and sub-acute phase of mild traumatic brain injury: Can we see the difference? *J Neurotrauma* 2013; 30(1):2-10.

21. Squarcina L, Bertoldo A, Ham TE, Heckemann R, Sharp DJ: A robust method for investigating thalamic white matter tracts after traumatic brain injury. *Neuroimage* 2012;63(2):779-788.

22. Grossman EJ, Ge Y, Jensen JH, et al: Thalamus and cognitive impairment in mild traumatic brain injury: A diffusional kurtosis imaging study. *J Neurotrauma* 2012;29(13):2318-2327.

23. Bazarian JJ, Blyth B, Cimpello L: Bench to bedside: Evidence for brain injury after concussion: Looking beyond the computed tomography scan. *Acad Emerg Med* 2006;13(2):199-214.

24. Rutherford WH, Merrett JD, McDonald JR: Symptoms at one year following concussion from minor head injuries. *Injury* 1979;10(3):225-230.

25. Dikmen SS, Temkin NR, Machamer JE, Holubkov AL, Fraser RT, Winn HR: Employment following traumatic head injuries. *Arch Neurol* 1994;51(2):177-186.

26. Jagoda AS, Bazarian JJ, Bruns JJ Jr, et al: Clinical policy: Neuroimaging and decisionmaking in adult mild traumatic brain injury in the acute setting. *Ann Emerg Med* 2008;52(6):714-748.

27. Ponsford J, Willmott C, Rothwell A, et al: Impact of early intervention on outcome following mild head injury in adults. *J Neurol Neurosurg Psychiatry* 2002;73(3):330-332.

28. Jackson JC, Obremskey W, Bauer R, et al: Long-term cognitive, emotional, and functional outcomes in trauma intensive care unit survivors without intracranial hemorrhage. *J Trauma* 2007; 62(1):80-88.

29. Stulemeijer M, van der Werf SP, Jacobs B, et al: Impact of additional extracranial injuries on outcome after mild traumatic brain injury. *J Neurotrauma* 2006; 23(10):1561-1569.

30. Read KM, Kufera JA, Dischinger PC, et al: Life-altering outcomes after lower extremity injury sustained in motor vehicle crashes. *J Trauma* 2004;57(4): 815-823.

31. Centers for Disease Control and Prevention: Injury prevention & control: Traumatic brain injury. Concussion: What are the signs and symptoms of concussion? Available at: http://www.cdc.gov/concussion/signs_symptoms.html. Accessed July 10, 2013.

32. Gioia G, Collins M: Acute Concussion Evaluation (ACE): Physician/Clinician office version. Available at: http://www.cdc.gov/concussion/headsup/pdf/ACE-a.pdf. Accessed July 10, 2013.

33. Karceski S: Patient page: Concussion. *Neurology* 2011;76(17):e83-e85.

34. Knowconcussion: The sideline assessment for concussion. Available at: http://www.knowconcussion.org/concussion-management/the-sideline-assessment-for-concussion. Accessed July 10, 2013.

35. Bazarian JJ, McClung J, Cheng YT, Flesher W, Schneider SM: Emergency department management of mild traumatic brain injury in the USA. *Emerg Med J* 2005;22(7):473-477.

36. Gordon WA, Zafonte R, Cicerone K, et al: Traumatic brain injury rehabilitation: State of the science. *Am J Phys Med Rehabil* 2006;85(4):343-382.

37. Koehler R, Wilhelm EE, Shoulson I: *Cognitive Rehabilitation Therapy for Traumatic Brain Injury: Evaluating the Evidence.* Washington, DC, National Academy, 2011.

38. Tsaousides T, Gordon WA: Cognitive rehabilitation following traumatic brain injury: Assessment to treatment. *Mt Sinai J Med* 2009;76(2):173-181.

39. The Society for Cognitive Rehabilitation: Practical innovation in cognitive rehabilitation therapy. Available at: www.societyforcognitiverehab.org. Accessed July 11, 2013.

40. Pape HC, Grimme K, Van Griensven M, et al: Impact of intramedullary instrumentation versus damage control for femoral fractures on immunoinflammatory parameters: Prospective randomized analysis by the EPOFF Study Group. *J Trauma* 2003; 55(1):7-13.

41. Giannoudis PV, Giannoudi M, Stavlas P: Damage control orthopaedics: Lessons learned. *Injury* 2009;40(suppl 4):S47-S52.

42. Richards JE, Guillamondegui OD, Archer KR, Jackson JC, Ely EW, Obremskey WT: The association of reamed intramedullary nailing and long-term cognitive impairment. *J Orthop Trauma* 2011;25(12):707-713.

**HEADS UP CLINICIANS**

## ACUTE CONCUSSION EVALUATION (ACE)
### PHYSICIAN/CLINICIAN OFFICE VERSION

Gerard Gioia, PhD[1] & Micky Collins, PhD[2]
[1]Children's National Medical Center
[2]University of Pittsburgh Medical Center

Patient Name:_____
DOB: _____  Age:_____
Date:_____  ID/MR#_____

---

**A. Injury Characteristics**   Date/Time of Injury_____   Reporter: __Patient __Parent __Spouse __Other_____

**1. Injury Description** _____
_____

1a. Is there evidence of a forcible blow to the head (direct or indirect)?   __Yes __No __Unknown
1b. Is there evidence of intracranial injury or skull fracture?        __Yes __No __Unknown
1c. Location of Impact: __Frontal __Lft Temporal __Rt Temporal __Lft Parietal __Occipital __Neck __Indirect Force
2. **Cause:** __MVC __Pedestrian-MVC __Fall __Assault __Sports (specify)_____ Other_____
3. **Amnesia Before (Retrograde)** Are there any events just BEFORE the injury that you/ person has no memory of (even brief)?  __ Yes __No  Duration
4. **Amnesia After (Anterograde)** Are there any events just AFTER the injury that you/ person has no memory of (even brief)?   __ Yes __No  Duration
5. **Loss of Consciousness:** Did you/ person lose consciousness?                  __ Yes __No  Duration
6. **EARLY SIGNS:** __Appears dazed or stunned __Is confused about events __Answers questions slowly __Repeats Questions __Forgetful (recent info)
7. **Seizures:** Were seizures observed? No__ Yes__  Detail_____

---

**B. Symptom Check List*** Since the injury, has the person experienced any of these symptoms any more than usual today or in the past day?
Indicate presence of each symptom (0=No, 1=Yes).                            *Lovell & Collins, 1998 JHTR

| PHYSICAL (10) | | | COGNITIVE (4) | | | SLEEP (4) | | | |
|---|---|---|---|---|---|---|---|---|---|
| Headache | 0 | 1 | Feeling mentally foggy | 0 | 1 | Drowsiness | 0 | 1 | |
| Nausea | 0 | 1 | Feeling slowed down | 0 | 1 | Sleeping less than usual | 0 | 1 | N/A |
| Vomiting | 0 | 1 | Difficulty concentrating | 0 | 1 | Sleeping more than usual | 0 | 1 | N/A |
| Balance problems | 0 | 1 | Difficulty remembering | 0 | 1 | Trouble falling asleep | 0 | 1 | N/A |
| Dizziness | 0 | 1 | COGNITIVE Total (0-4) | | | SLEEP Total (0-4) | | | |
| Visual problems | 0 | 1 | EMOTIONAL (4) | | | | | | |
| Fatigue | 0 | 1 | Irritability | 0 | 1 | **Exertion:** Do these symptoms worsen with: | | | |
| Sensitivity to light | 0 | 1 | Sadness | 0 | 1 | Physical Activity  __Yes __No __N/A | | | |
| Sensitivity to noise | 0 | 1 | More emotional | 0 | 1 | Cognitive Activity __Yes __No __N/A | | | |
| Numbness/Tingling | 0 | 1 | Nervousness | 0 | 1 | **Overall Rating:** How different is the person acting compared to his/her usual self? (circle) | | | |
| PHYSICAL Total (0-10) _____ | | | EMOTIONAL Total (0-4) _____ | | | | | | |
| (Add Physical, Cognitive, Emotion, Sleep totals) Total Symptom Score (0-22) | | | | | | Normal 0  1  2  3  4  5  6 Very Different | | | |

---

**C. Risk Factors for Protracted Recovery** (check all that apply)

| Concussion History? Y ___ N___ | √ | Headache History? Y ___ N___ | √ | Developmental History | √ | Psychiatric History |
|---|---|---|---|---|---|---|
| Previous # 1  2  3  4  5  6+ | | Prior treatment for headache | | Learning disabilities | | Anxiety |
| Longest symptom duration Days__ Weeks__ Months__ Years__ | | History of migraine headache __ Personal __ Family_____ | | Attention-Deficit/ Hyperactivity Disorder | | Depression |
| | | | | | | Sleep disorder |
| If multiple concussions, less force caused reinjury?  Yes__ No__ | | | | Other developmental disorder_____ | | Other psychiatric disorder |

List other comorbid medical disorders or medication usage (e.g., hypothyroid, seizures)_____
_____

---

**D. RED FLAGS for acute emergency management:** Refer to the emergency department with sudden onset of any of the following:

| | | | |
|---|---|---|---|
| * Headaches that worsen | * Looks very drowsy/ can't be awakened | * Can't recognize people or places | * Neck pain |
| * Seizures | * Repeated vomiting | * Increasing confusion or irritability | * Unusual behavioral change |
| * Focal neurologic signs | * Slurred speech | * Weakness or numbness in arms/legs | * Change in state of consciousness |

---

**E. Diagnosis (ICD):** __Concussion w/o LOC 850.0 __Concussion w/ LOC 850.1 __Concussion (Unspecified) 850.9 __Other (854) _____
__No diagnosis

---

**F. Follow-Up Action Plan    Complete ACE Care Plan and provide copy to patient/family.**
__ No Follow-Up Needed
__ Physician/Clinician Office Monitoring: Date of next follow-up _____
__ Referral:
____ Neuropsychological Testing
____ Physician: Neurosurgery____ Neurology____ Sports Medicine____ Physiatrist____ Psychiatrist____ Other_____
____ Emergency Department

**ACE Completed by:**_____

© Copyright G. Gioia & M. Collins, 2006

This form is part of the "Heads Up: Brain Injury in Your Practice" tool kit developed by the Centers for Disease Control and Prevention (CDC).

**A concussion (or mild traumatic brain injury (MTBI))** is a complex pathophysiologic process affecting the brain, induced by traumatic biomechanical forces secondary to direct or indirect forces to the head. Disturbance of brain function is related to neurometabolic dysfunction, rather than structural injury, and is typically associated with normal structural neuroimaging findings (i.e., CT scan, MRI). Concussion may or may not involve a loss of consciousness (LOC). Concussion results in a constellation of physical, cognitive, emotional, and sleep-related symptoms. Symptoms may last from several minutes to days, weeks, months or even longer in some cases.

## ACE Instructions

The ACE is intended to provide an evidence-based clinical protocol to conduct an initial evaluation and diagnosis of patients (both children and adults) with known or suspected MTBI. The research evidence documenting the importance of these components in the evaluation of an MTBI is provided in the reference list.

**A. Injury Characteristics:**

1. Obtain **description of the injury** – how injury occurred, type of force, location on the head or body (if force transmitted to head). Different biomechanics of injury may result in differential symptom patterns (e.g., occipital blow may result in visual changes, balance difficulties).

2. Indicate the **cause of injury.** Greater forces associated with the trauma are likely to result in more severe presentation of symptoms.

3/4. **Amnesia:** Amnesia is defined as the failure to form new memories. Determine whether amnesia has occurred and attempt to determine length of time of memory dysfunction – before (retrograde) and after (anterograde) injury. Even seconds to minutes of memory loss can be predictive of outcome. Recent research has indicated that amnesia may be up to 4-10 times more predictive of symptoms and cognitive deficits following concussion than is LOC (less than 1 minute).[1]

5. **Loss of consciousness (LOC)** – If occurs, determine length of LOC.

6. **Early signs.** If present, ask the individuals who know the patient (parent, spouse, friend, etc) about specific signs of the concussion that may have been observed. These signs are typically observed early after the injury.

7. Inquire whether **seizures** were observed or not.

**B. Symptom Checklist:** [2]

1. Ask patient (and/or parent, if child) to report presence of the four categories of symptoms since injury. It is important to assess all listed symptoms as different parts of the brain control different functions. One or all symptoms may be present depending on mechanisms of injury.[3] Record "1" for Yes or "0" for No for their presence or absence, respectively.

2. For all symptoms, indicate presence of symptoms as experienced within the past 24 hours. Since symptoms can be present premorbidly/at baseline (e.g., inattention, headaches, sleep, sadness), it is important to assess change from their usual presentation.

3. **Scoring:** Sum total number of symptoms present per area, and sum all four areas into Total Symptom Score (score range 0-22). (Note: most sleep symptoms are only applicable after a night has passed since the injury. Drowsiness may be present on the day of injury.) If symptoms are new and present, there is no lower limit symptom score. Any score > 0 indicates positive symptom history.

4. **Exertion:** Inquire whether any symptoms worsen with physical (e.g., running, climbing stairs, bike riding) and/or cognitive (e.g., academic studies, multi-tasking at work, reading or other tasks requiring focused concentration) exertion. Clinicians should be aware that symptoms will typically worsen or re-emerge with exertion, indicating incomplete recovery. Over-exertion may protract recovery.

5. **Overall Rating:** Determine how different the person is acting from their usual self. Circle "0" (Normal) to "6" (Very Different).

**C. Risk Factors for Protracted Recovery:** Assess the following risk factors as possible complicating factors in the recovery process.

1. **Concussion history:** Assess the number and date(s) of prior concussions, the duration of symptoms for each injury, and whether less biomechanical force resulted in re-injury. Research indicates that cognitive and symptom effects of concussion may be cumulative, especially if there is minimal duration of time between injuries and less biomechanical force results in subsequent concussion (which may indicate incomplete recovery from initial trauma).[4-8]

2. **Headache history:** Assess personal and/or family history of diagnosis/treatment for headaches. Research indicates headache (migraine in particular) can result in protracted recovery from concussion.[8-11]

3. **Developmental history:** Assess history of learning disabilities, Attention-Deficit/Hyperactivity Disorder or other developmental disorders. Research indicates that there is the possibility of a longer period of recovery with these conditions.[12]

4. **Psychiatric history:** Assess for history of depression/mood disorder, anxiety, and/or sleep disorder.[13-16]

**D. Red Flags:** The patient should be carefully observed over the first 24-48 hours for these serious signs. Red flags are to be assessed as possible signs of deteriorating neurological functioning. Any positive report should prompt strong consideration of referral for emergency medical evaluation (e.g. CT Scan to rule out intracranial bleed or other structural pathology).[17]

**E. Diagnosis:** The following ICD diagnostic codes may be applicable.

**850.0 (Concussion, with no loss of consciousness)** – Positive injury description with evidence of forcible direct/ indirect blow to the head (A1a); plus evidence of active symptoms (B) of any type and number related to the trauma (Total Symptom Score >0); no evidence of LOC (A5), skull fracture or intracranial injury (A1b).

**850.1 (Concussion, with brief loss of consciousness < 1 hour)** – Positive injury description with evidence of forcible direct/ indirect blow to the head (A1a); plus evidence of active symptoms (B) of any type and number related to the trauma (Total Symptom Score >0); positive evidence of LOC (A5), skull fracture or intracranial injury (A1b).

**850.9 (Concussion, unspecified)** – Positive injury description with evidence of forcible direct/ indirect blow to the head (A1a); plus evidence of active symptoms (B) of any type and number related to the trauma (Total Symptom Score >0); unclear/unknown injury details; unclear evidence of LOC (A5), no skull fracture or intracranial injury.

**Other Diagnoses** – If the patient presents with a positive injury description and associated symptoms, but additional evidence of intracranial injury (A 1b) such as from neuroimaging, a moderate TBI and the diagnostic category of 854 (Intracranial injury) should be considered.

**F. Follow-Up Action Plan:** Develop a follow-up plan of action for symptomatic patients. The physician/clinician may decide to (1) monitor the patient in the office or (2) refer them to a specialist. Serial evaluation of the concussion is critical as symptoms may resolve, worsen, or ebb and flow depending upon many factors (e.g., cognitive/physical exertion, comorbidities). Referral to a specialist can be particularly valuable to help manage certain aspects of the patient's condition. (Physician/Clinician should also complete the ACE Care Plan included in this tool kit.)

1. **Physician/Clinician serial monitoring** – Particularly appropriate if number and severity of symptoms are steadily decreasing over time and/or fully resolve within 3-5 days. If steady reduction is not evident, referral to a specialist is warranted.

2. **Referral to a specialist** – Appropriate if symptom reduction is not evident in 3-5 days, or sooner if symptom profile is concerning in type/severity.
   - Neuropsychological Testing can provide valuable information to help assess a patient's brain function and impairment and assist with treatment planning, such as return to play decisions.
   - Physician Evaluation is particularly relevant for medical evaluation and management of concussion. It is also critical for evaluating and managing focal neurologic, sensory, vestibular, and motor concerns. It may be useful for medication management (e.g., headaches, sleep disturbance, depression) if post-concussive problems persist.



**ACQUIRED BRAIN INJURY** IRELAND

# SCAT3™

## Sport Concussion Assessment Tool

(For use by medical professionals only)

## What is the SCAT3?

The SCAT 3 is a standardised tool for evaluation injured athletes for concussion and can be used in athletes aged from 13 years and older. It supersedes the original SCAT and the SCAT2 published in 2005 and 2009, respectively.

NOTE: The diagnosis of a concussion is a clinical judgment, ideally made by a medical professional. The SCAT3 should not be used solely to make, or exclude, the diagnosis of concussion in the absence of clinical judgment. An athlete may have a concussion even if their SCAT3 is "normal". If you are not qualified, please use the Complete Concussion Test Tool.

A concussion is a disturbance in brain function caused by a direct or indirect force to the head. It results in a variety of non-specific signs and/or symptoms (some examples listed below) and most often does not involve loss of consciousness. Concussion should be suspected in the presence of **any one or more** of the following:
a) Symptoms: somatic (e.g. headache), or
b) Physical signs (e.g. unsteadiness), or
c) Impaired brain function (e.g. confusion) or
d) Abnormal behaviour (e.g., change in personality).

## SIDELINE ASSESSMENT

### Indication for Emergency Management

NOTE: A hit to the head can sometimes be associated with a more serious brain injury. Any of the following warrants consideration to activating emergency procedures and urgent transportation to the nearest hospital:

- Glasgow Coma score less than 15
- Deteriorating mental status
- Potential spinal injury
- Progressive, worsening symptoms or new neurologic signs.

### Potential signs of concussion?

If any of the following signs are observed after a direct or indirect blow to the head, the rider should stop participation, be evaluated by a medical professional and **should not be permitted to return to sport the same day** if a concussion is suspected.

| | | |
|---|---|---|
| Any loss of consciousness? | Y | N |
| "If so, how long?" | | |
| Balance or motor coordination | Y | N |
| (Stumbles, slow, laboured movements etc.?) | | |
| Disorientation or confusion | Y | N |
| (Inability to respond appropriately to questions?) | | |
| Loss of Memory | Y | N |
| "If so, how long?" | | |
| "Before or after the injury?" | | |
| Blank or vacant look | Y | N |
| Visible facial injury in combination with any of the above | Y | N |

### 1    Glasgow Coma Scale (GCS)

| **Best Eye Response (E)** | |
|---|---|
| No eye opening | 1 |
| Eye opening in response to pain | 2 |
| Eye opening to speech | 3 |
| Eyes opening spontaneously | 4 |
| **Best Verbal Response (V)** | |
| No verbal response | 1 |
| Incomprehensible sounds | 2 |
| Inappropriate words | 3 |
| Confused | 4 |
| Oriented | 5 |
| **Best Motor Response (M)** | |
| No motor response | 1 |
| Extension to pain | 2 |
| Abnormal flexion to pain | 3 |
| Flexion/Withdrawal to pain | 4 |
| Localizes to pain | 5 |
| Obeys commands | 6 |
| **Glasgow Coma Score (E+V+M)** | **of 15** |

**GCS should be recorded for all athletes in case of subsequent deterioration.**

### 2    Maddocks Score

"I am going to ask you a few questions, please listen carefully and give your best effort."

(1 point for each correct answer)

| | | |
|---|---|---|
| What venue are we at today? | 0 | 1 |
| Which half is it now? | 0 | 1 |
| Who scored last in this match? | 0 | 1 |
| What team did you play last week / game? | 0 | 1 |
| Did your team win the last game? | 0 | 1 |
| **Maddocks Score** | | **of 5** |

**Notes:** Mechanism of Injury ("tell me what happened"?):

**Any player with a suspected concussion should be REMOVED FROM PLAY, medically assessed, monitored for deterioration (i.e. should not be left alone) and should not drive a motor vehicle until cleared to do so by a medical professional. No player diagnosed with concussion should be returned to sports participation on the day of injury.**

SCAT3™ Concussion Assessment Tool (For use by medical professionals only)

## BACKGROUND

| | |
|---|---|
| Name: | Date: |
| Examiner: | |
| Sport/Team/School: | Date/time of injury: |
| Age: | Gender:   Male   Female |

Years of education completed:

Dominant hand:     Right   Left   Neither

How many concussions do you think you have had in the past?

When was the most recent concussion?

How long was your recovery from the most recent concussion?

| | | |
|---|---|---|
| Have you ever been hospitalized or had medical imaging done for a head injury? | Yes | No |
| Have you ever been diagnosed with headaches or migraines? | Yes | No |
| Do you have a learning disability, dyslexia, ADD/ADHD? | Yes | No |
| Have you ever been diagnosed with depression, anxiety or other psychiatric disorder? | Yes | No |
| Has anyone in your family ever been diagnosed with any of these problems? | Yes | No |
| Are you on medications? If yes, please list: | Yes | No |

**SCAT3 to be done in resting state.**
**Best done 10 or more minutes post exercise.**

## SYMPTOM EVALUATION

### 3 | How do you feel?

"You should score yourself on the following symptoms, based on how you feel now".

| | None | Mild | | Moderate | | Severe | |
|---|---|---|---|---|---|---|---|
| Headache | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| "Pressure in head" | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Neck Pain | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Nausea or vomiting | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Dizziness | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Blurred vision | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Balance problems | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Sensitivity to light | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Sensitivity to noise | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Feeling slowed down | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Feeling like "in a fog" | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| "Don't feel right" | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Difficulty concentrating | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Difficulty remembering | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Fatigue or low energy | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Confusion | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Drowsiness | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Trouble falling asleep | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| More emotional | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Irritability | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Sadness | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Nervous or Anxious | 0 | 1 | 2 | 3 | 4 | 5 | 6 |

**Total number of symptoms** (Maximum possible 22)

**Symptom severity score** (Maximum possible 132)

| | | |
|---|---|---|
| Do the symptoms get worse with physical activity? | Yes | No |
| Do the symptoms get worse with mental activity? | Yes | No |

Self rated          Self rated and clinician monitored

Clinician interview     Self rated with parent input

**Overall rating:** If you know the athlete well prior to the injury, how different is the athlete acting compared to his/her usual self.

Please circle one response:

No different   Very different   Unsure        N/A

### 4 | Cognitive Assessment

**Standardized Assessment of Concussion (SAC)**

#### Orientation (1 point for each correct answer)

| | | |
|---|---|---|
| What month is it? | 0 | 1 |
| What is the date today? | 0 | 1 |
| What is the day of the week? | 0 | 1 |
| What year is it? | 0 | 1 |
| What time is it right now? (within 1 hour) | 0 | 1 |
| **Orientation Score** | | **of 5** |

#### Immediate Memory

"I am going to test your memory. I will read you a list of words and when I am done, repeat back as many words as you can remember, in any order."

| List | Trial 1 | Trial 2 | Trial 3 | Alternative word list | | |
|---|---|---|---|---|---|---|
| elbow | 0 1 | 0 1 | 0 1 | candle | baby | finger |
| apple | 0 1 | 0 1 | 0 1 | paper | monkey | penny |
| carpet | 0 1 | 0 1 | 0 1 | sugar | perfume | blanket |
| saddle | 0 1 | 0 1 | 0 1 | sandwich | sunset | lemon |
| bubble | 0 1 | 0 1 | 0 1 | wagon | iron | insect |
| **Immediate Memory Score** | | | | | | **of 15** |

#### Concentration

**Digits Backwards:**

"I am going to read you a string of numbers and when I am done, you repeat them back to me backwards, in reverse order of how I read them to you. For example, if I say 7-1-9, you would say 9-1-7."

If correct, go to next string length. If correct, read trial 2. One point possible for each string length. Stop after incorrect on both trials. The digits should be read at the rate of one per second.

| | | | | |
|---|---|---|---|---|
| 4-9-3 | 0 1 | 6-2-9 | 5-2-6 | 4-1-5 |
| 3-8-1-4 | 0 1 | 3-2-7-9 | 1-7-9-5 | 4-9-6-8 |
| 6-2-9-7-1 | 0 1 | 1-5-2-8-6 | 3-8-5-2-7 | 6-1-8-4-3 |
| 7-1-8-4-6-2 | 0 1 | 5-3-9-1-4-8 | 8-3-1-9-6-4 | 7-2-4-8-5-6 |
| **Total** | **of 4** | | | |

#### Months in Reverse Order

"Now tell me the months of the year in reverse order. Start with the last month and go backward. So you'll say December, November...Go ahead."

1 pt. for entire sequence correct.

| | | |
|---|---|---|
| Dec-Nov-Oct-Sep-Aug-Jul-Jun-May-Apr-Mar-Feb-Jan | 0 | 1 |
| **Concentration Score** | | **of 5** |

### 5 | Neck Examination

- Range of motion
- Tenderness
- Upper and lower limb sensation & strength

Findings:

SCAT3™ Concussion Assessment Tool (For use by medical professionals only)

## 6 | Balance Examination

Do one or both of the following tests.

Footwear (shoes, barefoot, braces, tape, etc.)

**Modified Balance Error Scoring System (BESS) testing**

This balance testing is based on a modified version of the Balance Error Scoring System (BESS). A stopwatch or watch with a second hand is required for this testing.

Which foot was tested (i.e. which is the non-dominant foot)    Left    Right

Testing Surface

"I am now going to test your balance. Please take your shoes off, roll up your pant legs above ankle (if applicable), and remove any ankle taping (if applicable). This test will consist of three twenty second tests with different stances"

**(a) Double leg stance:**
"The first stance is standing with your feet together with your hands on your hips and with your eyes closed. You should try to maintain stability in that position for 20 seconds. I will be counting the number of times you move out of this position. I will start timing when you are set and have closed your eyes"

**(b) Single leg stance:**
"If you were to kick a ball, which foot would you use? [This will be the dominant foot] Now stand on your non-dominant foot. The dominant leg should be held in approximately 30 degrees of hip flexion and 45 degrees of knee flexion. Again, you should try to maintain stability for 20 seconds with your hands on your hips and your eyes closed. I will be counting the number of times you move out of this position. If you stumble out of this position, open your eyes and return to the start position and continue balancing. I will start timing when you are set and have closed your eyes"

**(c) Tandem stance:**
"Now stand heel-to-toe with your non-dominant foot in back. Your weight should be evenly distributed across both feet. Again, you should try to maintain stability for 20 seconds with your hands on your hips and your eyes closed. I will be counting the number of times you move out of this position. If you stumble out of this position, open your eyes and return to the start position and continue balancing. I will start timing when you are set and have closed your eyes.

**And / or Tandem Gate**

Participants are instructed to stand with their feet together behind a starting line (the test is best done with footwear removed). Then, they walk in a forward direction as quickly and as accurately as possible along a 38mm wide (sports tape), 3 meter line with an alternate foot heel-to-toe gait ensuring that they approximate their heel and toe on each step. Once they cross the end of the 3m line, they turn 180 degrees and return to the starting point using the same gait. A total of 4 trials are done and the best time is retained. Athletes should complete the test in 14 seconds. Athletes fail the test if they step off the line, have a separation between their heel and toe, or if they touch or grab the examiner or an object. In this case, the time is not recorded and the trial repeated, if appropriate.

**Balance Testing – types of errors**
- Hands lifted off iliac crest
- Opening eyes
- Step, stumble or fall
- Moving hip into > 30 degrees abduction
- Lifting forefoot or heel
- Remaining out of test position > 5 sec

Each of the 20-second trials is scored by counting the errors, or deviations from the proper stance, accumulated by the athlete. The examiner will begin counting errors only after the individual has assumed the proper start position. The modified BESS is calculated by adding one error point for each error during the three 20-second tests. The maximum total number of errors for any single condition is 10. If a rider commits multiple errors simultaneously, only one error is recorded but the athlete should quickly return to the testing position, and counting should resume once subject is set. Subjects that are unable to maintain the testing procedure for a minimum of five seconds at the start are assigned the highest possible score, ten, for that testing condition.

| Condition | Total Errors |
|---|---|
| Double Leg Stance (feet together) | of 10 |
| Single Leg Stance (non-dominant foot) | of 10 |
| Tandem Stance (non-dominant foot at back) | of 10 |
| Balance Examination score (30 minus total errors) | of 30 |

And/or

**Tandem gait**

Participants etc.

Time (best of 4 trials)                                              seconds

## 7 | Coordination Examination

Finger-to-nose (FTN) task:
"I am going to test your coordination now. Please sit comfortably on the chair with your eyes open and your arm (either right or left) outstretched (shoulder flexed to 90 degrees and elbow and fingers extended). When I give a start signal, I would like you to perform five successive finger to nose repetitions using your index finger to touch the tip of the nose as quickly and as accurately as possible."

Which arm was tested:                                    Left    Right

Scoring: 5 correct repetitions in < 4 seconds = 1

Note for testers: Athletes fail the test if they do not touch their nose, do not fully extend their elbow or do not perform five repetitions. Failure should be scored as 0.

Coordination score:                                              of 1

## 8 | SAC Delayed Recall

**Standardized Assessment of Concussion (SAC)**

**Delayed Recall** (1 point for each correct answer)

"Do you remember that list of words I read a few times earlier? Tell me as many words from the list as you can remember in any order."

Circle each word correctly recalled. Total score equals number of words recalled.

| List | Alternative word list | | |
|---|---|---|---|
| elbow | candle | baby | finger |
| apple | paper | monkey | penny |
| carpet | sugar | perfume | blanket |
| saddle | sandwich | sunset | lemon |
| bubble | wagon | iron | insect |
| **Delayed recall score** | | | **of 5** |

## Scoring Summary

| Test Domain | Score | | |
|---|---|---|---|
| | Date: | Date: | Date: |
| Number of symptoms of 22 | | | |
| Symptom Severity Score of 132 | | | |
| Orientation of 5 | | | |
| Immediate Memory of 15 | | | |
| Concentration of 5 | | | |
| Delayed Recall of 5 | | | |
| **SAC Total** | | | |
| BESS (total errors) | | | |
| Tandem Gait (seconds) | | | |
| Coordination of 1 | | | |

**Scoring on the SCAT3 should not be used as a stand-alone method to diagnose concussion, measure recovery or make decisions about an athlete's readiness to return to play after concussion. Since signs and symptoms may evolve over time, it is important to consider repeat evaluation in the acute assessment of concussion**

## Clinical Examination

B.P.:                                    Pulse:

Associated Injuries (especially facial):

Visual Fields:  L:                    R:                        Pupils:

## Neurological Examination

| | Normal | | Details |
|---|---|---|---|
| Level of consciousness | Y | N | |
| Cranial Nerves | Y | N | |
| Motor | Y | N | |
| Sensory | Y | N | |

**Red Flags for acute emergency management and referral, if any of the following are present**

| | | |
|---|---|---|
| Headache that worsens | Seizures | Repeated vomiting |
| Can't recognize people or places | Weakness/numbness in limbs | Slurred speech |
| Deteriorating consciousness | Looks very drowsy | Focal neurological signs |
| Increasing confusion or irritability | Severe neck pain | Unusual behavior change |

## Diagnosis

Concussion            Y    N

## Follow Up

| | | | |
|---|---|---|---|
| Referral to hospital | Y | N | (Name of hospital) |
| Discharge to care of responsible adult | Y | N | |
| Given concussion injury advice | Y | N | |
| Concussion injury advice sheet given to person monitoring the concussed athlete | Y | N | |
| No follow-up required | Y | N | |

Signed:                                    Contact No.:

## Athlete Information

**Notes**

### - Concussion / Head Injury

Any athlete suspected of having a concussion should be removed from play, and then seeks medical evaluation.

#### Signs to watch for

Problems could arise over the first 24-48 hours. The athlete should not be left alone and must go to a hospital at once if they:

- Have a headache that gets worse.
- Are very drowsy or can't be awakened.
- Can't recognize people or places.
- Have repeated vomiting.
- Behave unusually or seem confused; are very irritable.
- Have seizures (arms and legs jerk uncontrollably).
- Have weak or numb arms or legs.
- Are unsteady on their feet; have slurred speech.

**Remember, it is better to be safe.**

Consult your doctor after a suspected concussion.

### Concussion Management - 6 Day Return to Play Rehabilitation Plan

| Rehabilitation Stage | Functional Exercise at Each Stage of Rehabilitation | Objective at Each Stage | Adult | U6-20s |
|---|---|---|---|---|
| REST | None | Rest | 14 Days | 14 days |
| 1. No activity | Complete physical and cognitive rest | Recovery | 1 day | |
| 2. Light aerobic exercise | Walking, Swimming or stationary cycling keeping intensity <70% MPHR. No resistance training | Increase heart rate | 1 day | 2 days |
| 3. Sport-specific exercise | Running drills. No head impact activities | Add movement | 1 day | 2 days |
| 4. Non-contact training drills | Progression to more complex training drills (e.g. passing drills). May start progressive resistance training) | Exercise, coordination, cognitive load | 1 day | 2 days |
| 5. Full contact practice | Following medical clearance, participate in normal training activities | Restore confidence, assessment of functional skills by coaching staff | 2 days | 2 days |
| 6. Return to Play | Player rehabilitated | Recovered | 21 days | 23 days |

**Allow 24 hours for each rehabilitation stage. If signs or symptoms persist at any rehabilitation stage do not allow the player to move onto the next step until symptom free. Always seek medical advice and clearance.**

---

## Concussion Injury Advice
(To be given to the person monitoring the concussed player)

This patient has received an injury to the head.  A careful medical examination has been carried out and no sign of any serious complications has been found. Recovery time is variable across individuals and the player will need monitoring for a further period by a responsible adult. Your treating physician will provide guidance as to the timeframe.

**If you notice any changes in behaviour, vomiting, dizziness, worsening headache, double vision, or excessive drowsiness, please contact your doctor or the nearest hospital emergency department immediately.**

#### Other important points:

- Rest (physically and mentally), including training or playing sports until symptoms resolve and you are medically cleared.
- No alcohol.
- No prescription or non-prescription drugs without medical supervision. Specifically:
  - No sleeping tablets.
  - Do not use aspirin, anti-inflammatory medication or sedating pain killers.
- Do not drive until medically cleared.
- Do not train or play sport until medically cleared.

**Patients Name**

**Date / time of injury**

**Time/Date of medical review**

**Treating Physician**

Contact Stamp or Details

SCAT3™ Concussion Assessment Tool (For use by medical professionals only)

  

This tool does not constitute, and is not intended to constitute, a standard of medical care.  It is a guide derived from the Standardized Concussion Assessment Tool 2 (SCAT2) (McCrory, et al, BJSM '09) and represents a standardized method of evaluating NFL players for concussion consistent with the reasonable, objective practice of the healthcare profession.  This guide is not intended to be a substitute for the clinical judgment of the treating healthcare professional and should be interpreted based on the individual needs of the patient and the specific facts and circumstances presented.

**NFL Sideline Concussion Assessment Tool: Completed by healthcare professional. Athlete completes symptoms at bottom.**

Athlete _____ Position _____ Team _____ Evaluator _____ ATC / MD / DO

Evaluation date_____ time _____am / pm **Injury date** _____ **time** _____ am / pm **during** ☐ Game ☐ Practice ☐ Other _____

**Mechanism of injury** ☐ head to head ☐ elbow to head ☐ knee to head ☐ ground to head ☐ blow to body

☐ other mechanism _____ ☐ unknown mechanism

**Penalty called** ☐ Yes ☐ No          Other circumstances _____

---

**This concussion assessment tool contains an assessment of orientation, memory, concentration, balance & symptoms. This tool is intended to be used in conjunction with your clinical judgment. If UNDERLINE ANY significant abnormality is found, a conservative, "safety first" approach should be adopted. An athlete suspected of sustaining a concussion is a "No Go" and does not return to play in the same game or practice.**

---

**ANY OF THE FOLLOWING ARE OBVIOUS SIGNS OF DISQUALIFICATION (i.e. "No Go"):**

| | | |
|---|---|---|
| 1) **LOC or unresponsiveness?** (for any period of time) If so, how long? _____ | ☐ Y | N |
| 2) **Confusion?** (any disorientation or inability to respond appropriately to questions) | ☐ Y | N |
| 3) **Amnesia (retrograde / anterograde)?** If so, how long? _____ | ☐ Y | N |
| 4) **New and/or persistent symptoms: see checklist?** (e.g. headache, nausea, dizziness) | ☐ Y | N |
| 5) **Abnormal neurological finding?** (any motor, sensory, cranial nerve, balance issues, seizures) **or** | ☐ Y | N |
| 6) **Progressive, persistent or worsening symptoms?**  If so, consider cervical spine and/or a more serious brain injury (See box below) | ☐ Y | N |

Other _____  **Total Physical Signs Score: (total above ☐ Yes scores) of 6 = _____**

---

**Neurological Screen for Cervical Spine and/or More Serious Brain Trauma**

| | | |
|---|---|---|
| Deteriorating mental status? | Y | N |
| Any reported neck pain, cervical spine tenderness or decreased range of motion? | Y | N |
| Pupil reaction abnormal or pupils unequal? | Y | N |
| Extra-ocular movements abnormal and/or cause double vision? (difficulty tracking and/or reading) | Y | N |
| Asymmetry or abnormalities on screening motor or sensory exam? | Y | N |

---

| **ORIENTATION / SAC** | of 5 = _____ | | **ORIENTATION / Maddock's Questions** | of 5 = _____ | |
|---|---|---|---|---|---|
| What month is it? | 0 | 1 | Where are we? | 0 | 1 |
| What is the date today? | 0 | 1 | What quarter is it right now? | 0 | 1 |
| What is the day of the week? | 0 | 1 | Who scored last in the practice / game? | 0 | 1 |
| What year is it? | 0 | 1 | Who did we play last game? | 0 | 1 |
| What time is it right now? (within an hour) | 0 | 1 | Did we win the last game? | 0 | 1 |

---

**SAC / Word Recall:** Read list of 5 words 1 per second, ask athlete to repeat list, in any order. (Use of specific lists below optional).  For Trial 2 & 3, read the same list of words again and have athlete repeat them back, in any order. One point for each word remembered.  You must conduct all 3 trials regardless of their success on trial 1. **Do not tell athlete that delayed recall will be tested**

| List 1 | Immediate Recall Trials | | | Alternative Lists | | Delayed recall (perform at end of all sideline testing, at least > 5 minutes) |
|---|---|---|---|---|---|---|
| | #1 | #2 | #3 | | | |
| elbow | _____ | _____ | _____ | candle | baby | _____ |
| apple | _____ | _____ | _____ | paper | monkey | _____ |
| carpet | _____ | _____ | _____ | sugar | perfume | _____ |
| saddle | _____ | _____ | _____ | sandwich | sunset | _____ |
| bubble | _____ | _____ | _____ | wagon | iron | _____ |
| **Total of all three immediate word recalls: out of 15 = _____** | | | | | **Total delayed recall: out of 5 = _____** | |

  

**NFL Sideline Concussion Assessment Tool (continued)**

**Overall Rating;** If you know the athlete well p/t the injury, how different is the athlete acting compared to his usual self?

**Check one;**  ☐ No different  ☐ Very different  ☐ Unsure

**SAC / Concentration:** Read string of numbers, ask athlete to repeat backwards. (Use of specific numbers below optional). If correct go to the next string length. If incorrect, read second string (same length) 1 point for each string length correct. Stop after incorrect on both trials. Read digits at rate of 1 digit /sec

| Digits Backward: | | Alternative digit lists | |
|---|---|---|---|
| 4-9-3 | 0  1 | 6-2-9 | 5-2-6 |
| 3-8-1-4 | 0  1 | 3-2-7-9 | 1-7-9-5 |
| 6-2-9-7-1 | 0  1 | 1-5-2-8-6 | 3-8-5-2-7 |
| 7-1-8-4-6-2 | 0  1 | 5-3-9-1-4-8 | 8-3-1-9-6-4 |

1 point for each sequence correct of 4 = _____

**SAC / Concentration cont.** Months in reverse order
Dec - Nov - Oct - Sept - Aug - Jul - Jun - May - Apr - Mar - Feb - Jan

1 point for months in reverse correctly (<30 sec) = _____

**Total of SAC Concentration of 5 = _____**

**Modified BESS:** This is calculated by adding 1 error point for each error during the three 20-sec tests. The maximum total # of errors for any single condition is 10. The higher the score, the worse is the player's balance.

**Balance testing – types of errors**
1. Hands lifted off iliac crest
2. Opening eyes
3. Step, stumble, or fall
4. Moving hip into > 30 degrees abduction
5. Lifting forefoot or heel
6. Remaining out of test position > 5 sec

| Which foot tested (non-dominant foot) | ☐ L  ☐ R |
|---|---|
| Double leg stance (feet together) | # errors ___ |
| Single leg stance (non dominant foot) | # errors ___ |
| Tandem stance (non dominant foot at back) | # errors ___ |

**BALANCE SCORE: (summed # of errors) = _____**

Signs and symptoms of concussion may be delayed, and therefore it may be prudent to remove an athlete from play, not leave them alone, and serially monitor them over a period of time. **WHEN IN DOUBT, TAKE A "TIME OUT"**

**SCORING**
| | |
|---|---|
| All Physical Signs Score: (total # ☐ Yes) | = ___ of 6 |
| Maddock's score: | = ___ of 5 |
| All SAC scores: (summed orange boxes) | = ___ of 30 |
| Balance Score: (summed BESS Errors) | = ___ |
| Symptom Score: (# symptoms reported) | = ___ of 24 |

ALL SCORES SHOULD BE COMPARED WITH BASELINE VALUES FOR THE INDIVIDUAL ATHLETE

**The following symptom checklist should be completed by the athlete**

**How do you feel?** The athlete should score themselves on the following symptoms, as applicable, based on how they feel at the time.  (i.e.  0 = not present, 1 = mild, 3 = moderate, 6 = severe)

| | | | |
|---|---|---|---|
| Headache / head pressure | 0 1 2 3 4 5 6 | Feeling slowed down | 0 1 2 3 4 5 6 |
| Nausea / vomiting | 0 1 2 3 4 5 6 | Sensitivity to noise | 0 1 2 3 4 5 6 |
| Neck pain | 0 1 2 3 4 5 6 | Sensitivity to light | 0 1 2 3 4 5 6 |
| Drowsiness | 0 1 2 3 4 5 6 | Visual problems/ blurred vision | 0 1 2 3 4 5 6 |
| Balance problems | 0 1 2 3 4 5 6 | Sleeping more than usual | 0 1 2 3 4 5 6 |
| Dizziness | 0 1 2 3 4 5 6 | Sleeping less than usual | 0 1 2 3 4 5 6 |
| Fatigue / low energy | 0 1 2 3 4 5 6 | Trouble falling asleep | 0 1 2 3 4 5 6 |
| Confusion | 0 1 2 3 4 5 6 | Sadness | 0 1 2 3 4 5 6 |
| "Don't feel right" | 0 1 2 3 4 5 6 | Nervous or anxious | 0 1 2 3 4 5 6 |
| Feeling "in a fog" | 0 1 2 3 4 5 6 | Feeling more emotional | 0 1 2 3 4 5 6 |
| Difficulty remembering | 0 1 2 3 4 5 6 | Irritability | 0 1 2 3 4 5 6 |
| Difficulty concentrating | 0 1 2 3 4 5 6 | Numbness or tingling | 0 1 2 3 4 5 6 |

| | | | | |
|---|---|---|---|---|
| Do symptoms worsen with physical activity? | Y  N | **Total # symptoms** | = ___ of 24 |
| Do symptoms worsen with mental activity? | Y  N | Symptom Severity (max 24 X max 6) | = ___ of 144 |



(c) LearningRadiology.com
All Rights Reserved



Table 1

| Plaintiff | Defendant | Court | Docket # | Capacity | On behalf of: |
|---|---|---|---|---|---|
| Susan Middlebrooks | Charlotte Knight | SC: Oconee | 2014-CV-0458-H | Court appearance | Defense |
| Piper Slattery | Hurricane Towing, LLC | SC: Rockdale | 2016SV1457 | Deposition | Defense |
| Charles Branson | Norfolk Southern Railway Co., et al | SC: Burke | 2015-S-0021 | Deposition | Defense |
| Robert Barrett et al | Richard Hutchins | SC: Gilmer | 2016-CV260 | Deposition | Plaintiff |
| Michael Hutchins | Thomas Searcy | SC: Gwinnett | 16C00316-2 | Deposition | Plaintiff |
| Chris Bishop | Dylan Newman et al | SC: Cobb | 16-A-2782 | Court appearance | Plaintiff |
| Janna English et al | Jesus Enrique Jr et al | SC: Gwinnett | 16-C-03501-S4 | Deposition | Plaintiff |
| Ernest Wise | Christopher Reid | SC: Rockdale | 2017-SV-1810 | Deposition | Plaintiff |
| Darren Ward | Carpet Cheap LLC et al | SC: Cobb | 17-A-1932-2 | Deposition | Plaintiff |
| Robin Garson | Simon Property Group et al | SC: Fulton | 16-EV001398 | Deposition | Defense |
| Pereira, Jose | J.S. 82 Construction Group | SBWC: Georgia | 2017—22891 | Deposition | Plaintiff |